UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re CERIDIAN CORPORATION SECURITIES LITIGATION | ) ) ) | Civil No. 04-CV-03704 (PJS/RLE) |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL |
| ALL ACTIONS. | ) ) | SECURITIES LAWS |
| | ) | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     JURISDICTION AND VENUE .................................................................... 5

III.    THE PARTIES ............................................................................................... 5

IV.     BACKGROUND ............................................................................................ 7

V.      DEFENDANTS' ACCOUNTING SCHEMES AND FRAUDULENT
        COURSE OF CONDUCT ............................................................................. 8

        A.      Defendants Were Expressly Told About Ceridian's Accounting
                Fraud and Lack of Internal Controls as Early as 2001 by an Internal
                Whistleblower but Continued to Manipulate the Company's
                Financial Results ........................................................................................ 8

        B.      The Formal Findings of Occupational Safety and Health
                Administration Confirm that Ceridian "Knew" About Fraudulent
                Accounting Manipulations During the Class Period ................................... 11

        C.      The Statutory Objections Filed by Whistleblower #1 Confirm that
                Ceridian Attempted to Cover Up the Accounting Fraud During the
                Class Period ............................................................................................... 12

        D.      Defendants' Accounting Schemes Resulted in Five Separate
                Financial Restatements Impacting Over Four Years of Company
                Financial Results ........................................................................................ 12

        E.      RESTATEMENT # 1: Announced on February 18, 2004 ......................... 14

                1.      Improper Revenue Recognition Related to the Company's
                        Sale of Stored Value Cards ............................................................. 14

                2.      Ceridian's July 2003 Change in Revenue Recognition Policy
                        Violated GAAP ............................................................................... 16

                3.      Ceridian Later Admits that Its July 2003 Change in Revenue
                        Recognition Policy Violated GAAP ................................................ 18

                4.      Defendants Provided Conflicting Information Regarding
                        Their Involvement in the Decision to Change the Revenue
                        Recognition Policy .......................................................................... 20

**Page**

5.  Defendants Admit to Knowing About Revenue Recognition Issues Prior to Restatement #1 ........................................................ 23

6.  Defendants' Revenue Recognition Scheme Results in Tens of Millions of Dollars of False Revenues and Earnings ....................... 24

F.  RESTATEMENT #2: Announced on October 18, 2004 ........................... 25

1.  Improper Accounting for Expenses Related to Internal-Use Software ..................................................................... 25

2.  Improper Revenue Recognition ...................................................... 28

3.  Excessive Restructuring Charges .................................................... 30

4.  Improper Reserve Accounting and Accrual Adjustments ............... 31

5.  Company Admissions Regarding Restatement #2 .......................... 31

G.  RESTATEMENT #3: Announced on December 15, 2004 and January 31, 2005 ...................................................................... 34

1.  Improper Accounting for Derivative Instruments ........................... 35

2.  Improper Revenue Recognition ...................................................... 37

3.  Misclassification of Certain Cost and Expense Categories ............ 38

4.  Misclassification of Certain Assets and Liabilities ........................ 39

5.  Company Admissions Regarding Restatement #3 .......................... 39

H.  RESTATEMENT #4: Announced on March 17, 2005 .............................. 44

I.  RESTATEMENT #5: Announced on April 15, 2005 ................................ 45

1.  Improper Accounting for Scheduled Rent Increases ...................... 45

2.  Improper Accounting for International Operations ......................... 45

3.  Improper Reserve Accounting and Accrual Adjustments ............... 46

4.  Improper Accounting for Certain Balance Sheet Accounts ............. 47

5.  Improper Accounting for Income Tax Reserves .............................. 47

**Page**

J.     Ceridian's Fraudulent System of Internal Controls ................................... 47

     1.     Ceridian's Violations of SEC Regulations Due to Its
Inadequate Internal Controls ............................................................ 47

     2.     Material Weaknesses ........................................................................ 48

     3.     Significant Deficiencies ................................................................... 50

     4.     The Company's April 21, 2005 Admissions Regarding the
Lack of Internal Controls ................................................................ 51

K.     Defendants' Insider Trading Scheme ........................................................ 55

L.     Defendants' Compensation and Bonuses Were Tied Directly to
Ceridian's Earnings Targets and Were Suspiciously Changed to
Avoid Any Impact of the Restatements ..................................................... 57

     1.     Turner's Compensation Structure .................................................... 58

     2.     Eickhoff's Compensation Structure ................................................. 59

     3.     Other Top Ceridian Executives ....................................................... 60

M.     Statements from Former Ceridian Senior Vice Presidents and
Financial Personnel Reinforce the Strong Inference of Scienter ............... 61

N.     The Unusual Circumstances Surrounding the Departure of
Ceridian's Top Financial Officers Confirms the Strong Inference of
Scienter .................................................................................................... 63

O.     The Expanded SEC Investigation Reinforces the Strong Inference of
Scienter .................................................................................................... 65

P.     The Pervasiveness and Magnitude of the Company's Five
Restatements Reinforce Scienter .............................................................. 66

Q.     The Company's Fraudulent Financial Reporting Impacted the Core
Operations of the Company, Which Gives Rise to a Presumption of
Knowledge................................................................................................ 66

VI.     FALSE AND MISLEADING STATEMENTS ................................................... 68

A.     False 1Q03 Statements .............................................................................. 68

**Page**

B.    Reasons Why the 1Q03 Statements Were False and Defendants Knew It ...................................................................................... 72

C.    False 2Q03 Statements ................................................................. 73

D.    Reasons Why the 2Q03 Statements Were False and Defendants Knew It ...................................................................................... 76

E.    False 3Q03 Statements ................................................................. 78

F.    Reasons Why the 3Q03 Statements Were False and Defendants Knew It ...................................................................................... 81

G.    False 4Q03 and FY03 Statements ................................................ 82

H.    Reasons Why the 4Q03 and FY03 Statements Were False and Defendants Knew It ..................................................................... 88

I.    False 1Q04 Statements ................................................................. 90

J.    Reasons Why the 1Q04 Statements Were False and Defendants Knew It ...................................................................................... 93

K.    False 2Q04 Statements ................................................................. 98

L.    Reasons Why the 2Q04 Statements Were False and Defendants Knew It .................................................................................... 101

M.    3Q04 False Statements .............................................................. 103

N.    Reasons Why the 3Q04 Statements Were False and Defendants Knew It .................................................................................... 108

O.    Additional Adverse Facts Leak Out ........................................... 110

P.    False 2005 Statements ............................................................... 111

Q.    Reasons Why the 2005 Statements Were False and Defendants Knew It .................................................................................... 112

VII.    POST-CLASS PERIOD ADMISSIONS ............................................... 114

VIII.    CERIDIAN'S FALSE FINANCIAL REPORTING AND GAAP VIOLATIONS .................................................................................... 117

**Page**

A.     Ceridian's Five Restatements .................................................................... 117

B.     Ceridian's Financial Statements Violated Fundamental Concepts of GAAP ......................................................................................................... 119

C.     Improper Revenue Recognition ............................................................... 121

D.     Improper Expense Reporting .................................................................... 122

E.     Improper Accounting for Derivatives ....................................................... 127

F.     Improper Accounting for Operating Leases .............................................. 127

G.     Ceridian Lacked Adequate Internal Controls ........................................... 128

IX.     LOSS CAUSATION .......................................................................................... 130

X.     FIRST CLAIM FOR RELIEF .......................................................................... 136

XI.     SECOND CLAIM FOR RELIEF ...................................................................... 137

XII.     CLASS ACTION ALLEGATIONS ................................................................... 138

XIII.     PRAYER FOR RELIEF .................................................................................... 139

XIV.     JURY DEMAND ............................................................................................... 139

## I.     INTRODUCTION

1.     Lead Plaintiff Western Pennsylvania Electrical Employees Benefits Funds ("Western Pennsylvania") brings this securities fraud class action on behalf of all persons who acquired the publicly traded securities of Ceridian Corporation ("Ceridian" or the "Company") between April 17, 2003 and March 17, 2005, inclusive (the "Class Period") and suffered damages as a result of defendants' violations of the federal securities laws.

2.     Ceridian is an information processing and services company providing management solutions in the areas of human resources, transportation and retail.  During the Class Period, the Company, its Chief Executive Officer ("CEO") Ronald Turner, Chief Financial Officer ("CFO") John "Jack" Eickhoff, and Corporate Controller and "Principal Accounting Officer" Loren "Buzz" Gross (collectively the "Individual Defendants"), engaged in a massive accounting scheme to inflate Ceridian's financial results and its stock price.   Defendants' scheme consisted of numerous accounting manipulations which inflated the Company's revenues, earnings and assets, understated its costs and expenses, and misrepresented the overall financial condition of the Company. These financial manipulations caused the artificial inflation of Ceridian's stock price from $13.55 on the first day of the Class Period, to a Class Period high of over $23.00 per share.

3.     Defendants' accounting manipulations were so numerous and widespread that the Company was forced to restate its financial results on *five* separate occasions.  The restatements spanned five years of Ceridian's financial results and erased tens of millions in revenues and earnings from the Company's books.  In four particularly problematic quarters during the Class Period (3Q03, 4Q03, 1Q04 and 3Q04), the Company was forced to admit that its earnings per share ("EPS") results were overstated by ***35%, 43%, 31%, and 36%***, respectively.  In the most blatantly fraudulent quarter during the Class Period, EPS results were overstated by over ***100%***, from a gain of

- 1 -

$0.15 per share to a *loss* of ($0.02) per share.  The impact of the restatements on Ceridian's EPS

results during the Class Period is illustrated by the following chart:



4.      As illustrated above, the magnitude and severity of the Company's five restatements

confirms that the accounting violations were not the result of a few minor errors or

misinterpretations of Generally Accepted Accounting Principles ("GAAP").[1]  Defendants violated

the most fundamental rules of accounting such as revenue recognition and expense reporting, and

---

[1]      GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual financial statements.

flouted numerous basic principles of financial disclosure.  In fact, the Company was forced to change its revenue recognition policy *twice* in the span of one year during the Class Period, due to improper revenue accounting.  Defendants' accounting manipulations were so egregious that they are currently the subject of a formal ongoing investigation by the Securities and Exchange Commission ("SEC") which began during the Class Period and was subsequently broadened in scope as additional accounting violations came to light.  The Company also replaced its top two financial officers (CFO Eickhoff and Controller Gross) and other personnel implicated in the fraud. The events occurring during the Class Period are illustrated in the chart attached hereto as Exhibit ("Ex.") A.

5.      Defendants' motive for engaging in the fraudulent accounting schemes and inflating the Company's financial results was simple – money.  During the height of the fraud in 2003, before the revelation of the five restatements and SEC investigation, defendants Turner and Eickhoff dumped hundreds of thousands of Ceridian shares for $4 million in illicit insider trading proceeds. Turner and Eickhoff also had over $1 million each in bonuses tied specifically to the Company's false EPS and revenue results in 2003 and 2004, giving them a powerful incentive to falsify the numbers.  Importantly, in 2004, the year most severely impacted by the restatement, the Company disclosed that it was withholding Turner and Eickhoff's annual bonuses.

6.      Recently, new documents have come to light confirming that Ceridian's top executives were aware of the accounting manipulations as early as 2001 and continued the fraud throughout the Class Period.  Indeed, according to documents filed with the U.S. Department of Labor by a Company whistleblower and former Director of General Accounting ("Whistleblower #1"), defendants were well aware of Ceridian's accounting improprieties beginning in 2001. Whistleblower #1 personally told defendant Buzz Gross and other executives about the accounting manipulations occurring at Ceridian.  Whistleblower was later "neutralized" and then terminated for

raising her accounting concerns. Governmental findings also reveal that Ceridian admitted that at least 14 of its employees affirmatively "knew" that the Company was inflating its financial results through improper accounting. Suspiciously, defendants Eickhoff and Gross announced their "resignations" from the Company around the same time that Ceridian terminated 14 other employees for purportedly manipulating the Company's books.

7.     Whistleblower #1 ultimately filed a lawsuit against Ceridian for violating the employee protection provisions set forth in Section 806 of the Sarbanes Oxley Corporate and Criminal Fraud Accountability Act of 2002, 18 U.S.C. §1514A, et seq. ("Sarbanes-Oxley"). That lawsuit was recently settled by Ceridian for an undisclosed amount. At least one additional former Ceridian employee also filed a lawsuit against Ceridian under Sarbanes-Oxley, and the Company has admitted that another whistleblower ("Whistleblower #2") came forward to raise accounting concerns during the Class Period which ultimately led to the expanded SEC investigation.

8.     Defendants' fraud has plagued the Company and its shareholders. In addition to the millions in revenue and earnings erased in the five restatements, the Company is still under formal investigation by the SEC, and has paid millions in investigation costs and remedial measures. In fact, according to Ceridian's most recent SEC filings, on June 15, 2005, Ceridian received a subpoena from the SEC seeking certain additional documents that relate to areas such as "Ceridian's restatements, revenue recognition, capitalization, expense recognition, ***how we respond to any internal ethics complaints***, and Ceridian's accounting policies and procedures." In contrast, the Individual Defendants walked away with over $4 million in insider trading proceeds and millions more in bonuses and stock options awards.

## II.  JURISDICTION AND VENUE

9.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act" or the "Exchange Act").  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

10.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the acts alleged herein, including the dissemination of misleading statements and omissions substantially occurred in this District.

11.     In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications and the facilities of national securities exchange markets.

12.     The Company's corporate headquarters are in Minneapolis, Minnesota where the daily operations of the Company were directed and managed.

## III.     THE PARTIES

13.     The Lead Plaintiff in this action is Western Pennsylvania.  Western Pennsylvania purchased Ceridian securities at artificially inflated prices during the Class Period and suffered economic damages due to defendants' misconduct.

(a)     Plaintiffs Richard Shaller, Edmund Biancarelli, Sharon Zaks, Ellen Lear, Garco Investments, and Bruce Valentine Mickan each filed actions against substantially the same defendants alleging violations of the federal securities laws.  These actions have been consolidated into this action.  Lead Plaintiff Western Pennsylvania is acting as Lead Plaintiff on behalf of these plaintiffs and the plaintiff class.

(b)     Plaintiffs Shaller, Biancarelli, Zaks, Lear, Garco Investments, and Mickan all purchased Ceridian securities at artificially inflated prices during the Class Period and were damaged thereby, as reflected in the certifications attached to their respective complaints.

- 5 -

14.     Defendant Ceridian is a public corporation which has its principal place of business located at 3311 East Old Shakopee Road, Minneapolis, Minnesota 55425.  According to the Company's most recent Form 10-K filed with the SEC, Ceridian is an information services company specializing in the human resource, transportation and retail markets. The Company is divided into two business segments: (1) HRS, which offers a broad range of human resource services, including payroll processing, tax filing, benefits services and employee assistance programs, and (2) Comdata, a subsidiary of Ceridian which provides transaction processing, financial services and regulatory compliance services primarily to the transportation and retail industries.  Ceridian stock trades on the New York Stock Exchange under the ticker symbol "CEN."

15.     Defendant Turner was the CEO and President of Ceridian during the Class Period.  In April 2006, Turner announced that he would be retiring his post as CEO.  Turner assisted in the preparation of Ceridian's false financial statements and repeated the contents to the market.  Turner signed and certified the quarterly and year-end financial statements filed with the SEC and approved the Company press releases during the Class Period.  Turner also signed sworn certifications pursuant to Sarbanes-Oxley attesting to the truth and accuracy of Ceridian's financial statements and its systems of internal controls.  During the Class Period, Turner sold 51,000 shares of his Ceridian stock for proceeds of $1.01 million, while in possession of material, adverse, undisclosed information about Ceridian.

16.     Defendant Eickhoff was the CFO of Ceridian during the Class Period.  Eickhoff participated in the preparation of the false financial statements and disseminated the information to the market.  Eickhoff signed and certified the quarterly and year-end financial statements filed with the SEC and approved the Company press releases during the Class Period.  Eickhoff also signed sworn certifications pursuant to Sarbanes-Oxley attesting to the truth and accuracy of Ceridian's financial statements and its systems of internal controls.  During the Class Period, Eickhoff sold

- 6 -

165,298 shares of his Ceridian stock for proceeds of $2.9 million, while in possession of material, adverse, undisclosed information about Ceridian.  In December 2004, Eickhoff suspiciously announced that he would be leaving the Company in the midst of the SEC investigation.

17.     Defendant Buzz Gross was Ceridian's Corporate Controller and "Principal Accounting Officer."  Gross participated in the preparation of the Company's financial statements and disseminated the information to the market.  Gross also signed the quarterly and year-end financial statements filed with the SEC.  In December 2004, Gross suspiciously announced his abrupt departure from the Company in the middle of the SEC investigation.

18.     Defendants Turner, Eickhoff and Gross are the Individual Defendants.  In addition to the statements directly attributed to each of the Individual Defendants, they are liable for the false statements pleaded in §VI., as those statements were "group-published" information.

## IV.     BACKGROUND

19.     Ceridian is a Minneapolis-based information services company specializing in the human resource, transportation and retail markets.  Ceridian collects, manages and analyzes data, processes transactions, and provides customers with related products, software applications and services.  The Company is divided into two main units – HRS and Comdata.  In 2003, HRS accounted for 70% of Ceridian's total revenues, and Comdata brought in the remaining 30%.  In 2004, 73% of the Company's revenues were generated by HRS, and 27% by Comdata.

20.     HRS provides a broad range of human resource services to assist its customers in managing their work forces.  The division focuses on information management, human resource administration and employee assistance services and software.  More specifically, HRS offers payroll processing and integrated human resource information systems solutions, tax filing services, benefits administration, qualified retirement and other plan administration, regulatory compliance services, work-life effectiveness, and employee-assistance programs.  A key element to the HRS

business is its ability to timely develop and implement the appropriate technology-based solutions for its customers.  HRS must integrate its human resource solutions with its customers' other acquired services and in-house applications.  According to the Company's Form 10-K filed on April 20, 2005, HRS's revenues in 2003 and 2004 were $894.2 and $964.4 million, respectively.

21.     Comdata, a subsidiary of Ceridian, provides transaction processing services, financial services, and regulatory compliance services for the transportation and retail industries. Comdata is a major payment processor and issuer of credit cards, debit cards and stored value cards.   Within the transportation industry, Comdata's principal market is the trucking industry.  Comdata provides its clients with a credit/debit-type of card which truckers use for fuel and other expenses during trips and which allows the trucking companies to monitor and control these expenses and obtain trip information.  Additionally, Comdata assists clients in obtaining regulatory permits and with other compliance services such as fuel tax reporting and driver log auditing.

22.     Through its retail services division, Comdata provides stored value cards and employer pay cards to customers in the retail industry.  Included in this division is Stored Value Systems ("SVS"), a wholly owned subsidiary of Comdata.  SVS is a retail services unit that offers rechargeable private label gift and cash cards as well as other transaction processing services to retailers, grocery and restaurant chains, and entertainment companies.  In 2003 and 2004, SVS generated revenues of $319.7 and $356.0 million, respectively.

## V.     DEFENDANTS' ACCOUNTING SCHEMES AND FRAUDULENT COURSE OF CONDUCT

### A.     Defendants Were Expressly Told About Ceridian's Accounting Fraud and Lack of Internal Controls as Early as 2001 by an Internal Whistleblower but Continued to Manipulate the Company's Financial Results

23.     Long before Ceridian began leaking its massive financial restatements to the market, Whistleblower #1 began to voice concern over Ceridian's financial manipulations directly to

Ceridian's top executives, including defendant Buzz Gross.  Whistleblower #1 was the "Director of General Accounting" from at least 2001-2004 and was responsible for supervising the team of personnel creating certain entries to Ceridian's general ledger and ensuring the proper consolidation of subledgers.

24.     According to a formal complaint and sworn declaration filed by Whistleblower #1 against Ceridian on December 11, 2004 for violation of the employee protection provisions of the Sarbanes-Oxley Act, during 2Q01, Ceridian "***improperly reported its income and expenses on its financial books of account providing the basis for financial statements to its shareholders***."  Ex. B at 1 (emphasis added).  Copies of Whistleblower #1's complaint and sworn statement of facts are attached hereto as Exs. B and C.  Specifically, Whistleblower #1 stated that Ceridian engaged in improper revenue recognition and expense reporting, and conducted an internal project called "Sprint to the Finish" whereby the Company manipulated its financial results to artificially inflate earnings.  Ex. C at 1.

25.     Whistleblower #1 informed Ceridian's management of the improprieties on several occasions in 2001, including defendant Buzz Gross, as well as Ceridian's "internal auditors" and financial personnel responsible for SEC compliance.  Ex. C.  Whistleblower #1 was told by her supervisor Dan Dolan (who reported to defendant Gross) that "***orders were being overstated because Ceridian executives believe that stock analysts did not have the patience to wait 2 quarters for Ceridian to show a turnaround***."  *Id.* at 1 (emphasis added).  Whistleblower #1 also met personally with defendant Gross to express her concerns with the improper accounting and confirmed that Gross reviewed and approved the improprieties.  *Id.* at 2.

26.     According to Whistleblower #1's sworn statements after she raised the accounting concerns to management, a meeting was held between several top officers of the Company, including defendant Buzz Gross, to discuss the Company's SEC filings and financial disclosures.

Whistleblower #1 was told that during the meeting, the group, including Gross, had decided to "neutralize" or "de-fang" Whistleblower #1 by including her in the accounting meetings. The specific dates of the meetings and facts described above are set forth in Exs. C and D.

27.     Whistleblower #1's complaint under Sarbanes-Oxley attached handwritten notes and other documents such as email, created contemporaneously with the events described above. Those notes and documents are attached hereto as Ex. D. The documents confirm that Whistleblower #1 personally met with defendant Buzz Gross to voice her concerns about Ceridian's improper accounting. The notes also stated that "[a]t the 2nd Q preview mtg on June 26, we forecasted revenue $6-$7 million below the actual number. Then actuals came in higher b/c of the revenue 'exercise.'" Ex. D at 10. Importantly, the notes also expressed alarm that there was no way to raise accounting concerns to a "disinterested third party" at Ceridian because "[a]ll potential listeners were tied to Jack [Eickhoff], Tony [Holcomb], Ron [Turner]." *Id.* at 7.

28.     Whistleblower #1's notes reflected her deep concerns about Ceridian's overall integrity:

> ***I am appalled at the cheating***
>
> ***I am horrified by the positive recognition of the people and the process of cheating.***
>
> ***I am disappointed in KPMG's lack of reaction (per Jan M.)***
>
> ***I am disappointed in the lack of reaction by the executives***
>
> ***I am offended by Ron Turner's ethics presentation in July [2001].***

*Id.* at 10.

29.     On November 1, 2004, Whistleblower #1 was terminated.  On December 11, 2001,

Whistleblower #1 filed a complaint for violations of the whistleblower provisions of the Sarbanes-

Oxley Act.[2]

> **B.     The Formal Findings of Occupational Safety and Health Administration Confirm that Ceridian "Knew" About Fraudulent Accounting Manipulations During the Class Period**

30.     On April 25, 2005, the Regional Administrator of the Occupational Safety and Health

Administration ("OSHA"), acting on behalf of the U.S. Department of Labor, issued written findings

with respect to Whistleblower #1's complaint under Sarbanes-Oxley.  A copy of the findings is

attached as Ex. E.  Although the findings concluded that Whistleblower #1 did not meet all of the

elements of an unlawful termination claim under Sarbanes-Oxley, Whistleblower #1 exercised her

statutory rights to file formal objections and request a hearing with an Administrative Law Judge

(ALJ).  Those objections are attached hereto as Ex. F.

31.     The findings of OSHA confirm that Ceridian "knew" about accounting manipulations

during the Class Period which eventually resulted in Ceridian's five restatements.  Specifically,

OSHA's findings cited to an internal investigation at Ceridian revealing that "*fourteen employees,*

*including [Whistleblower #1], engaged in inappropriate deferral of expenses that inflated*

*[Ceridian's] financial information in violation of GAAP*."  Ex. E at 2 (emphasis added).  The

findings also cited Ceridian's admission that "each of the fourteen employees, including

[Whistleblower #1], *knew* these expense deferrals inappropriately inflated [Ceridian's] financial

information and were contrary to GAAP."  *Id.* (emphasis added).  The OSHA findings also

---

[2]     At least one additional employee filed a whistleblower action under Sarbanes-Oxley on December 28, 2004, around the same time as Whistleblower #1.  The results of that claim are unknown at this time.

confirmed that the improper accounting ultimately resulted in Ceridian's restatements.  ("The matter was corrected and [Ceridian's] financial statements were restated.").  *Id.*

C.   **The Statutory Objections Filed by Whistleblower #1 Confirm that Ceridian Attempted to Cover Up the Accounting Fraud During the Class Period**

32.   The formal objections filed by Whistleblower #1 on May 16, 2005 confirm that Ceridian was committing accounting fraud during the Class Period and attempted to deflect blame from the Senior Executives of the Company.  The objections filed by Whistleblower #1 stated that "the erroneous accounting practices complained of were uncorrected and Complainant was transferred to a different job working for one of the parties who had generated the improper accounting practices."  Ex. F at 1.  Whistleblower #1's objections also stated that her transfer "created a hostile environment and exercised a chilling effect upon her employment."  *Id.*  The objections also disputed the integrity of Ceridian's internal investigation and stated that Whistleblower #1 "***was part of a group terminated in Ceridian's effort to protect senior management personnel by attempting to pin blame on subordinates.***"  Ex. F at 2 (emphasis added).  Finally, the objections stated that "[c]omplainant exercized [sic] no decision making in any effort to inappropriately defer expenses."  *Id.*

33.   On May 25, 2006, prior to an ALJ hearing on Whistleblower #1's formal objections, Ceridian settled the case for an undisclosed sum.

D.   **Defendants' Accounting Schemes Resulted in Five Separate Financial Restatements Impacting Over Four Years of Company Financial Results**

34.   Beginning in February 2004, Ceridian began to leak information regarding what would later turn out to be five massive financial restatements due to the Company's accounting manipulations.  The five restatements confirmed that the accounting improprieties occurred in the same areas identified by Whistleblower #1:  revenue recognition and improper expense reporting.

- 12 -

Notably, these two areas were well known by Ceridian to be the "most critical" of the accounting

policies prior to the Class Period.  Indeed, in Ceridian's 2002 Form 10-K filed on March 27, 2003,

the Company stated the following:

> Ceridian's significant accounting policies are described in a note to our
> consolidated financial statements entitled "Accounting Policies."  ***We consider the
> most critical of those policies to be revenue recognition and software and
> development costs recoverability.***

35.    Yet the bulk of the accounting manipulations occurred in those two "critical" areas.

The restatements revealed a litany of other violations which touched upon every aspect of the

Company's financial statements.  Those violations included:

(a)    overstating revenue, net earnings and EPS due to improper revenue
recognition related to the Company's stored value cards;

(b)    overstating income and assets through the improper accounting for the
Company's internal-use software, including the following types of manipulations: capitalizing costs
associated with product fixes and maintenance for the software, capitalizing expenditures prior to
obtaining the requisite management approval for the project, capitalizing overhead costs, failing to
cease capitalization of costs at the appropriate time, failing to timely write-down an impaired
capitalized asset, and accounting for projects that did not meet the criteria to be accounted for as
internal-use software as the Company intended to sell the projects upon completion;

(c)    overstating income through the improper understatement of reserves and
accrual adjustments related to the Company's accounts payable and employee compensation and
benefits liabilities;

(d)    overstating revenue from the following types of manipulations: recognizing
revenue associated with multiple deliverables transactions as separate transactions for accounting
purposes, prematurely recognizing revenue associated with a contract prior to there being formal
acceptance of the contract, failing to defer certain up-front fees associated with a contract and
recognize them over the terms of the contract, recognizing revenue related to a third-party vendor on
a gross basis rather than a net basis, and by prematurely recognizing revenue prior to delivery;

(e)    improper accounting for the Company's derivative instruments;

(f)    mischaracterizing the Company's cost of revenue expense as either selling,
general and administrative expense or research and development expense, thereby overstating gross
profits;

(g)    misclassifying certain of the Company's assets and liabilities;

(h)    taking excessive restructuring charges;

- 13 -

(i)      failing to accelerate the amortization of an abandoned trademark;

(j)      improper accounting for its scheduled rent increases included in the terms of its operating leases;

(k)      improper accounting for its international operations, including accounting for its international acquisitions;

(l)      improper accounting for its balance sheet reserves and accrual adjustments related to its casualty loss reserves, its accrual of commissions and incentives, its prepayments of expenses, and its payroll taxes on third-party contractors in the United Kingdom;

(m)      improper accounting for its balance sheet reserves and accrual adjustments related to its income tax reserves; and

(n)      misclassifying certain balance sheet accounts related to amounts due from customers and taxing authorities, and for its employee benefits accrual.

36.      As the above illustrates, defendants' accounting violations were not limited to one or two mistakes or negligent applications of GAAP.  The entire accounting system was intentionally structured to allow defendants to manipulate virtually every accounting function of the Company at will.  Defendants Turner and Eickhoff issued EPS results that were overstated by as much as *100%* during the Class Period, while simultaneously signing sworn certifications that the Company's reported results "fairly present[ed]" the financial condition of the Company.  Defendant Gross signed the Company's financial statements, attesting to their accuracy and reliability.  These and other representations were false and misleading.

**E.      RESTATEMENT # 1: Announced on February 18, 2004**

**1.      Improper Revenue Recognition Related to the Company's Sale of Stored Value Cards**

37.      One of defendants' principal accounting schemes prior to and during the Class Period was to overstate revenues related to sales of the Company's stored value cards (*e.g.*, gift cards), which are the primary products sold by Ceridian's SVS unit, a division of its Comdata subsidiary. SVS sells stored value cards and provides related services on the cards, such as activation, reporting

and transaction processing services to the retail industry.  SVS represents approximately 10% of Ceridian's overall revenue.

38.     As set forth more fully in §VIII.C., *infra*, GAAP has strict requirements for recognizing revenues on sales transactions involving "multiple deliverables," *i.e.*, multiple elements or services rendered by the seller which are essential to the functionality of the delivered element. Generally speaking, GAAP prohibits recognition of revenue on such transactions until all the "deliverables" or elements are actually delivered to the customer.

39.     Ceridian's sale of stored value cards during the Class Period involved multiple deliverables.  The Company's shipment of the cards was only the first step in the sales transaction. The cards also required activation, processing and other services which were integral to the functionality of the product.  In a typical transaction, those additional deliverables were not usually rendered until six to eight months after the sale and shipment of the cards, when the customer activated the cards and began processing transactions.  Thereafter, approximately 90% of the processing occurred in the first six months after the card was activated with the remaining 10% occurring in the following two years.  Thus, under GAAP, the revenue associated with Ceridian's sale of stored value cards should not have been recognized until all deliverables were actually performed.

40.     Prior to July 1, 2003, defendants improperly recognized revenue from the sale of stored value cards.  Instead of deferring revenue until the cards were actually activated and used as GAAP requires, the Company recognized revenue ratably over a 12-month period, beginning with the period in which the card was shipped.  For example, if the Company entered into a $120.00 sales transaction involving stored value cards in which the cards shipped on January 1, 2003 and servicing began on July 1, 2003, Ceridian would recognize $10.00 of that revenue in January, $10.00 in February, and so on, through December.  This accounting treatment violated GAAP because even

though the cards may have shipped on January 1, 2003, the essential activation and processing did

not occur until six months later.  Thus, prior to July 1, 2003, the Company overstated its revenues

and earnings by improperly recognizing revenue on sales of stored value cards.

### 2.     Ceridian's July 2003 Change in Revenue Recognition Policy Violated GAAP

41.     On June 15, 2003, the Financial Accounting Standards Board ("FASB") issued

Emerging Issue Task Force ("EITF") 00-21 entitled, *Revenue Arrangements with Multiple*

*Deliverables*.  The new rule addressed how and when a revenue transaction involving multiple

deliverables could be divided into separate revenue generating transactions for accounting purposes.

Essentially, the rule allowed revenue to be recognized on separate deliverables if, *inter alia*, the

deliverable had stand-alone value or functionality to the customer and there was objective and

reliable evidence of the fair value of the undelivered item.  *See* §VIII.C., *supra*.  If the separate

deliverables were not independently functional, however, and there was not sufficient evidence of

the fair value of the individual parts of the transaction, then revenue recognition is not proper.

42.     In July 2003, Ceridian announced that it was changing its revenue recognition policy,

purportedly in compliance with GAAP and new EITF 00-21.  Instead of recognizing revenue from

sales of stored value cards over a 12-month period as previously done (which also violated GAAP),

the Company began to recognize revenue immediately upon ***shipment*** of the cards to customers.

Additionally, the Company began recognizing 100% of the revenue associated with the servicing

fees on a straight line basis over a six month period following the activation of the card, even though

typically only 90% of the processing occurred in the first six months.  Defendant Eickhoff explained

this change in an October 15, 2003 conference call and falsely claimed that it would have a positive

effect on the Company's future revenues:

> ***In July, I indicated that we had implemented a minor modification to the way SVS***
> ***revenue is recognized.  The change will affect revenue in the second half of the***

> *year positively by 3 to $4 million and reduced operating income modestly. Most of this occurred in the third quarter.*

In a January 22, 2004 conference call, defendants also discussed the change to the Company's revenue recognition policy and touted a positive impact on the Company's revenue. Defendant Turner stated the following:

> *As a result of the change in revenue recognition rules, we modified the SVS method of recognizing revenue for cards in July of last year, and to a lesser extent also modified transaction processing revenue. For the quarter, the change positively impacted year-over-year revenue by $6 million, and for the six-month period by about $10 million.*

> \*       \*       \*

> One point that I might bring up, Steve, just in case there is any question here, *this accounting change was suggested strongly by our outside auditors and implemented with their full blessing. I just want to make sure everyone understands that. That was done for that reason.*

Defendant Eickhoff also stated:

> Just so we understand what we did here. *What we did was become less conservative. We were amortizing cards over 12 months and now we're taking cards as we ship the cards. That was the biggest single change that was made.*

> 43.     In the question and answer session of the January 22, 2004 conference call, defendant

Eickhoff unequivocally stated that the change in revenue recognition was strictly to comport with a new rule:

> MARK MARCON, ANALYST, WACHOVIA SECURITIES: A couple questions. First of all, Jack, can you go through the reasons why you changed the revenue recognition policies as it relates to SVS earlier in '03?

> JACK EICKHOFF: That was done in July, Mark, and *it was a requirement because of some rules that had changed at that time. And so we made that change in the July timeframe, so it was a rule change, nothing else.*

### 3. Ceridian Later Admits that Its July 2003 Change in Revenue Recognition Policy Violated GAAP

44.     On February 18, 2004, less than eight months after the Company changed its revenue recognition policy for SVS transactions, defendants announced Restatement #1 and curiously disclosed another change to the policy.  The press release stated in part:

> Ceridian Corporation (NYSE: CEN) announced today that it is changing its revenue recognition policy at its Stored Value Systems ("SVS") unit, a wholly owned subsidiary of its Comdata business that provides gift card and related processing principally to the retail industry. The change will be applied retroactively, and is being made with the concurrence of the Company's outside auditors, KPMG LLP.

> ***The change in revenue recognition results from a reassessment of the accounting for revenue related to stored value card sales and transaction processing. The revised policy supersedes the revenue recognition methodology previously applied by the Company for periods prior to July 1, 2003. In addition, the conclusion is that revenue recognition at the SVS unit should not have been revised based on the guidance in EITF Issue 00-21, which was effective for fiscal periods beginning July 1, 2003. The original change in July 1, 2003 was made with the concurrence of our outside auditors.***

> *          *          *

> Ronald L. Turner, Chairman, President and Chief Executive Officer of Ceridian said, "***I want to emphasize that with this revenue recognition change, revenue and profit at SVS have not been lost, but simply deferred and recognized over a longer time period. The vast majority of the change relates to card revenue related to customers for whom we also provide processing***. Revenue from card sales will now be deferred at the time of shipment and revenue will be recognized over approximately the same period as processing occurs. Once processing of cards commences, which can on average take six to eight months from shipment date, recognition of card revenue commences.  Approximately ninety percent of the deferred card revenue will be recognized over the first six months and the remaining ten percent will be recognized up to roughly an additional 24 months. ***The change has no impact on the strength of SVS, its business, its future, or Ceridian's cash flow, business or prospects. SVS continues to be a strong and rapidly growing business for Ceridian, and we believe its prospects are strong***.

> "In our January 22, 2004 press release and webcasted conference call, we set forth in detail the impact of the SVS accounting change that was effective July 2003, so our investors could clearly understand the impact on comparisons to prior years' results. ***Subsequent to our earnings release and conference call, KPMG advised us that we needed to reevaluate our revenue recognition policy at SVS. After extensive discussions and evaluation, the determination was made that our revenue recognition policy at SVS required revision.***

45.     In the same February 18, 2004 press release, defendants expressly denied that the SVS revenue recognition issue was a "specific" focus of the previously disclosed SEC investigation. Yet they admitted that the SEC was beginning to look into the issue after the mysterious changes in the policy:

> **"To our knowledge, revenue recognition at SVS has not been a specific focus of the SEC formal investigation that we reported on January 22, 2004. The SEC Division of Corporation Finance, which typically reviews SEC filings of all public companies, has asked the Company for a fuller explanation of our prior SVS revenue recognition change. This new change in SVS revenue recognition could cause additional inquiries from the SEC."**

46.     During a corresponding conference call on February 19, 2004, defendants again tried to explain why the Company switched the revenue recognition policy twice in only seven months. Turner stated:

> Obviously, we would prefer not to have a conference such as this. The SVS revenue recognition change that we put into effect as of July 1 of 2003 was implemented only after extensive discussion and evaluation internally, and with our outside auditors, whose guidance we ultimately followed. Subsequent to our earnings release and webcasted conference call on January 22, 2004, and our board of directors and audit committee meeting on January 27, our outside auditors, KPMG advised that they were re-evaluating the July 2003 change in their accounting policy at SVS. *After extensive discussions and review, a new guidance from KPMG, which we received late last week, and, actually Tuesday of this week, we again are changing the revenue recognition policy at SVS. I want to emphasize that with this revenue recognition change, revenue and profit at SVS have not been lost, but simply deferred, and will be recognized over a longer period of time. A portion of the revenue and profit has simply gone on the balance sheet as deferred revenue. The change has no impact on the strength of SVS, its business, its future, or its prospects, or for that fact Ceridian cash flow business or business prospects. SVS continues to be a strong and rapidly growing business for Ceridian, and we believe it has a very strong future*.
>
> *To our knowledge, the SVS revenue recognition has not been a specific focus of the SEC formal investigation that we reported on January 22nd. The SEC division of corporate finance, which typically reviews SEC filings of all public companies, had asked us for a broader explanation of our prior SVS revenue recognition change. This new change, however could cause additional inquiries from the SEC.*

Defendant Eickhoff also tried to explain the Company's abrupt change to the revenue recognition

policy:

> The adjustment we are making is isolated to the recognition of revenue, and a rapidly growing towards value of this business. We are painfully aware that after following our outside auditors' guidance only eight months ago, we are again changing the way we recognized SVS revenue based on their re-assessment resulting in a different recommendation. ***I want to emphasize that our contract, billing practices, shipping methods, collection practices, and the cash flow related to SVS business has not changed towards last year, and that our prospects for growth of this business have not changed***. The only thing at issue is how we record the revenues from that business. While the restatement amounts we discussed may not seem material in any individual period, we concluded that a restatement is appropriate to properly reflect the cumulative deferred income on the balance sheet. The only acceptable way of arriving at the appropriate level of deferred income on the balance sheet is through the P&L of each year effective.

### 4.   Defendants Provided Conflicting Information Regarding Their Involvement in the Decision to Change the Revenue Recognition Policy

47.   Even though defendants tried to explain away the reason for the improper revenue

recognition changes, their conflicting statements concerning how and why the decision was made

confirmed defendants' knowing participation in the wrongdoing. During the question and answer

session of the February 19, 2004 conference call, defendants provided cagey and conflicting

responses to analysts who expressed noticeable suspicion about why the revenue recognition policy

was changed so soon after the first decision in July 2003. First, defendant Turner implicitly blamed

the Company's auditor, KPMG LLP ("KPMG"), and gave the impression that the Company had

***nothing*** to do with the decision:

> ADAM FRISCH, ANALYST, UBS: ...what made the auditors change their minds on this topic? Was there some kind of update on the guidelines or a new team from KPMG because, ***it seems kind of odd that they would change their mind in a relatively short period of time***?
>
> RONALD TURNER: ***I guess you'd have to ask them that.*** I think it's routine, I think it was the issue on revenue recognition across the board in quite of a number of areas, it's been bounced up into a professional group located in New York, and it saw a team out of a different organization than doing the normal review, which is were

[sic] the agreements between KPMG and us were at up until that point in time. ***Beyond that, I really don't know what caused the decision.***

ADAM FRISCH: Okay. And then, secondly in the press release and also in your comments, your prepared comments this morning you said that this could cause additional increase from the SEC, any reason why you would say that, if this was simply just an interpretation of a new guideline?

RONALD TURNER: ***Nothing other than the fact that it's been raised and elevated in terms of something that was changed. So, we are just guessing that they may want to take a deeper look at it, which would be defined***.

JACK EICKHOFF: ***Well, Adam they may not. It's just an assumption that if we made another, there is another change here, we would have done it certainly, we had changed last year, now we have changed another way, and that is just in itself might invite inquiry into why those changes were made. So, it was, they may in fact not do it. It's totally up to them*** --.

48.     Later in the same February 19, 2004 conference call, defendants again tried to blame

KPMG, this time by representing that the reason for the change was because two ***different offices***

within KPMG appeared to disagree at different points in time:

MARK S. MARCON: Okay, and then just to beat the dead horse [so that we are clear], my interpretation of your earlier comments was that your local office of KPMG basically concurred with you to move to a liberal interpretation of the EITF back in July of '03, and then a new group in New York has come in with a more conservative interpretation and imposed that on the local officers, is that correct?

JACK EICKHOFF: I think that's a fair assessment. The group in New York is a group that looks at all these very technical issues, and the people have been with that organization to a great extent for long periods of time, now the people rotated and announced that they are, they know the technology very, very well, and reviewed it and came to the conclusion they came to.

                    *        *        *

RONALD TURNER: ***I think it is fair to say we don't know exactly who rendered what -- I mean we were viewing it as the firm's position KPMG, which is only we can't view it, and specifically who or what rendered final judgment on some of those things is beyond our reach, but generally -- I mean obviously, Mark, when we get judgment from KPMG who we obviously hired as our advisor in this area, we take the firms position [sic], and we've related as the firms position [sic] notwithstanding who made the final judgment within the firm***.

JACK EICKHOFF: Having said all that, there was as you can well imagine a lengthy discussion with both local people, and people in New York on it throughout.

MARK S. MARCON: But originally was the local office that came to you in July of '03 with the more liberal interpretation --?

JACK EICKHOFF: Again, Mark, that was -- *we are not even sure of that.* It was KPMG's position in July of '03, and we deemed it as the firm's total position and not one, which at all we would recognize, would be a local.

\*   \*   \*

JACK EICKHOFF: The people that we communicate with just to make sure are the local people, Mark. And if they had some involvement with New York at that time, *we don't know*. But, the people we deal with routinely would be the local people.

Finally, at the end of the February 19, 2004 call, defendants realized that their statements blaming

the decision on KPMG were misleading.   After being pressed by analysts, defendant Turner

backtracked on his earlier statements and admitted that the Company worked directly with KPMG in

making the decision to change the revenue recognition policy:

MARK S. MARCON: I guess what I am trying to ascertain is, it was KPMG's suggestion to move to the more liberal policy in July of '03. It was initiated by them not necessarily by you. Is that correct?

RONALD TURNER: That's correct. It was an involvement involved with the interpretation of EITF 00-21 is how it came about and that came into effect on July 1. So, it was associated with that new policy.

\*   \*   \*

RONALD TURNER: *Obviously, I think it's fair to say that we worked with KPMG in developing that position obviously*.

\*   \*   \*

RONALD TURNER: *Yes. This was not just them obviously. We are responsible for our own records and we were in agreement with them at that point in time. So, it wasn't just them. We are not trying to say that at all*.

49.     Thus, in the span of a one-hour conference call, defendants completely changed their

story as to why the Company switched its revenue recognition policy so soon after their previous

change in July 2003.  Ultimately, Ceridian admitted in its amended Form 10-Q filed on March 15,

2004, that it should not have revised its revenue recognition policy for its SVS transactions in July

2003 because the Company lacked sufficient evidence of the fair values of the cards and related

- 22 -

services to account for them separately, as GAAP requires. The March 15, 2004 Form 10-Q stated in

part:

> [W]e lacked sufficient objective and reliable evidence to support our determination of separate accounting units for retail card sales and sales of related services upon adoption of Emerging Issues Task Force Issue No. 00-21 ("EITF 00-21") to support the change in revenue recognition disclosed in our Quarterly Report of Form 10-Q for the quarter ended September 30, 2003. . . .

### 5.       Defendants Admit to Knowing About Revenue Recognition Issues Prior to Restatement #1

50.       During the January 22, 2004 earnings conference call, defendant Turner discussed the

SEC's formal investigation of Ceridian.  Turner admitted that the Company already knew about

certain "revenue items" that were the focus of the SEC investigation:

> The documents requested [by the SEC] generally (indiscernible) accounting and financial reporting policies, practices, and procedures. However, ***most of the information requested focuses on revenue items that we had previously reviewed internally and with our outside auditors***.

Turner reiterated these statements during the question and answer part of the January 22, 2004 call:

> DAVID FARINA, ANALYST, WILLIAM BLAIR & COMPANY: A couple questions for you. First off, and you may not be able to answer this, but how do you know the SEC investigation is looking at areas I think you said the words not material to the results? Is it just what they are asking for or can you give any color there whatsoever?

> RONALD TURNER: Let me -- obviously, David, I think you understand there are limitations on what can be said here, but let me just reemphasize specifically one point. ***The items requested generally relate to matters we previously reviewed in depth, previously reviewed in depth with our outside auditors. And I'm going to be a bit repetitive but I think you'll appreciate this. We believe in the aggregate that these items are not material to our consolidated financial statements.***

> *            *            *

> ADAM FRISCH, ANALYST, UBS SECURITIES: Thanks for taking my question at the late hour. Just a clarification Ron, first on the SEC and I know you can't comment on it, but since you brought up the language, I just wanted to clarify that you don't think it's material because of the fact that you have been through a review of it with your auditors already or because it is a small piece of your business or the issue was a small piece of your total P&L?

- 23 -

RONALD TURNER: Based on what we know, we believe that as I stated, *we believe it is not material. Beyond that, our auditors know about it. We knew about it. We reviewed it quite a while ago as a matter-of-fact, whatever it is.* I can't get specific, so I hope you'll appreciate that (multiple speakers) I want to avoid any questions. I just [sic] given where we are and given the fact that this issue is not closed until it is closed, we are just not in a position to say more.

We tried to be as specific as we possibly could here, and I hope you'll appreciate that. I wish I could tell you everything I knew but we're just not in a position to do that.

51.     Thus, Turner revealed that the "revenue" issues being investigated by the SEC were already reviewed in depth by the Company prior to the issuance of many of the Company's false financial statements.  And, although defendants stated on the call that the SEC investigation had "nothing" to do with the improper revenue recognition at SVS, the Company would later have to restate its revenues again, based on revenue recognition violations.

> **6.     Defendants' Revenue Recognition Scheme Results in Tens of Millions of Dollars of False Revenues and Earnings**

52.     Ceridian ultimately restated its financial statements for all fiscal periods between December 31, 1999 and December 31, 2003 due to the improper revenue recognition at the Company's SVS unit.  The Company decreased its reported revenue by an aggregate *$40.5 million* and its reported earnings by *$10.3 million*.  The charts below summarize the effect of the Company's improper recognition on Ceridian's quarterly reported revenue and net income for FY00 - FY03.

**Effect on Reported Revenue[3]**
**(millions of $)**

| Increase (Decrease) in Revenue | FY00 | FY01 | FY02 | FY03 |
|---|---|---|---|---|
| First Quarter | -- | (1.0) | 0.3 | (0.5) |
| Second Quarter | -- | 0.6 | 4.1 | 1.7 |
| Third Quarter | -- | (3.3) | 0.0 | (5.6) |

---

[3]     For all charts herein, fields that are left blank indicate that either the Company did not restate those particular results or did not break out the specific numbers for those periods.

| Fourth Quarter | -- | (7.1) | (6.1) | (16.5) |
| --- | --- | --- | --- | --- |
| | | | | |
| **Total** | **($7.1)** | **($10.8)** | **($1.7)** | **($20.9)** |

**Effect on
Reported Revenue
(millions of $)**

| Increase (Decrease) in Earnings | FY00 | FY01 | FY02 | FY03 |
| --- | --- | --- | --- | --- |
| First Quarter | -- | 0.3 | 0.8 | 1.4 |
| Second Quarter | -- | 0.3 | 0.6 | 0.6 |
| Third Quarter | -- | (0.7) | 0.0 | (1.0) |
| Fourth Quarter | -- | (2.5) | (3.0) | (4.2) |
| | | | | |
| **Total** | **($2.9)** | **($2.6)** | **($1.6)** | **($3.2)** |

**F.     RESTATEMENT #2: Announced on October 18, 2004**

**1.     Improper Accounting for Expenses Related to Internal-Use
Software**

53.     In addition to the revenue recognition scheme described above in Restatement #1,
defendants also employed a scheme to understate the Company's costs and expenses, which inflated
its earnings results.  Defendants' primary tactic was to "capitalize" the Company's expenses (*e.g.*,
not recognize the expense in the current period and defer to a later period), so that its current
earnings were inflated in the short-term.  As set forth more fully in §VIII.D., *infra*, GAAP has strict
requirements for when a Company can capitalize its expenses related to software development for
internal use.

54.     Defendants' violations were not merely innocent or negligent misapplications of one or two provisions of GAAP.  Defendants systematically violated *six separate provisions* of the governing GAAP standard Statement of Position ("SOP") 98-1 on numerous occasions.

55.     First, Ceridian improperly capitalized costs associated with product fixes and maintenance in the post implementation/operations phase of software development.  For certain projects, Ceridian capitalized costs for both product enhancements that improved the functionality of the software, as well as costs for product fixes.  Because Ceridian was unable to separate the costs for the product fixes from the costs for the product enhancements, capitalizing the entire amount of the costs violated GAAP.  SOP 98-1, ¶¶24-26.

56.     Second, the Company committed an even more flagrant violation of GAAP by capitalizing expenditures for certain projects before obtaining the requisite internal approval. Because management had not yet committed to these projects, Ceridian was not permitted to capitalize costs.  SOP 98-1, ¶27.

57.     Third, Ceridian violated GAAP by improperly capitalizing overhead costs associated with internally developed software.  As set forth in §VIII.D., *infra*, SOP 98-1 ¶31, clearly provides that overhead costs associated with internally developed software should be expensed in the period incurred.

58.     Fourth, Ceridian violated GAAP by failing to stop its capitalization of expenses at the appropriate time.  GAAP states that "[c]apitalization should cease no later than the point at which a computer software project is substantially complete and ready for its intended use."  *See* SOP 98-1, ¶29.  Despite this clear rule, Ceridian continued to capitalize costs associated with software projects beyond the point where the software was sufficiently tested, substantially complete, and ready for its intended use.

59.     Fifth, Ceridian violated GAAP by failing to timely write-off an asset whose value had been impaired by a change in project objectives in 2002.  As set forth in §VIII.D., GAAP requires that if there is a change in circumstances concerning a project, such as a change in the direction in the project, a company needs to determine if the project asset has been impaired and if a write-off is required.  *See* SOP 98-1, ¶¶34-35; Statement of Financial Accounting Standards ("SFAS") No. 144, ¶¶7-9.  If a write-off is taken, it reduces the company's earnings for the period in which it is taken. Ceridian has admitted that it failed to properly write-off an impairment charge related to one of its software projects that had been abandoned during the Class Period.

60.     Sixth, Ceridian violated GAAP by capitalizing expenses from certain purported "internal use" software projects which were actually being developed for sale to outside customers. As set forth in §VIII.D., *infra*, GAAP prohibits capitalization of expenses for internal software projects unless those projects are developed solely to meet the needs of the company.  As Ceridian did not have the intention to acquire, internally develop or modify certain software to *solely* meet the needs of the Company, these projects did not qualify for treatment under SOP 98-1, but rather should have been accounted for under FASB 86.  *See* SOP 98-1, ¶¶1, 7, 12-16; FASB 86.

61.     All of the above violations caused the Company to overstate earnings and understate expenses during the Class Period.  Defendants' accounting scheme resulted in a restatement of the Company's financial results in 1999-2003 and 1Q04.  The restatement increased the Company's reported costs and expenses by an aggregate *$53.1 million* and reduced its reported net income by *$33.9 million*.  Defendants' violations also caused an overstatement of Ceridian's reported assets prior to and during the Class Period.  For FY02, FY03 and 1Q04, Ceridian's reported software and

development costs, net of amortization, on its balance sheet were overstated by *$33.1 million*, *$51.1 million* and *$57.1 million*, respectively.[4]

62.    The charts below illustrate the material impact of defendants' expense capitalization scheme on Ceridian's quarterly reported expenses and net income prior to and during the Class Period:

### Effect on Reported Costs & Expenses
### (millions of $)

| Increase (Decrease) in Expenses | Pre-1999 | FY99 | FY00 | FY01 | FY02 | FY03 | FY04 |
|---|---|---|---|---|---|---|---|
| First Quarter | -- | -- | -- | -- | 2.8 | 1.3 | $5.3 |
| Second Quarter | -- | -- | -- | -- | 3.2 | 5.6 | -- |
| Third Quarter | -- | -- | -- | -- | 2.3 | 5.0 | -- |
| Fourth Quarter | -- | -- | -- | -- | 2.4 | 5.7 | -- |
| | | | | | | | |
| **Total** | **$2.8** | **$1.2** | **$8.6** | **$9.7** | **$10.7** | **$17.6** | **$5.3** |

### Effect on Reported Net Income
### (millions of $)

| Increase (Decrease) in Net Income | Pre-1999 | FY99 | FY00 | FY01 | FY02 | FY03 | FY04 |
|---|---|---|---|---|---|---|---|
| First Quarter | -- | -- | -- | -- | (1.8) | (0.8) | (3.5) |
| Second Quarter | -- | -- | -- | -- | (2.0) | (3.6) | -- |
| Third Quarter | -- | -- | -- | -- | (1.5) | (3.2) | -- |
| Fourth Quarter | -- | -- | -- | -- | (1.6) | (3.7) | -- |
| | | | | | | | |
| **Total** | **($1.8)** | **($0.8)** | **($5.4)** | **($6.1)** | **($6.9)** | **($11.3)** | **($3.5)** |

### 2.    Improper Revenue Recognition

63.    In addition to defendants' manipulations of the Company's expense accounts, Restatement #2 also revealed manipulations of revenue in Ceridian's important HRS division.

---

[4]    Additionally, Ceridian adjusted its beginning retained earnings balance for 1999 to reflect software projects improperly accounted for in 1997 and 1998 in violation of GAAP.

Notably, some of these violations were virtually identical to the revenue recognition schemes disclosed in Restatement #1.

64. First, Ceridian improperly recognized revenue associated with sales of its HRS service offerings. In 2003, Ceridian's HRS division began to provide customers with a variety of human resource outsourcing services such as conversion and implementation consulting services, and processing services related to customers' payroll, tax filing and employee benefit needs. These HRS sales were similar to the Company's SVS transactions because they involved multiple deliverables such as processing and services which occurred after the sales transaction commenced. Similar to the Company's scheme involving SVS card sales, defendants improperly booked revenue on the installation and implementation of the HRS solutions, even though the undelivered processing and administrative elements of the transactions had not occurred. Since the Company did not have objective evidence of the fair value of the undelivered services, and those services were integral to the functionality of the delivered element, the Company's booking of revenue upon installation and implementation violated GAAP as set forth in §VIII.C. SEC Staff Accounting Bulletin ("SAB") No. 101; EITF 00-21, ¶¶9-10.

65. Second, Ceridian violated GAAP by improperly recognizing revenue for up-front and contractual performance fees in its HRS division prior to the customers' substantive acceptance of the underlying contract. As set forth in §VIII.C., *infra*, one of the most basic GAAP requirements is that revenue be earned and delivery occur prior to recognition of revenue. Despite this most fundamental rule, Ceridian improperly booked revenue prior to substantive acceptance by the customer. This violation inflated Ceridian's revenue and earnings during the Class Period. Statement of Financial Accounting Concepts ("FASCON") No. 5, ¶¶83-84; SAB No. 101.

66. Finally, Ceridian violated GAAP by improperly recognizing the full amount of revenue associated with contractual up-front fees immediately upon execution of the contract. As set

forth in §VIII.C., GAAP prohibits companies from recognizing revenue on up-front fees associated with a contract involving multiple deliverables. Those revenues should be deferred and recognized over the term of the contract. Similar to the Company's scheme involving its SVS transactions, Ceridian violated GAAP by recognizing up-front fees immediately upon execution of the contract, before all deliverables were rendered.

### 3.       Excessive Restructuring Charges

67.       In addition to the foregoing, Restatement #2 also disclosed that defendants manipulated the Company's "accrual" accounts. GAAP requires that accruals, *i.e.*, reserves, be taken only when it is probable that a loss has been incurred and the amount can be reasonably estimated. *See* SFAS No. 5, ¶8. In the late 1990s it became apparent that companies improperly used large "restructuring" changes, a/k/a "big baths," to mask other problems within the Company. As former SEC chairman Arthur Levitt stated in a speech given on September 28, 1998:

> Problems arise, however, when we see large charges associated with companies restructuring. These charges help companies "clean up" their balance sheet – giving them a so-called "big bath."
>
> Why are companies tempted to overstate these charges? When earnings take a major hit, the theory goes Wall Street will look beyond a one-time loss and focus only on future earnings.
>
> And if these charges are conservatively estimated with a little extra cushioning, that so-called conservative estimate is miraculously reborn as income when estimates or future earnings fall short.
>
> When a company decides to restructure, management and employees, investors and creditors, customers and suppliers all want to understand the expected effects. We need, of course, to ensure that financial reporting provides this information. But this should not lead to flushing all the associated costs – and maybe a little extra – through the financial statements.

68.       In the 1980s and 1990s, Ceridian over-reserved for special restructuring charges by at least $23.5 million. Ceridian held this "special" excess reserve on its balance sheet prior to and

throughout the Class Period.  As part of Restatement #2, Ceridian transferred the balance of this excessive reserve to its beginning balance of its retained earnings for FY99.

### 4.    Improper Reserve Accounting and Accrual Adjustments

69.    Restatement #2 also revealed that defendants improperly engaged in a "cookie jar" accounting scheme by improperly using the Company's accrual accounts to smooth earnings. Ceridian admitted that it falsely reported the amount of its accruals related to its accounts payable and employee compensation and benefits liabilities.  The charts below illustrate the impact of the violation on Ceridian's quarterly reported expenses for FY99-FY04.

### Effect on Costs and Expenses
### (millions of $)

| Increase (Decrease) in Expenses | Pre-1999 | FY99 | FY00 | FY01 | FY02 | FY03 | FY04 |
|---|---|---|---|---|---|---|---|
| First Quarter | -- | -- | -- | -- | (1.3) | -- | 1.5 |
| Second Quarter | -- | -- | -- | -- | 0.2 | 1.7 | -- |
| Third Quarter | -- | -- | -- | -- | 0.3 | (0.5) | -- |
| Fourth Quarter | -- | -- | -- | -- | 2.9 | 4.5 | -- |
| | | | | | | | |
| **Total** | **$0.3** | **$1.2** | **$0.3** | **($3.7)** | **2.1** | **5.7** | **1.5** |

### 5.    Company Admissions Regarding Restatement #2

70.    As part of the Company's SEC disclosures in connection with Restatement #2, defendants admitted to the above accounting violations and misconduct.  The Company's October 18, 2004 press release stated in part:

**Audit Committee Investigation and Restatement**

Based on its investigation to date, the Audit Committee has concluded that *the Company needs to restate its financial statements for the years 1999 through 2003, and the first quarter of fiscal 2004, to reflect necessary accounting adjustments, and that those previously issued financial statements should not be relied upon*. Review of earnings results, adjustments and investigation findings by the Company's external auditor is continuing.

- 31 -

As part of its investigation, the Audit Committee examined, among other things, the Company's policies and practices for the capitalization of internally developed software, the commencement of amortization of capitalized software development costs, and the accrual of expenses at the end of a quarter. ***The Audit Committee determined that there were deficiencies in these policies and practices. The investigation concluded that the Company's capitalization practices were, in certain respects, not consistent with GAAP and that the training and controls around capitalization and expense accruals needed to be substantially strengthened. In addition to strengthening internal controls and training, the Company anticipates that certain personnel changes will be made in the future.***

\*       \*       \*

*In some instances, we had the wrong accounting policy in place. In other instances, our accounting policies were not followed, and our internal controls fell short. We found cases where our interpretation of the appropriate accounting policy was incorrect. And sometimes people exercise bad judgment, and our internal controls were not effective. We have addressed or will be addressing each of those issues.*

*Some of the remedial actions that will be taken, including personnel changes, are being formulated by the audit committee and the Board of Directors. But I can assure you that we will implement measures and controls that will insure disciplined reporting, a rigorous compliance structure, and severe sanctions for noncompliance.*

71.     In a follow-up conference call on October 18, 2004, defendant Turner admitted to the Company's misconduct regarding capitalization of software expenses.  He also confirmed that there would be certain "personnel changes" as a result of the Company's misconduct:

*In some instances, we had the wrong accounting policy in place. In other instances, our accounting policies were not followed, and our internal controls fell short. We found cases where our interpretation of the appropriate accounting policy was incorrect. And sometimes people exercise bad judgment, and our internal controls were not effective. We have addressed or will be addressing each of those issues.*

*Some of the remedial actions that will be taken, including personnel changes, are being formulated by the audit committee and the Board of Directors. But I can assure you that we will implement measures and controls that will insure disciplined reporting, a rigorous compliance structure, and severe sanctions for noncompliance.*

72.     Also during the October 18, 2004 conference call, defendant Eickhoff admitted that an internal whistleblower had come forward to raise concerns about the Company's accounting policies.  Eickhoff also provided details about the specific software capitalization violations:

*In July, in response to a concern raised internally about the capitalization of internally developed software and certain other (indiscernible) items, the Company's audit committee commenced its investigation with the assistance of Deloitte and outside independent legal counsel.*  The audit committee in consultation with its advisers determined the scope of the review in terms of what was to be reviewed in this time frame to consider. Since the capitalized software policy and practice used in the U.S. were also used internationally, and because *accounting errors were found in the initial development projects that were examined,* the audit committee reviewed all projects that affected the financial results for the 5 years, both as capitalized and amortized. This required the analysis of development projects dating back to 1997.

\*          \*          \*

*The audit committee investigation is revealed [sic] that we had a fundamental misunderstanding in some of the rules around capitalization, and that our capitalization policy needed to be updated and that the Company's controls around capitalization needed substantial improvement. We have corrected our policy on internally capitalized software to capitalize only those costs allowable under SOP 98-1.*  Our policies require that expenditures for product enhancements where there is increased functionality be capitalized and that product fixes be expensed.  *Upon review, certain product fixes had been erroneously capitalized.*

*We historically did not identify the cost of product fixes separate from product enhancements. So in the restatement, as required by the accounting rules, we have now expensed the cost of both. Under our new and corrected policy and practice, unless we can specifically separate cost for product fixes versus capitalized enhancements, we will record the cost as (indiscernible). The audit committee also found instances where expenditures were capitalized before the appropriate internal approval was obtained. In these instances as a part of the restatement, these costs have been eliminated and recognized as expense as required by the rules.*

*In 2 cases, we had projects on which work had been altered, and decisions have been made to move into a different direction. This resulted in impaired assets which, as part of the restatement, have appropriately been written off. In certain instances, we capitalized software projects, and once completed, the product was sold to customers on a license basis. The software is sold on a license basis, a different accounting treatment for software development applied. Therefore, as a part of the restatement, the costs incurred up to the point of product release, which is the point at which we believe we have reached technological feasibility, have been expensed rather than capitalized.*

- 33 -

73.     Eickhoff also admitted to various other accounting violations related to expense accruals and accounts payable due to "inadequate internal controls around the quarterly and year-end closed process." He also admitted to additional revenue recognition violations and improper accounting for reserves:

> As you know, the BPO business is a new but rapidly growing business for us. *Since we got into this business a year and a half ago, we recognized the front-end installation revenue in the same manner we had done for years with our more standard payable contracts. This treatment was incorrect under the applicable accounting rules.*
>
> \*       \*       \*
>
> One other adjustment on the balance sheet I will talk about. The largest adjustment that we are making as a part of the restatement aside from those related to software capitalization is a balance sheet only adjustment that relates to an *accumulation of excess restructuring reserves and accruals. The accruals were established in the 1980s and '90s when the Company was going through a series of restructuring. The current balance of $23.5 million represents the amount by which the original accruals exceeded the ultimate requirement. The only way to account for these excess accruals would have been to restate history or to treat them as frozen reserves, which is what we did*.
>
> Because we did not want to enhance and distort prior-year's earnings and because of their significance, we did not have an option to run these excess accruals through the P&L. This restatement now affords us the opportunity to dispose of the excess reserves that appropriately reflect equity. The adjustment reduced liabilities by $23.5 million and increased equity by the after-tax effect or about $14 million. This balance sheet adjustment was made effective January 1, 1999.

74.     Finally, during the October 18, 2004 conference call, defendant Eickhoff admitted that he was responsible and accountable for the improprieties:

> *Our internal controls around capitalization and expense accruals were inadequate. As CFO, I am accountable and I can assure you that I will do everything I can to ensure that all remedial actions, including those directed by the Board of Directors, will be taken and that noncompliance will not be tolerated*.

## G.     RESTATEMENT #3: Announced on December 15, 2004 and January 31, 2005

75.     On December 15, 2004 and January 31, 2005, the Company announced additional accounting violations which resulted in the Company's third restatement.  Like the previous

restatements, Restatement #3 revealed multiple accounting manipulations used to inflate the Company's earnings and understate its expenses. Notably, Restatement #3 *again* disclosed a third round of revenue recognition violations and improper expense reporting. Ceridian's first violation was the improper accounting in connection with its derivative instruments.

### 1.    Improper Accounting for Derivative Instruments

76.    A derivative is a financial instrument whose characteristics and value depend upon the characteristics and value of an underlying instrument, typically a commodity, bond, equity or currency. Examples of derivatives include futures and options. In some cases, companies engage in the purchase or sale of derivative instruments strictly as an investment strategy, similar to purchasing stock. Trading derivatives can be highly risky and is widely considered to be speculative activity.

77.    On the other hand, in certain circumstances, companies may use derivatives to effectively hedge against exposure to certain risks. A hedge is an investment made in order to reduce the risk of adverse price movements in a security, by taking an offsetting position in a related security, such as an option or a short sale. A company may purchase or sell derivative instruments to manage the risk associated with the underlying security, to protect against fluctuations in value, or to profit from periods of inactivity or decline.

78.    The accounting rules for derivatives are set forth in §VIII.E., *infra*. Essentially, if a company's derivative instrument is not designated as a specific type of hedging activity, GAAP requires the company to recognize any gain or loss from the investment in the current earnings period. In other words, at the end of a reporting period, a company is required to reduce current period earnings (in the case of a decline in value) or increase earnings (in the case of an increase in value) in order to "mark" *or adjust* the value of the derivative instrument to its then current market value (*i.e*., "mark-to-market"). SFAS No. 133, ¶18.

79.     If a company designates the derivative activity as a "cash flow hedge," GAAP requires the effective portion of the derivative's gain or loss to be initially reported as a component of other comprehensive loss and subsequently reclassified into earnings when the hedge items actually impact earnings.  The ineffective portion of the gain or loss must be reported into earnings immediately.  In other words, changes in the fair value of the derivatives are deferred in equity and reclassified into earnings as the transactions being hedged affect earnings.  SFAS No. 133, ¶¶18, 28.

80.     Hedge accounting is elective and the special accounting for hedges is permitted only if certain conditions are met.  If a company elects to apply the hedge accounting, it must meet substantial documentation requirements at the inception of the hedge as specified in SFAS No. 133.  The formal documentation required in order to qualify instruments for cash flow hedge accounting is set forth in SFAS No. 133, ¶¶28, 29.

81.     Since 1992 and throughout most of the Class Period, Ceridian engaged in an interest rate hedging program related to its customer deposits.  This program consisted of interest rate collars and swaps and was set to expire in 2007, however, Ceridian decided to unwind the interest rate hedge in February of 2005.  In 2003, Ceridian also initiated a fuel price hedging strategy in order to mitigate Ceridian's exposure to fuel price variability in its Comdata operations.  This program consisted of fuel price swap contracts and is set to expire at the end of 2005.

82.     Since inception of these derivative activities, Ceridian accounted for both its interest rate derivatives and its fuel price derivatives as "cash flow hedges."  Accordingly, Ceridian recorded as revenue the cash received or paid out under the hedge contracts as the cash transactions occurred.  In its restatement, however, Ceridian admitted that its hedging activities were not properly documented and did not satisfy the requirements of GAAP.  *See* §VIII.E., *infra*.  Consequently, the Company was forced to restate almost $75 million in revenue, $38.2 of which impacted the Class Period.

83.     The charts below summarize the effect this accounting violation had on Ceridian's quarterly reported revenue for FY01-FY04:

**Effect on Reported Revenue**
**(millions of $)**

| Increase (Decrease) in Revenue | FY01 | FY02 | FY03 | FY04 |
|---|---|---|---|---|
| First Quarter | -- | (6.5) | (7.1) | (8.1) |
| Second Quarter | -- | (6.5) | (7.4) | -- |
| Third Quarter | -- | (6.7) | (7.7) | -- |
| Fourth Quarter | -- | (7.1) | (7.9) | -- |
|  |  |  |  |  |
| **Total** | **($10.3)** | **($26.8)** | **($30.1)** | **($8.1)** |

## 2.     Improper Revenue Recognition

84.     Although Restatement #1 and Restatement #2 both revealed various revenue recognition violations, the Company disclosed *additional* revenue recognition improprieties in Restatement #3.

85.     First, Ceridian admitted that it violated GAAP by improperly recognizing revenue associated with transactions with its third-party vendors.  Under GAAP, revenue from transactions with third-party vendors, which also results in costs to the vendor, must be recognized on a net basis – reducing the revenue by the amount of associated costs.  In Ceridian's 2003 Form 10-K filed on March 15, 2004, Ceridian represented that its accounting policy complied with this principle:

> We include in revenue amounts that we bill for and remit to third-party vendors for associated products and services as required on a gross basis as a principal rather than net as an agent when the following conditions are met: (1) we are the primary obligor in the arrangement with the customer; (2) we have credit risk and inventory risk; (3) we have latitude in the establishment of pricing, subject to general economic restraints; and (4) we have full discretion in vendor selection.

86.     Nonetheless, Ceridian improperly recognized revenue associated with its HRS customers and its third-party vendors on a *gross* basis – booking the full amount of the revenue

associated with the transaction and treating the vendor's cost separately in Ceridian's cost of revenue.  This violated GAAP which requires that revenue be recognized on a net basis – with the vendor's cost reducing the amount of revenue reported by Ceridian.

87.  Ceridian also violated a fundamental maxim of GAAP by recognizing revenue prior to delivery of certain goods.  At year end 2001 and 2002, Ceridian's Comdata segment recognized revenue associated with certain equipment sales even though the equipment **had not yet been delivered and accepted by the customer prior to year end closing**.  The equipment was then delivered and accepted by the customer shortly **after** the end of the fiscal year.  This type of basic revenue recognition scheme violates the most fundamental premises of GAAP.  *See* §VIII.C. (citing FASCON No. 5, ¶¶83-84 and SAB No. 101).

88.  In total, the first three restatements revealed at least **six** different violations of GAAP involving improper revenue recognition.  The chart below summarizes the effect these violations had on Ceridian's quarterly reported revenue for FY01-FY04 (not including the stored value gift card issue which is discussed separately).

### Effect on Reported Revenue
### (millions of $)

| Increase (Decrease) in Revenue | FY01 | FY02 | FY03 | FY04 |
|---|---|---|---|---|
| First Quarter | -- | 0.5 | (0.1) | (4.5) |
| Second Quarter | -- | (0.6) | (1.0) | -- |
| Third Quarter | -- | (0.6) | (4.6) | -- |
| Fourth Quarter | -- | (3.2) | (3.5) | -- |
| | | | | |
| **Total** | **($1.7)** | **($3.9)** | **($9.2)** | **($4.5)** |

### 3.  Misclassification of Certain Cost and Expense Categories

89.  Restatement #3 revealed that Ceridian manipulated its financial statements by improperly misclassifying certain "cost of revenue" expenses as either "selling, general, and administrative" expenses or "research and development" expenses.  While this violation appears

insignificant, misclassifying expenses in this way helped the Company inflate its overall operating margins, which is an important indicator for a company's overall financial health.  Had the Company complied with GAAP, its operating margins would have been reduced, indicating weakness in its core ability to generate profits.  In its restatement, Ceridian admitted that it understated cost of revenue in 2001, 2002, 2003 and 1Q04 by *$84.3 million*, *$91.1 million*, *$108.6 million* and *$27.4 million*, respectively.

### 4.        Misclassification of Certain Assets and Liabilities

90.        Ceridian also misclassified certain of its assets and liabilities in its Comdata segment. First, in several instances, Ceridian violated GAAP by offsetting certain assets against related liabilities, thus understating its reported liabilities.  These misclassifications include the following: offsetting trade receivables against certain customer advances, and offsetting customer deposits against related liabilities.  As a result, for 4Q02, 4Q03 and 1Q04, Ceridian's liabilities were understated by *$20.2 million*, *$25.8 million* and *$26.4 million*, respectively.

91.        Second, Ceridian violated GAAP by misclassifying a vendor payable account in a net debit position as a reduction in its liabilities, as opposed to an asset.  As a result, for 4Q03, Ceridian's liabilities were understated by *$2.6 million*.

92.        Finally, Ceridian violated GAAP by misclassifying certain receivables as current assets when they were not.  Because investors look to current assets as an indication of a Company's liquidity and ability to meet its present debts and obligations, defendants' misrepresentation was material.  As a result of this violation, Ceridian's current assets in 4Q03 and 1Q04 were overstated by *$2 million* and *$1.7 million*, respectively.

### 5.        Company Admissions Regarding Restatement #3

93.        On December 16, 2004, the Company held a conference call at which defendants admitted some of the violations in Restatement #3:

Several adjustments, mostly reclassifications, were made to historical financial statements since our second quarter earnings release. These items arose through the continuing audit committee investigation and concerns raised internally. ***These adjustments are required to correct errors in our interpretation or applications of GAAP.***

\*　　\*　　\*

The first reclassification relates to certain costs that, historically were reported as R&D expense that now have been reclassified properly to cost of sales. This reclassification, which has no impact on the bottom line, primarily relates to product maintenance, minor enhancements and systems support expenses. This reclassification resulted in a ***net reduction of R&D expenses in 2003 of approximately $40 million, and in the first and second quarters of this year of about $11 million each quarter. The second reclassification relates to installation costs, which were historically reported as service costs within the SG&A line. These costs have also been reclassified to cost of sales. For all of 2003 this amounted to approximately $46 million and in the first and second quarters of this year, about 12.3 and 14.6 million respectively***.

***The only other change of significance, which also had no impact on profit, relates to how revenue and costs were reported for services provided to our customers, that are subcontracted through a third party. Historically customer billings for these arrangements were recorded as revenue and the associated third party expenses as cost of sales. This treatment has been changed for certain contracts, that do not meet specific accounting requirements related to third party subcontracts***.

94.     On January 31, 2005, the Company issued a press release admitting to further accounting errors relating to Restatement #3 which were not disclosed in the December 15-16, 2004 disclosures:

***After recent consultation with the Company's independent registered public accounting firm, the Company determined that the accounting treatment of its hedging programs, as governed since 2001 by FAS 133, "Accounting for Derivative Instruments and Hedging Activities" needed to be changed as the hedging relationships as documented did not strictly satisfy the requirements of FAS 133***.

\*　　\*　　\*

***In addition to the change in accounting for derivative securities discussed above, other adjustments have been made to Ceridian's historical financial statements since the Company reported preliminary results for the third quarter of 2004 on December 15, 2004. These adjustments include line item expense reclassifications impacting 2001 through 2004, and changes in revenue***

*recognition which reduced 2003 revenue and earnings before income taxes by approximately $3.6 million and $2.4 million, respectively. For the first three quarters of 2004, these revenue recognition adjustments reduced revenue and earnings before income taxes by approximately $2.5 million and $0.7 million, respectively*.

95.    The January 31, 2005 press release also admitted to numerous "material weaknesses"

in various aspects of the Company's accounting and financial reporting processes.  The Company

admitted that its auditor KPMG would not be able to issue a positive opinion on its internal controls:

> As a result of the previously announced investigation conducted by the Audit Committee of Ceridian's Board of Directors and Ceridian's efforts to comply with Section 404 of the Sarbanes-Oxley Act of 2002, *the Company has identified a number of deficiencies in its internal control over financial reporting, and a number of these deficiencies individually or in the aggregate may constitute a "material weakness" (as defined under standards established by the Public Company Accounting Oversight Board as a deficiency that could result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected) in its internal control over financial reporting. These material weaknesses include deficiencies in the Company's internally developed software capitalization guidelines, the commencement of amortization of its capitalized software development costs, its month-end close and cost and expense accrual process, its entity-level control process, the policies and practices relating to revenue recognition at HRS and the classification of costs and expenses in its consolidated financial statements, the timeliness of the reconciliation of certain balance sheet accounts at HRS, the application of FAS 133, and the close of accounting records related to the periods affected by the restatement*.

> \*        \*        \*

> Due to the nature of and the time necessary to effectively remediate each of the material weaknesses identified to date, the Company expects to conclude that some of the material weaknesses identified to date will have not been effectively remediated. *As a result, the Company believes that its independent registered public accounting firm will not be able to issue a positive opinion on the Company's internal controls in the Company's 2004 Annual Report on Form 10-K*. The Company does expect that its independent registered public accounting firm will issue a clean, unqualified opinion on the financial statements contained in the Company's 2004 Annual Report on Form 10-K.

96.    On February 18, 2005, the Company filed its Amended Form 10-K for 2003 which

contained additional detailed admissions of defendants' accounting misconduct in connection with

Restatement #3.   The Company's admissions concerning the capitalization and expensing of software development costs included:

- Costs for non-capitalizable software product fixes and maintenance were not properly distinguished from capitalizable software product enhancements that improve functionality. The non-capitalizable costs have now been charged to, and the related amortization charges have been eliminated from, the appropriate expense classifications.

- Costs incurred before the appropriate internal approval was obtained were capitalized instead of being charged to expense. These amounts have now been charged to the appropriate expense classifications.

- Costs that should have been charged to expense as non-capitalizable overhead costs were included in capitalized costs. These costs have now been charged to the appropriate expense classifications.

- Adjustments to the timing of the commencement of amortization of properly capitalized software development costs generally resulted in advancing the commencement of amortization to the time when the software product was sufficiently tested to make it ready for its intended use rather than when the software was actually placed in service. Amortization charges have now been restated for the affected periods.

- A software asset whose value had been impaired by a change in project objectives in 2002 was written down by $0.6 million in that year.

97.   The Company's amended 10-K for 2003 also admitted that despite the previous revenue recognition violations in the previous restatements, the Company had again violated fundamental revenue recognition rules in Restatement #3 by, inter alia, recording revenue "*__before substantive acceptance requirements were met__*":

As we began implementation work for new HRS customers in 2003, we recognized revenue for installation and implementation as those efforts progressed in the same manner that we had determined to be appropriate for our standard payroll product. *__Upon further examination, we have determined that we are generally not able to establish objective evidence of fair value for the undelivered processing and administrative services element. We also identified instances where revenue was recorded by HRS for up front fees or contractual performance before substantive acceptance requirements were met.__* Therefore, the revenue and related costs associated with these arrangements have been deferred and will be recognized over the term of the contract.

*We found that revenue from certain sales arrangements involving our HRS customers and third party vendors, where we recorded revenue on a gross basis and the vendor's cost in cost of revenue, did not meet the GAAP requirements for this treatment.* As a result, we have corrected the recording of these transactions to a net basis with an equal reduction of revenue and cost of revenue.

We also identified instances at the end of 2001 and 2002 where Comdata merchant services equipment shipments recorded at the end of those years had not been delivered and accepted by the customer until shortly after year-end. Therefore, that revenue and related costs has been restated to recognize it in the first quarter of the subsequent year.

These adjustments reduced revenue by $14.8 and cost of revenue by $10.4 during the years 2001 through 2003.

98.     Finally, in addition to explaining numerous other accounting violations, the

Company's Form 10-K admitted that a whistleblower had come forward to express concern over the

Company's accounting manipulations:

*At the end of June 2004, we became aware of an employee's concerns regarding the capitalization and expensing of certain costs in HRS.* Upon becoming aware of these concerns, the Audit Committee of our Board of Directors (the "Audit Committee") commenced an investigation with the assistance of independent legal counsel and Deloitte & Touche LLP. In October 2004, we announced the initial determinations from the Audit Committee Investigation which had examined, among other things, our policies and practices for the capitalization of software development costs, the timing of amortization of capitalized software development costs and the accuracy and timeliness of accruing for costs and expenses. The preliminary conclusions of the Audit Committee Investigation indicated that our capitalization guidelines and practices were, in certain respects, deficient and not consistent with accounting principles generally accepted in the United States of America ("U.S. GAAP") and that this had led to errors in the recording of certain capitalized costs for internally developed software during the period from 1997 through 2003 and in the first quarter of 2004. The preliminary conclusions from the Audit Committee Investigation also indicated the presence of deficiencies related to the commencement of amortization of capitalized software development costs and the accuracy and timeliness of accruing for costs and expenses.

99.     Though the Company stated in its 2003 Form 10-K that it only became aware of the

whistleblower's concerns in June 2004, the Company later disclosed in its 2004 Form 10-K that the

SEC broadened its investigation to include "*how [the Company] respond[s] to any internal ethics*

*complaints*."

- 43 -

### H.        RESTATEMENT #4: Announced on March 17, 2005

100.     On March 17, 2005, Ceridian announced that it would be restating its results for the fourth time in a little over a year.  The restatement revealed that Ceridian inflated its earnings by failing to accelerate the amortization of an abandoned trademark.

101.     Under GAAP, as set forth in SFAS No. 142, ¶¶12-14, an intangible asset, such as a trademark, with a finite useful life is subject to amortization over its estimated useful life:

> An entity shall evaluate the remaining useful life of an intangible asset that is being amortized each reporting period to determine whether events and circumstances warrant a revision to the remaining period of amortization.  If the estimate of an intangible asset's remaining useful life is changed, the remaining carrying amount of the intangible asset shall be amortized prospectively over that revised remaining useful life.

In 1999, as part of an acquisition for its benefits service provision, Ceridian acquired the trademark CobraServ.  Thereafter, Ceridian held the trademark on its balance sheet as an asset and began amortizing it on a straight-line basis.  In January 2004, Ceridian decided to rename the CobraServ product offering and stop using the trademark by December 2004.  At the time, the remaining carrying value of the asset as of December 31, 2004 – and the remaining amortization for 2005 and beyond – was $40.9 million.  Accordingly, because of the decision to abandon the trademark in January 2004, the estimated economic life of the trademark was shortened to one year.  Pursuant to GAAP, Ceridian was required to accelerate the remaining amortization over the remaining time (*i.e.*, the four quarters of 2004).  SFAS No. 142, ¶14.  Nonetheless, in violation of GAAP, Ceridian failed to accelerate the remaining amortization balance of this abandoned trademark.  This failure caused Ceridian's amortization expense to be understated for 1Q04 - 3Q04 by $30.6 million ($10.2 million per quarter) and its earnings to be inflated by *$20 million* (*$6.7 million per quarter*).  It further caused Ceridian's assets to be overstated for 1Q04, 2Q04 and 3Q04 by *$10.2 million*, *$20.4 million* and *$30.6 million*, respectively.

- 44 -

I.      **RESTATEMENT #5: Announced on April 15, 2005**

102.    On April 15, 2005, Ceridian announced that it would be restating its results for the fifth time in a little over a year.  The fifth restatement revealed another laundry list of improprieties occurring in different areas of the Company.  The restatement revealed the following violations:

1.      **Improper Accounting for Scheduled Rent Increases**

103.    As set forth in §VIII.F., *infra*, GAAP requires companies to recognize certain expenses related to rent increases on a straight-line basis over the term of the lease unless another more reasonable basis is available.  During the Class Period, the Company violated this GAAP provision by failing to properly account for its scheduled rent increases.  Certain of Ceridian's operating leases contained scheduled rent increases, such as free rent or rent holdings, concessions and escalation clauses.  Ceridian violated GAAP by failing to expense these scheduled rent increases on a straight-line basis over the terms of the lease.  Instead, the Company deferred the recognition of these expenses to a future period, causing Ceridian's earnings to be overstated and its liabilities to be understated during the Class Period.

104.    Because of the violation, Ceridian was forced to restate its financial results for 2000 - 2004.  Ceridian admitted that it overstated its net income for 2000, 2001, 2002, 2003 and the first nine months of 2004 by *$2 million*, *$1.1 million*, *$2.1 million* and *$1.5 million*, respectively.  Additionally, Ceridian's liabilities were understated as a result of its improper lease accounting.  For example, for the year ending 2003, Ceridian's other non-concurrent liabilities were understated by $5.9 million due to this GAAP violation.

2.      **Improper Accounting for International Operations**

105.    Restatement #5 also revealed that the Company violated GAAP in connection with the Company's international operations.  First, the Company admitted to improperly accounting for two acquisitions made in the United Kingdom and Canada in 1995 and 1998.  Ceridian improperly

accounted for the initial accounting entries for the acquisition and the ongoing treatment of the purchases.   Second, Ceridian improperly calculated the impact of certain foreign currency conversions on balance sheet items such as goodwill, other intangible assets, capitalized software and accumulated other comprehensive income – foreign currency translation.

106.   The impact of these violations was that the Company understated its expenses by *$2.4 million*, *$0.8 million* and *$0.6 million* for the fiscal years prior to 2002, FY03 and 1Q04-3Q04, respectively.   These violations also caused the Company to overstate expenses in 2002 by $1.3 million.

### 3.   Improper Reserve Accounting and Accrual Adjustments

107.   As discussed in Restatement #2, Ceridian improperly engaged in "cookie jar" accounting by improperly using its accrual accounts to smooth its earnings.   In Restatement #5, Ceridian admitted to additional misstatements involving its accounting for its balance sheet reserves and accrual adjustments in violation of GAAP.   During the Class Period, Ceridian improperly used its reserve accounts related to the following items: casualty loss reserves, accrual of commissions and incentives, prepayments of expenses, and payroll taxes on third party contractors in the UK.

108.   In many cases, although the expense recognition offset each other on a yearly basis, this improper accounting misstated Ceridian's reported *quarterly* results.   The chart below summarizes the effect this improper accrual of costs and expenses had on Ceridian's quarterly reported expenses for FY00-FY04:

**Effect on Costs & Expenses**
**(millions of $)**

| Increase (Decrease) in Expenses | Pre-2002 | FY02 | FY03 | FY04 |
|---|---|---|---|---|
| First Quarter | -- | -- | (1.2) | (0.9) |
| Second Quarter | -- | -- | (0.2) | 0.3 |
| Third Quarter | -- | -- | (0.2) | 0.3 |
| Fourth Quarter | -- | -- | 1.6 | -- |
| | | | | |
| **Total** | **($0.4)** | **$0.3** | **--** | **($0.3)** |

### 4.     Improper Accounting for Certain Balance Sheet Accounts

109.    Restatement #5 also revealed that Ceridian failed to correctly account for certain of its balance sheet accounts related to its customer funds and its employee benefits for 4Q03.  In its restatement, Ceridian admitted that it restated the amounts due from customers and taxing authorities by $11.4 million.  Further, Restatement #5 revealed that Ceridian had to reclassify $2 million of its employee benefits accrual as a current liability rather than as a long-term liability.

### 5.     Improper Accounting for Income Tax Reserves

110.    Finally, Restatement #5 revealed that Ceridian violated GAAP by manipulating its income tax reserve accounts.  This violation caused the Company to restate its tax liability by $0.9 million in 4Q03.

### J.     Ceridian's Fraudulent System of Internal Controls

### 1.     Ceridian's Violations of SEC Regulations Due to Its Inadequate Internal Controls

111.    To execute the foregoing accounting schemes, defendants knowingly utilized a corrupt system of internal controls that allowed them to manipulate the Company's financial results at will.  The Company's lack of internal controls resulted in a systematic breakdown of credibility and accuracy in the Company's financial reporting to investors.

112.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must "(A) make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP]." 15 U.S.C. §78m(b)(2).  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

113.    Ceridian has now admitted that its disclosure controls and procedures during the Class Period were a colossal disaster.  In its last two restated Reports on Form 10-K filed with the SEC on February 18, 2005 and April 21, 2005, Ceridian admitted to countless "***material weaknesses***" and/or "***significant deficiencies***" in its internal controls over financial reporting.

### 2.    Material Weaknesses

114.    In its Form 10-K/A filing with the SEC on February 18, 2005, the Company admitted that its audit committee "identified the following deficiencies in our internal control over financial reporting, and management has determined that each of these deficiencies constitutes a 'material weakness"' (as defined under standards established by the Public Company Accounting Oversight Board or "PCAOB") in our internal control over financial reporting:"

- ***Deficiencies related to our internally developed software capitalization guidelines. Our internally developed software capitalization guidelines, in particular those utilized by HRS, were inconsistent with U.S. GAAP and needed to be updated. In addition, we lacked personnel with sufficient expertise in software capitalization rules under U.S. GAAP and did not adequately train employees, such as financial analysts and project managers, who performed these accounting functions. We also failed to document sufficient support for the historical capitalization of certain software development costs and our system for tracking costs that qualify for capitalization needs improvement. Finally, our deterrent controls and detective***

*controls related to the capitalization of internally developed software were insufficient.*

- *Deficiencies pertaining to the commencement of amortization of our capitalized software development costs. The Audit Committee Investigation also identified deficiencies in the accounting for the amortization of our capitalized software development costs. Specifically, these deficiencies included insufficient documentation relating to the commencement of such amortization. In addition, as a result of our failure to train relevant personnel in U.S. GAAP rules applicable to the amortization of internally developed software, such employees often misunderstood or improperly applied such rules. Finally, our deterrent controls and detective controls related to the amortization of our capitalized software development costs were insufficient.*

*                    *        *        **

- *Deficiencies related to entity-level controls at Ceridian. A number of events provide indications of an ineffective control environment at Ceridian, including the results of the Audit Committee Investigation and our compliance efforts with the Section 404 Requirements and the delayed filing of our Quarterly Reports on Form 10-Q for the quarterly periods ended June 30, 2004 and September 30, 2004. Management believes that such events are the result of (i) accounting policies, procedures and practices that were inconsistent with U.S. GAAP and needed to be updated, (ii) personnel lacking sufficient expertise in areas of U.S. GAAP, (iii) inadequately trained employees, such as financial analysts and project managers, who perform accounting functions, (iv) failure to document with sufficient support the prior application of our accounting policies, practices and procedures, and (v) lack of effective deterrent controls and detective controls to properly apply U.S. GAAP to our financial reporting process. As a result, management has concluded that there are deficiencies in the design and execution of our entity-level controls that constitute a material weakness in our internal control over financial reporting.*

- *Deficiencies related to inadequate or ineffective policies and practices relating to revenue recognition at HRS. Our revenue recognition guidelines at HRS were inconsistent with U.S. GAAP and needed to be updated, particularly with respect to the adoption of Emerging Issues Task Force Issue No. 00-21, "Revenue Arrangements with Multiple Deliverables." Additionally, we lacked personnel with adequate expertise in the revenue recognition rules, and failed to consistently include finance personnel in the analysis of the impact that new customer contracts would have on our financial reporting. Finally, our deterrent controls and detective controls related to revenue recognition were insufficient.*

- *Deficiencies related to inadequate or ineffective policies and practices relating to the classification of costs and expenses in our Statement of Operations. Our cost and expense classification guidelines were inconsistent with U.S. GAAP and needed to be updated. Also, our deterrent controls and detective controls related to the classification of costs and expenses were insufficient. We had not performed an*

*adequate review of whether our costs and expenses were being classified appropriately in our Statement of Operations.*

- *Deficiencies related to the untimely reconciliation of certain balance sheet accounts at HRS. Although our stated account reconciliation policies require timely reconciliations of accounts, we failed to timely reconcile certain balance sheet accounts at HRS for the third quarter of 2004.*

- *Deficiencies related to the application of FAS 133 "Accounting for Derivative Instruments and Hedging Activities." In January 2005, we determined that our interest rate and fuel price derivative contracts did not satisfy the requirements of FAS 133 and as such, did not qualify for hedge accounting treatment.*

- *Deficiencies related to the internal control over financial reporting of our HRS operations in the United Kingdom. Such deficiencies relate primarily to the aggregation of issues pertaining to revenue recognition, basic internal controls, and controls surrounding the use of certain information technology applications.*

### 3.    Significant Deficiencies

115.    In addition to the foregoing "material weaknesses," the Company also admitted to the following "significant deficiencies" in its internal controls during the Class Period:

- *Deficiencies related to revenue recognition at SVS.* In February 2004 we announced the restatement of our financial statements for the years ended December 31, 2002, 2001 and 2000 and the first three quarterly periods in 2003 to correct the application of U.S. GAAP as it relates to multiple-element arrangements that include the sale of retail cards and related services such as activation, processing and reporting at our Stored Value Systems unit, a wholly owned subsidiary of our Comdata business unit.

    *        *        *

- *Deficiencies related to controls surrounding the use of certain information technology applications.* Such deficiencies include inadequate system security, inappropriate access to systems and segregation of duties within systems, lack of appropriate system documentation, ineffective change management processes and insufficient disaster recovery plans pertaining to such applications.

- *Deficiencies related to certain basic internal controls.* Such deficiencies include instances of failure to segregate conflicting duties, lack of documented policies and procedures, failure to receive or document appropriate approvals, incomplete or untimely account reconciliations and failure to appropriately assess and monitor the effectiveness of controls executed by third-party service providers.

116.    The Company later admitted that the magnitude and pervasiveness of its material weaknesses and deficiencies with respect to internal controls would result in an adverse opinion by its auditor, KPMG.  Further, the Company admitted that some of the material weaknesses would not be remedied before the filing of its delayed Form 10-K for 2004, and also impacted its 2003 results. The Company's 2003 amended Form 10-K stated in pertinent part:

> Due to the nature of and the time necessary to effectively remediate each of the material weaknesses identified to date, ***we expect to conclude that some of the material weaknesses identified to date will not have been effectively remediated by the filing deadline for the 2004 Form 10-K. As a result, we believe that KPMG will not be able to issue a positive opinion on our internal control over financial reporting in the 2004 Form 10-K***.

> *              *              *

> As a result of the material weaknesses identified above, ***we concluded that as of December 31, 2003, our disclosure controls and procedures were ineffective to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act are recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission***. . . .

### 4.    The Company's April 21, 2005 Admissions Regarding the Lack of Internal Controls

117.    On April 21, 2005, the Company elaborated on the material weaknesses in its internal controls.  These disclosures revealed that the Company's financial reporting system was a complete disaster.  Some of the more notable admissions were that the Company "fail[ed] to document and approve journal entries," and "lacked personnel with sufficient expertise" in the very accounting areas identified by the Company as the "most critical."  The Company admitted to the following material weaknesses in financial reporting:

> 1.  ***Inadequate company-level controls***.  We did not maintain effective company-level controls as defined in the Internal Control – Integrated Framework published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). These deficiencies related to each of the five components of internal control as defined by COSO (control environment, risk assessment, control activities, information and communication, and monitoring), specifically:

- 51 -

- We did not maintain sufficient documentation supporting the application of our accounting policies, practices and procedures;

- We did not maintain adequately trained personnel in accounting and other functions critical to financial reporting;

- We did not maintain adequate mechanisms for anticipating and identifying financial reporting risks and for reacting to changes in our operating environment that could have a material effect on financial reporting;

- We did not maintain policies and procedures designed to ensure that we accounted for software capitalization, revenue recognition, and expense recognition in accordance with U.S. GAAP, and did not maintain effectively-designed preventive and detective controls to ensure proper application of U.S. GAAP in the financial reporting process;

- We did not adequately communicate employees' duties and control responsibilities; and

- Our periodic evaluations of internal controls and monitoring of remediation activities were not effective.

2.  ***Inadequate financial statement preparation and review procedures***.  We did not maintain adequate policies, procedures and personnel to ensure that accurate, reliable interim and annual consolidated financial statements were prepared and reviewed on a timely basis. Specifically, we identified the following deficiencies:

- Failure to document and approve journal entries at our corporate office and U.S. and U.K. payroll divisions;

- Inadequate policies and procedures to identify errors in accounts payable and various accruals and to ensure timely recognition of costs and expenses;

- Failure to appropriately segregate and define certain accounting duties relating to the identification, calculation and recording of liabilities;

- Inadequate cost and expense classification processes and review controls to ensure compliance with U.S. GAAP;

- Inadequate policies and procedures for the identification, calculation and recording of acquisitions and consolidation entries for international subsidiaries;

- Ineffective reconciliation of accounts; and

- Lack of sufficient finance and accounting personnel with appropriate U.S. GAAP expertise.

As a result of this material weakness, we (i) failed to recognize costs and expenses on a timely basis and misclassified costs and expenses in our consolidated statements of operations; (ii) incorrectly calculated and recorded acquisition and consolidation entries associated with our subsidiaries, principally in the United Kingdom and Canada, and (iii) improperly accounted for free rent, concessions and escalation clauses in leases.

3. ***Inadequate financial reporting processes and information systems in our United Kingdom subsidiary***.  Our financial reporting processes and information systems at our subsidiary in the United Kingdom were not adequately designed or operating to effectively support our financial reporting requirements. This material weakness is the result of aggregate deficiencies in internal control activities, specifically:

- Access and security control deficiencies surrounding the use of certain information technology applications;

- Insufficient data validation controls in end-user computing applications;

- Insufficient management oversight; and

- Lack of adequately trained finance and accounting personnel.

These deficiencies result in more than a remote likelihood that improper accounting for transactions could occur, and not be detected on a timely basis, resulting in material misstatements in our consolidated financial information.

4. ***Inadequate controls associated with the accounting for capitalized software costs and related amortization***.  Our internally developed software capitalization guidelines were not consistent with U.S. GAAP; we lacked personnel with sufficient expertise in software capitalization rules pursuant to U.S. GAAP; we did not adequately train employees, including financial analysts and project managers who performed these accounting functions; we failed to maintain sufficient documentation for the historical capitalization of certain software development costs and for the commencement of amortization related to such costs; and we had insufficient preventive and detective controls related to the capitalization of internally developed software. As a result of this material weakness, corrections of errors in accounting were required to reduce assets and stockholders' equity in our consolidated balance sheets; increase costs and expenses and reduce net earnings in our consolidated statements of operations; and reclassify amounts between operating activities and investing activities in our consolidated statements of cash flows.

5. ***Inadequate controls over complex transactions and accounting matters***.  We lacked adequately trained finance and accounting personnel with appropriate U.S. GAAP accounting expertise. Accordingly, in certain circumstances, an effective secondary review of technical accounting matters could not be performed. As a result of these deficiencies, errors in accounting for certain complex transactions occurred in the following areas:

- 53 -

- **_Inadequate revenue recognition procedures and controls_**.  We did not have adequate policies and procedures in place related to revenue recognition; we lacked personnel with adequate expertise in revenue recognition rules under U.S. GAAP; and we failed to consistently include finance and accounting personnel in the analysis of the impact revenue arrangements would have on consolidated financial reporting. As a result, accounting errors were identified related to revenue recognition. These errors in accounting were corrected by increasing deferred income and deferred costs and reducing stockholders' equity in our consolidated balance sheets; and reducing revenue, cost of revenue and net earnings in our consolidated statements of operations in 2003 and 2004.

- Statement of Financial Accounting Standards (FAS) 133, "Accounting for Derivative Instruments and Hedging Activities." *Our interest rate and fuel price derivative instruments did not satisfy the requirements of FAS 133 and, as such, did not qualify for hedge accounting treatment*.

*     *     *

- Application of FAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." *Our processes were insufficient to ensure the timely identification of business events impacting the useful life of our long-lived assets*. As a result, we failed to timely identify the need to shorten the estimated useful life of a trademark asset resulting from a strategic marketing decision made in January of 2004.

*     *     *

      *As a result of the aforementioned material weaknesses in internal control over financial reporting*, *material misstatements of our current and previous consolidated financial statements occurred and were identified*. To correct these errors in accounting, we restated our annual and interim consolidated financial statements for fiscal 1999 through fiscal 2003 and the fiscal quarters of 2004.

      118.   In Ceridian's 2004 Form 10-K, filed on April 21, 2005, Ceridian's auditor KPMG

issued a report confirming the Company's lack of adequate internal controls:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Ceridian Corporation:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting (page 58), that Ceridian Corporation and subsidiaries (the "Company") *did not maintain effective internal control* over financial reporting as of December 31, 2004, because of the effect of material weaknesses identified in management's assessment, based on criteria established in Internal Control—Integrated Framework issued by the

Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria).

119.    KPMG's report also set forth a comprehensive list of material deficiencies, which were identical to the Company's disclosures in ¶105.

**K.    Defendants' Insider Trading Scheme**

120.    At the time Ceridian was engaged in its fraudulent accounting manipulations which inflated its financial results and the price of the Company's stock, the Individual Defendants suspiciously sold 216,298 shares of Ceridian stock during the Class Period for proceeds of nearly *$4 million*. Defendants' sales are summarized in the chart below:

| Insider | Date | Price | Shares Sold | Proceeds | % Sold |
|---------|------|-------|-------------|----------|--------|
| **R. TURNER** | 9/9/2003 | $19.900 | 11,300 | $224,870 | |
| | 9/9/2003 | $19.940 | 3,500 | $69,790 | |
| | 9/9/2003 | $19.880 | 300 | $5,964 | |
| | 9/9/2003 | $19.810 | 400 | $7,924 | |
| | 9/9/2003 | $19.800 | 4,500 | $89,100 | |
| | 9/9/2003 | $19.860 | 3,900 | $77,454 | |
| | 9/9/2003 | $19.870 | 4,400 | $87,428 | |
| | 9/9/2003 | $19.920 | 4,500 | $89,640 | |
| | 9/9/2003 | $19.930 | 7,400 | $147,482 | |
| | 9/9/2003 | $19.750 | 300 | $5,925 | |
| | 9/9/2003 | $19.950 | 200 | $3,990 | |
| | 9/9/2003 | $19.890 | 3,100 | $61,659 | |
| | 9/9/2003 | $19.910 | 3,000 | $59,730 | |
| | 9/9/2003 | $19.850 | 900 | $17,865 | |
| | 9/9/2003 | $19.990 | 600 | $11,994 | |
| | 9/9/2003 | $19.970 | 600 | $11,982 | |
| | 9/9/2003 | $19.830 | 800 | $15,864 | |
| | 9/9/2003 | $19.700 | 100 | $1,970 | |
| | 9/9/2003 | $19.980 | 100 | $1,998 | |
| | 9/9/2003 | $19.960 | 1,000 | $19,960 | |
| | 9/9/2003 | $19.710 | 100 | $1,971 | |
| | **Totals** | | **51,000** | **$1.015M** | **26.08%** |
| **J. EICKHOFF** | 5/15/2003 | $16.620 | 50,000 | $831,000 | |
| | 5/15/2003 | $16.490 | 49,958 | $823,807 | |
| | 9/8/2003 | $20.000 | 65,340 | $1,306,800 | |
| | **Totals** | | **165,298** | **$2.961M** | **74.83%** |
| **GRAND TOTAL** | | | **216,298** | **$3.976 M** | |

121.    As the above chart illustrates, defendants Turner and Eickhoff dumped most of their shares for nearly $20.00 per share, which was over *40% higher* than Ceridian's stock price of $13.55 on the first day of the Class Period, and close to the Class Period high of $23.41.  Thus, defendants timed their insider sales perfectly to capture the significant inflation of the stock price, which was a result of the Company's false financial results and positive statements.

122.    **Timing and Coordination:**  Even though the Class Period in this case runs for nearly two years, Turner's and Eickhoff's insider sales occurred in a very short trading window.  In fact, all of Turner's sales and most of Eickhoff's sales occurred during the *same two-day period* (September 8-9, 2003) for up to $20.00 per share.  Thus, defendants' stock sales during the Class Period were highly coordinated and timed perfectly to coincide with the ascent of Ceridian's stock price.

123.    Additionally, defendants' stock sales occurred prior to the disclosure of *any* of the Company's five restatements or the SEC investigation.  Even more revealing, all of defendant Turner's sales during the Class Period, and $1.3 million of Eickhoff's sales, were executed in *3Q03*, a quarter in which EPS results were *overstated by 35%*.  In other words, defendants were careful to sell their shares and make their millions before the restatements were revealed while the Company was issuing fictitious EPS results that were grossly inflated due to defendants' fraud.

124.    **Suspicious Amounts:**  The amounts of defendants' stock sales are also evidence that the sellers knew of the serious undisclosed scheme and financial manipulations occurring inside Ceridian's business.  For example:

**Ronald Turner:**

- Turner had not sold a single share of Ceridian stock in *three years* prior to his Class Period sales.

- Turner's sale of 51,000 shares of Ceridian stock constituted over *26%* of his available shares of Ceridian stock.

**John Eickhoff:**

- 56 -

- Eickhoff had not sold a single share of Ceridian stock in *four years* prior to his Class Period sales.

- Eickhoff's sale of 165,298 shares of Ceridian stock constituted nearly *75%* of his available shares of Ceridian stock.

125.    The highly unusual coordination, timing, nature and amount of the Individual Defendants' stock sales is evidence that they possessed adverse non-public information regarding Ceridian's inflated financial statements.  Further, thousands of the shares sold by defendants were acquired at shockingly low prices pursuant to options exercise.  According to their SEC Form 4s, Turner acquired shares at $7.10 per share and Eickhoff acquired shares for $5.34 and $7.10. Meanwhile, average investors were paying $16-$20 per share, which were artificially inflated by defendants' misconduct.  As set forth in §V.A.-J., at the time when defendants were selling their stock for millions in illicit insider trading proceeds, they were aware that Ceridian's reported financial results were only attained through rampant accounting manipulations and a corrupt system of internal controls.

**L.    Defendants' Compensation and Bonuses Were Tied Directly to Ceridian's Earnings Targets and Were Suspiciously Changed to Avoid Any Impact of the Restatements**

126.    During the Class Period, defendants Turner and Eickhoff were motivated to inflate Ceridian's financial results by highly lucrative cash bonuses, potentially over $1 million per year, which were directly contingent upon Ceridian meeting certain EPS targets and other financial performance metrics.  According to the Company's 2003 and 2004 Proxies, *80%* of defendants' 2003 bonuses and *60%* of their 2004 bonuses were dependent upon the Company meeting certain EPS targets.  Not surprisingly, the Company's EPS results were grossly inflated during the Class Period and the most hard hit by the Company's restatements.  Indeed, the restatements revealed that the Company's reported EPS results for 2003 were *overstated by over 22%*.  In 3Q03, the quarter in which defendants unloaded most of their stock, the Company's EPS results were *overstated by 35%*.

In other words, 80% of defendants' 2003 bonuses were based on fictitious EPS results that defendants fraudulently engineered.

127.    In 2004, a period in which 60% of defendants' bonuses were based on EPS results, the restatements were even worse than 2003.  In 1Q04, 2Q04 and 3Q04, the Company's EPS results were ***overstated by 31%, 100% and 36%***, respectively.  Also in 2004, Turner's and Eickhoff's bonus structure suspiciously changed so it was no longer tied to revenue targets.  Instead, only 60% of defendants' bonuses were tied to EPS, and 40% were tied to ***cash flow targets***.  Thus, defendants purposely made sure that 40% of their bonuses were tied to a financial metric that they knew would not be impacted by the future restatements.  Indeed, defendants repeatedly tried to downplay the restatements by saying that it did not impact the ***cash flow*** of the Company.  For example, in connection with Restatement #2, Turner stated in the Company's October 18, 2004 press release that "***it should be noted that [the restatement] did not impact the historical cash flow of the Company***." This change was not coincidental.  As alleged in §V.A.-E., *infra*, defendants knew in 2003 that they were improperly booking revenue on SVS transactions and had changed their revenue recognition policy in July 2003.

### 1.    Turner's Compensation Structure

128.    Specifically, the Company's Proxy Statements for FY03 and FY04 revealed that in 2003, defendant Turner was eligible to receive a cash bonus of up to 200% of his $650,000 base salary.  According to the 2004 Proxy Statement, he also received 37,010 shares of restricted stock valued at $538,496 and was granted a stock option of 275,000 shares with a potential realizable value of up to $2.4 million.  However, Turner's potential $1,387,308 bonus was only available to him if Ceridian hit certain EPS and revenue targets. His 2003 bonus was 60% dependent on EPS, 20% dependent on quarterly EPS, and 20% dependent on revenue growth.  This gave Turner a $1,387,308 motive to make sure Ceridian's financial results reached certain levels, irrespective of

how those numbers were achieved.  Ultimately, Turner received a $650,000 bonus, or 100% of his salary based on the false financial results Ceridian reported in 2003.  Turner's entire 2003 bonus was based on EPS and revenue results that were overstated by *22% and 4.7%*, respectively.

129.    In 2004, while defendants continued to conceal Ceridian's true financial condition, Turner received an 11.5% raise, increasing his base salary to $725,000.  Pursuant to the 2005 Proxy Statement, in 2004, Turner was also granted a stock option for 262,280 shares with potential realizable value of up to $3.3 million and 43,715 shares of restricted stock valued at $898,780.  Also in 2004, Turner was eligible for a cash bonus of up to 140% of his $725,000 salary.  However, this potential $1,015,000 bonus was only available if Ceridian hit certain EPS and cash flow results.  60% of Turner's 2004 bonus was dependent on Ceridian's EPS results and 40% was tied to cash flow targets, meaning Turner had $609,000 riding on Ceridian's EPS targets alone.  These lucrative potential payouts during the Class Period gave Turner a strong motive to artificially inflate Ceridian's financial results.  Not surprisingly, after numerous restatements revealed that Ceridian's EPS results were overstated by as much as *100%* in 2004, Turner did not receive a bonus for 2004.  The Company's 2005 Proxy Statement stated that Turner's bonus was not merited given the overall performance of the Company.

### 2.    Eickhoff's Compensation Structure

130.    Defendant Eickhoff was eligible for a similar compensation structure.  In 2003, Eickhoff received a $414,423 salary.  Pursuant to the 2004 Proxy Statement, Eickhoff was also granted a stock option of 190,500 shares with potential realizable value of up to $1.2 million.  He was also eligible for a cash bonus as high as 110%-150% of his base salary.  The bonus was 60% dependent on EPS, 20% dependent on quarterly EPS, and 20% dependent on revenue growth.  Based on the false 2003 financial results, Eickhoff received a $300,000 bonus.  Thus, Eickhoff's

entire 2003 bonus was based on EPS and revenue results that were overstated by *22% and 4.7%*, respectively.

131.     In 2004, Eickhoff received an increase in his base salary to $425,000.  According to the 2005 Proxy Statement, Eickhoff also received a stock option of 114,450 shares with potential realizable value of up to $1.4 million.  In 2004,  Eickhoff's bonus was 60% dependent on Ceridian's EPS results and 40% on cash flow results.  If Ceridian hit the specified EPS and cash flow numbers in 2004, Eickhoff could receive a payment of up to 110% of his annual salary, or $467,000 in cash. These large potential cash payments provided strong motivation to artificially inflate Ceridian's financial results.   Like Turner, Eickhoff did not receive his 2004 bonus after news of the restatements was released.  According to the Company's 2005 Proxy Statement, Eickhoff did not merit any bonus whatsoever based on the financial performance of the Company and his individual performance.

### 3.     Other Top Ceridian Executives

132.     Bo Ewald, President of the Company's problematic HRS division was also eligible for a cash bonus based on certain targeted financial results.  Ewald became President of HRS on July 21, 2003.  For only six months of work, Ewald received a bonus of $215,000, more than 100% of his base salary of $210,096.  He also received $508,188  in restricted stock awards, stock options with potential realizable value of up to $1.9 million, along with a $76,392 tax reimbursement for his $90,000 one-time hiring bonus.  In 2004, Ewald received a raise of slightly more than 20% (using his annualized 2003 salary), increasing his salary to $475,000.   According to the 2005 Proxy Statement, Ewald also received a stock option with potential value of up to $1.3 million and $343,146 of restricted stock.   However, Ewald's 2004 bonus was withheld after the Company disclosed its accounting improprieties and false results, many of which occurred in Ewald's HRS unit.  Ewald was also replaced in the wake of the Company's restatements.

133. Notably, other top executives, Gary Krow, Executive Vice President and President of Comdata, and Gary Nelson, Executive Vice President, General Counsel and Corporate Secretary, received their results-based bonuses for 2004. The fact that Turner, Eickhoff, and Ewald had their bonuses withheld when other executive officers received bonuses for 2004 indicates that Turner, Eickhoff and Ewald were involved in conduct that caused Ceridian to issue false financial statements. Additionally, as set forth above, both Eickhoff and Ewald were replaced, further confirming their involvement in the Company's fraud.

134. Defendants' compensation packages combined with their insider trading scheme during the Class Period provided strong motivation to manipulate and overstate Ceridian's financial results for personal gain.

**M.      Statements from Former Ceridian Senior Vice Presidents and Financial Personnel Reinforce the Strong Inference of Scienter**

135. Numerous former employees of Ceridian have confirmed various facts related to plaintiffs' allegations and defendants' participation in Ceridian's accounting decisions during the periods impacted by the financial restatements. Confidential Witness ("CW__") No. 1 was the Vice President of Finance for the problematic HRS Division at Ceridian before and during the Class Period until late 2004. CW1's duties and responsibilities for HRS included overseeing revenue recognition and interfacing with financial analyst Mike Dyste who was responsible for development/capital costs.

136. CW1 explained that defendant Buzz Gross was responsible for the accounting policies and procedures for the entire Company and reported directly to defendant CFO Eickhoff. CW1 stated that Gross was also responsible for ensuring that Ceridian and its employees complied with proper accounting standards. CW1 stated that Gross directed that Ceridian's accounting policies and procedures be kept on Ceridian's internal website for reference by Ceridian accounting and finance personnel. CW1 also stated that if he or Mike Dyste had an accounting question, they

would request guidance directly from defendant Buzz Gross. CW1 stated that he and Mike Dyste personally conferred with Gross for validation and approval of accounting decisions to make sure they followed the correct accounting standards. CW1 also stated that if he was unsure about a revenue recognition transaction, he would seek guidance directly from Gross. CW1 recalled a specific issue with revenue recognition changes in 2003 for multi-element contracts, and stated that Gross was responsible for compliance with the new rules and worked directly with KPMG.

137.    CW1 first heard about revenue recognition problems at Comdata/SVS in early 2003. He recalled that the issue was related to Comdata's recognition of revenue on SVS gift cards. CW1 stated that HRS held monthly meetings to discuss operations and that defendants Eickhoff and Turner attended. CW1 also stated that during one meeting in 1Q04 the SEC investigation and the restatements were discussed and Eickhoff and Turner admitted that Ceridian's orders had slowed. They tried to establish a plan to answer questions from Ceridan customers whereby all customer inquiries were directed to defendant CEO Turner.

138.    CW2 was the former Senior Vice President of Marketing at Ceridian from January 2002 to February 2005. CW2 worked in the Company's problematic HRS division, which was the source of a large amount of Ceridian's improper accounting. CW2's responsibilities consisted of marketing Ceridian's payroll software products , including SourceWeb and E-Source. CW2 initially reported to HRS division President Tony Holcombe, but later reported to President successor Bo Ewald, who eventually left the Company under suspicious circumstances after Ceridian's massive restatements. *See* §V.N., *infra*. According to CW2, there was a "schedule of authorization" for expenses at Ceridian. Defendants Turner and Eickhoff were required to sign off on a "schedule of authority" form for all capital expenditures or expense approvals over a certain dollar amount. CW2 also stated that even the smaller marketing expenses for which CW2 sought approval needed to be signed by both Eickhoff and Turner. CW2 stated that defendant Eickhoff rarely signed anything

without defendant Turner signing it first.  CW2 also reported that Eickhoff and Turner attended monthly HRS meetings with CW2 and 35-50 other senior managers to discuss HRS operations.

139.    CW3 was the former Senior Financial Analyst at Ceridian from March 1999 through September 2001.  CW3 reported that financial analysts were responsible for month-end closing of Ceridian's books, comparing actual results to forecasts, and assisting in budgeting.  CW3 also reported that defendants Eickhoff and Gross had meetings at the end of each month to discuss Ceridian's monthly financial results, including revenues and expenses.  CW3 stated that defendants Gross and Eickhoff made the strategic decisions related to the capitalization of expenses concerning Ceridian's software projects, including Ceridian's "Source500" software project.  CW3 also stated that she learned through her experience in the accounting and finance organization that Ceridian was recognizing revenue on contracts with customers without any contract.  This type of revenue manipulation was confirmed by Ceridian's restatements and the allegations of Whistleblower #1 as set forth above.

**N.    The Unusual Circumstances Surrounding the Departure of Ceridian's Top Financial Officers Confirms the Strong Inference of Scienter**

140.    During the height of defendants' fraudulent accounting schemes in December 2004, the Company abruptly announced the departure of three of Ceridian's top executives, including defendants Eickhoff and Gross, and HRS President Ewald.  These announcements came amid a formal SEC investigation after the Company had delayed numerous SEC filings due to accounting violations and impending financial restatements.  The departures were not coincidental.  All three executives occupied high-level positions of power and had statutory responsibility for areas of the Company which resulted in the financial restatements.  Eickhoff and Gross, as CFO and "Principal Accounting Officer," respectively, had complete control over the Company's accounting and financial reporting processes and internal controls.  Most if not all of the fraud occurred in areas of accounting and finance, under the direct supervision of Eickhoff and Gross.  Indeed, Eickhoff and

Gross both signed Ceridian's false financial statements and Eickhoff signed sworn certifications under Sarbanes-Oxley that the financial statements were accurate. Ewald was the President of the HRS division, which was responsible for much of the Company's improper expense reporting problems during the Class Period.

141.    The suspicious exodus of these top executives, including defendants Eickhoff and Gross, just as partial disclosures of the violations and false statements were leaking out, contributes to a strong inference that they knew or were reckless in not knowing that Ceridian's financial statements were false.

142.    The strong inference of scienter is also reinforced by Ceridian's announcement that the departure of defendants Eickhoff and Gross would become effective only upon the filing of amended (*i.e.*, truthful) financial statements which corrected earlier accounting violations announced in December and January 2005. Although Eickhoff left the Company on February 18, 2005 when some of the restated financials were filed with the SEC, those restated financials were also false and misleading and resulted in additional restatements in March and April 2005. The timing of Eickhoff's ouster after dumping almost 75% of his total available shares of Ceridian stock at inflated prices and leaving other investors holding the bag for the Company's additional restatements, gives rise to a strong inference of his scienter.

143.    The purported "retirement" of defendant Buzz Gross was also made contingent upon the filing of clean restated financials. This fact combined with Gross' position as "principal accounting officer" and direct involvement in the Company's accounting processes and controls, gives rise to a strong inference of his scienter.

144.    The fact that three high-level executives stepped down during the same period in which Ceridian began disclosing massive financial improprieties and restatements in the areas that those executives were responsible for, gives rise to an inference of their scienter. Further, the

suspicious timing of the announcement of the departure of Eickhoff, Gross and Ewald during the same time that Ceridian fired 14 other employees (including Whistleblower #1), for knowingly inflating Ceridian's books by manipulating expenses, reinforces the inference of scienter.  Indeed, the Company admitted in SEC filings that certain "disciplinary actions" were taken as a result of the Company's widespread accounting violations.  As stated in the Company's Form 10-K for 2004:

> In addition, in an effort to improve internal control over financial reporting, we continue to emphasize the importance of establishing the appropriate environment in relation to accounting, financial reporting and internal control over financial reporting and the importance of identifying areas of improvement and to create and implement new policies and procedures where material weaknesses or significant deficiencies exist. Furthermore, in an effort to improve internal control over financial reporting, we have hired additional accounting expertise, continued our use of external resources, *taken certain disciplinary actions, terminated certain individuals, and selected a new chief financial officer to join the Company following the retirement of Mr. Eickhoff*.

145.    Although the Company did not expressly disclose which personnel were replaced, the suspicious timing of the departures of Eickhoff, Gross and Ewald gives rise to an inference that they were involved in the Company's misconduct.

**O.    The Expanded SEC Investigation Reinforces the Strong Inference of Scienter**

146.    On April 20, 2005 in connection with the Company's filing of its Form 10-K for 2004, the Company admitted that the SEC had widened the scope of its investigation.  According to the Company, the SEC issued a second document request on December 10, 2004, which "broadened the areas of inquiry to include, among other things, Ceridian's restatement, revenue recognition, capitalization, expense recognition, *how we respond to any internal ethics complaints*, and Ceridian's accounting policies and procedures."

147.    Given the damaging allegations and facts revealed by Whistleblower #1, and the Company's previous acknowledgements that Whistleblower #2 came forward to complain about Ceridian's improper accounting, the announcement that the SEC was investigating how the

Company "respond[s]" to such complaints gives rise to an inference that defendants were at least severely reckless and deliberately ignored the violations.

### P.   The Pervasiveness and Magnitude of the Company's Five Restatements Reinforce Scienter

148.   As set forth in §V.E.-I., and in the chart on p. 2, the pervasiveness and magnitude of Ceridian's restatements further confirm defendants' scienter.   The restatements are admissions that the financial statements originally issued were false and that the overstatement of revenues and earnings was material.   Defendants restated *five* times based on violations in virtually every aspect of Ceridian's accounting practices.   Such numerous and widespread violations are not the result of minor or technical errors or changes in accounting principles.   Rather, the restatements are evidence of the fraudulent scheme defendants employed to inflate Ceridian's revenues, earnings and EPS, three of the most important line items on Ceridian's financial statements.   The magnitude and materiality of the restatements are evidence that defendants knowingly or recklessly caused Ceridian to report materially false and misleading financial results.

### Q.   The Company's Fraudulent Financial Reporting Impacted the Core Operations of the Company, Which Gives Rise to a Presumption of Knowledge

149.   Defendants' knowledge and/or deliberate recklessness are also inferred from the fact that the most pervasive fraud occurred in Ceridian's core division, HRS.   As CEO, CFO and Controller, the Individual Defendants kept a close watch on the financial results of HRS, which accounted for *73%* of Ceridian's revenues in 2004 and *70%* of revenues in 2003.   The fact that accounting manipulations in the HRS division's financial results necessitated the vast majority of Ceridian's restatements raises a strong inference of defendants' scienter as to the falsity of those financial results.

150.   Moreover, the fraud primarily involved what Ceridian admitted in its 2002 Form 10-K were its two "most critical" accounting policies: "revenue recognition and development cost

recoverability." As the restatements reveal, and discussed in §V.A.-G., *supra*, it was in these two areas where the significant accounting manipulations occurred. Thus, a strong inference can be drawn that defendants knew, or were reckless in not knowing, that Ceridian's financial statements were false given that the Company's two "most critical" accounting practices were at the heart of the falsity.

151. Finally, defendants admitted that the internal investigation of Ceridian's accounting practices had a direct effect on the Company's core operations. HRS orders declined as a result of customer concern over the accounting investigation. In the October 18, 2004 press release, defendants admitted:

> Margins will be reduced by approximately $7 million due to the costs associated with the above mentioned investigation and greater spending related to Sarbanes-Oxley compliance. In addition, the adoption of the new capitalization policy will result in additional expense of about $6.5 million for the third quarter than previously planned. Consequently, earnings per share for the third quarter are expected to be $.12 to $.13.
>
> ***Order levels for the third quarter in HRS have been hurt by uncertainty in the market created by the delayed announcement of second quarter results*** and concerns of customers as to the timing of their own Sarbanes-Oxley compliance efforts. Consequently, orders were down slightly over 10 percent in the quarter from the prior year. Following the Company's filing of its current financial statements, orders are expected to rebound to double digit growth levels in the fourth quarter. However, orders lower than plan in the third quarter will have a negative impact on near term revenues and profits.

152. Turner also admitted the negative impact on orders in 3Q04 in a December 15, 2004 press release:

> Order levels in U.S. HRS were weak, however, because of the disruption and uncertainty related to the internal accounting investigation.
>
> \*        \*        \*
>
> HRS revenue and margins will be negatively impacted by continuing weakness in order levels in the U.S. The Company anticipates that orders should rebound as the uncertainty surrounding the Audit Committee investigation clears, however, we now expect HRS orders in the fourth quarter to be down modestly compared to last year. This will also have a negative impact on our performance in 2005.

153.    Similarly in the December 16, 2004 conference call, Turner admitted that the accounting scandal had impacted Ceridian's core operations, but misleadingly attempted to draw attention away from the investigation by claiming other factors had also affected the decline in orders:

> As we discussed in October, the uncertainty created by our internal investigation had a negative impact on our HRS business in the third quarter. Concerns of potential customers as to the timing of their own Sarbanes-Oxley compliance efforts also impacted us in the third quarter.

## VI.    FALSE AND MISLEADING STATEMENTS[5]

### A.    False 1Q03 Statements

154.    **False Statement – April 17, 2003 Press Release:**  On April 17, 2003, Ceridian issued a press release entitled "*Ceridian Corporation Reports Solid First Quarter Results,*" announcing its 1Q03 financial results.  The press release was also attached to a corresponding Form 8-K filed with the SEC on the same date.  The press release stated in part:

> *First quarter 2003 net earnings were $26.7 million, or $.18 per diluted share of common stock, on revenue of $314.6 million. . . .*

> "*I am very pleased with Ceridian's operating results for the first quarter of 2003 and believe we are off to a good start for the year*," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian.

> *              *              *

> "*Comdata's performance during the quarter exceeded our expectations, despite the on-going challenges in both the transportation and retail markets. Revenue during the quarter was greater than our expected range with high transaction volumes in both transportation and Stored Value Systems (SVS)*. Comdata's emerging businesses in local fleet services and payroll cards gained traction during the quarter and contributed meaningfully to growth. SVS' solid performance in gift card sales and transactions is expected to continue through the balance of the year."

---

[5]     All false and misleading statements are identified in bold and italics.

155.     **False Statement – April 17, 2003 Conference Call:**  Also, on April 17, 2003,

Ceridian held a conference call with investment analysts repeating and discussing the 1Q03 financial

results.  Defendants Turner and Eickhoff both issued false statements to the investment community.

(a)     During the call, Individual Defendant Turner stated in part:

> *With the uncertain and difficult economic environment which we operate,*
> *we are pleased with the results of our first quarter, our financial performance in*
> *the first quarter was in line with what we expected for human resource solutions*
> *with revenue in the range we discussed on our January call.  In the first quarter,*
> *Comdata exceeded the top end of the revenue range we anticipated.  Earnings for*
> *the first quarter at 18 cents per share, were in the middle of the range we indicated*
> *in January.  In my view, the first quarter was a good, solid quarter and a good start*
> *for the year.*

*                    *          *          *

> *Comdata Stored Value Systems also performed very well in a difficult retail*
> *environment. SVS had strong quarter card sales and revenue from these sales*
> *increased significantly from the prior year period. . . .*

> *The number of transactions processed at SVS showed a very solid increase,*
> *and revenue growth from card processing also increased very strong from last*
> *year. SVS grew its revenue by 22% over the prior year period.*  We expect SVS to
> continue to grow at a healthy double-digit rate and meet our expectations for the
> year.

(b)     In addition, during the April 17, 2003 conference call, defendant Eickhoff

repeated the Company's false financial statements and stated:

> *So in summary, revenue and profit were right in line with what we*
> *expected. Both internal and for each of the business units*.

156.     On April 21, 2003, the next trading day, Ceridian's stock price increased over 1% to

an artificially inflated price of $17.22 per share, which was 27% higher than the stock price on the

first day of the Class Period.

157.     **False Statement – May 8, 2003 Form 10-Q:**  On May 8, 2003, Ceridian issued its

final 1Q03 financial results in a Form 10-Q filed with the SEC.  The 10-Q reported the following

false revenue, expenses, net earnings and EPS for the quarter ending March 31, 2003:

- 69 -

| Revenue | $314.6[6] |
|---|---|
| Total Costs and Expenses | $272.5 |
| Net Earnings | $26.7 |
| EPS (diluted) | $0.18 |

158.    The Company also reported the following with respect to its "Controls and Procedures."

(a)  Evaluation of Disclosure Controls and Procedures.

Within 90 days prior to the filing of this report ("Evaluation Date"), *we carried out an evaluation, under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Executive Vice President and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-14 of the Securities Exchange Act of 1934, as amended ("Exchange Act")*. Based upon this evaluation, our President and Chief Executive Officer and our Executive Vice President and Chief Financial Officer concluded that, as of the Evaluation Date, *our disclosure controls and procedures (as defined in Rule 13a-14(c) under the Exchange Act) are effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.*

(b)  Changes in Internal Controls.

*There were no significant changes in our internal controls or in other factors that could significantly affect these controls subsequent to the Evaluation Date.*

Ex. G.

159.    Defendant Gross signed and attested to the Company's financial statements and Form 10-Q as the "Vice President and Corporate Controller (Principal Accounting Officer)."

160.    **False Statement – May 8, 2003 Certifications:** On May 8, 2003, both Turner and Eickhoff submitted signed certifications as exhibits to the Form 10-Q attesting to the truth and

---

[6]    Dollars are in millions, except EPS.

accuracy of the reported financial statements.  The certifications are attached hereto as Ex. G and state in pertinent part:

> 1.      I have reviewed this quarterly report on Form 10-Q of Ceridian Corporation;
>
> 2.      ***Based on my knowledge, this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; [and]***
>
> 3.      ***Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report*** . . . .

161.    Turner and Eickhoff also both filed signed certifications attesting to the accuracy of the financial statements pursuant to their obligations under §906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").  Each defendant certified that, to the best of his knowledge:

> (1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) ***The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.***

162.    Turner and Eickhoff also filed sworn certifications attesting to the Company's systems of internal financial controls.  The certifications stated in pertinent part:

> The registrant's other certifying officers and I are ***responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:
>
> a)  ***designed such disclosure controls and procedures*** to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;
>
> b) ***evaluated the effectiveness*** of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and
>
> c)  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*Id.*

## B.     Reasons Why the 1Q03 Statements Were False and Defendants Knew It

163.    The falsity of defendants' 1Q03 statements is confirmed by the Company's five separate financial restatements as set forth in §V.A.-G., *supra*.  In the first restatement, Ceridian admitted to overstating revenue in 1Q03 by $0.5 million.  Even that restated number, however, was false and misleading because the subsequent restatements revealed that revenue was actually overstated by *$7.7 million,* or *2.4%* of total 2Q03 revenues, which was *1400%* higher than the revenue number disclosed in the first restatement.

164.    As set forth in §V.D.-I., the Company's restatements of its 1Q03 financial results are an admission that those results were materially false at the time they were issued, based on facts existing at the time.  *See* Accounting Principles Board ("APB") No. 20.  Thus, defendants' statements in press releases, SEC filings and conference calls concerning the Company's overall financial condition and specifically revenues at its SVS unit were false and misleading when issued.  Further, defendants' 1Q03 statements were false because they failed to disclose the Company's accounting manipulations and lack of internal controls.  As set forth in §V.E., defendants were aware

in 1Q03 that their revenue recognition policy was being manipulated to overstate revenues recognized from SVS transactions before the revenue was earned. Indeed, defendants falsely changed their revenue recognition policy only a few months after their 1Q03 results were issued.

165.     As set forth in §§V.K. & L., defendants' insider trading scheme and 2003 compensation packages were tied directly to the Company's revenue and EPS results in 2003, giving them a strong motive to falsify the 1Q03 results. In fact, on May 15, 2003, only a week after the Company filed its final 1Q03 results with the SEC (which contained defendants' signed certifications of the accuracy of the results), Eickhoff dumped almost a *million* shares of his stock for over *$1.6 million* in illicit proceeds. Eickhoff and Gross were later replaced and their so-called "retirements" were made contingent on the issuance of accurate 2003 and 2004 financial results.

166.     Finally, defendants' scienter is shown by the facts alleged in connection with Whistleblower #1's lawsuit filed against Ceridian under Sarbanes-Oxley. ¶¶23-33, *infra*. Whistleblower #1 stated that she specifically told defendant Buzz Gross about Ceridian's improper accounting and that many other executives were aware of it. The restatements reveal that Ceridian continued to disregard Whistleblower #1's warnings and ended up reversing millions in revenues and expenses in the same areas identified by Whistleblower #1 in 2001. ¶¶34-36. Ceridian also expressly admitted in documents filed with OSHA that at least 14 employees "knew" about improper accounting and caused Ceridian to inflate its financial results. ¶31. Defendants' scienter is also reinforced by the numerous CWs cited in ¶¶135-139, who confirmed defendants' involvement in all aspects of the Company's financial and accounting decisions.

C.     **False 2Q03 Statements**

167.     **False Statement – July 17, 2003 Press Release:**  On July 17, 2003, Ceridian issued a press release entitled, ***"Ceridian Corporation Reports Solid Second Quarter Results,"*** announcing

its 2Q03 financial results.  The press release was also attached to a corresponding Form 8-K which

defendants filed with the SEC on the same date.  The press release stated in part:

> **Second quarter 2003 net earnings were $25.4 million, or $.17 per diluted share of common stock, on revenue of $297.8 million. . . .**

> **"I am pleased with Ceridian's operating results for the second quarter of 2003,"** said Ronald L. Turner, chairman, president and chief executive officer of Ceridian.

> **"The Human Resource Solutions (HRS) business again met revenue growth expectations despite the low interest rate environment and moderating weakness in customer employment levels.**  I am particularly encouraged that customer retention remains ahead of plan, and that order levels during the quarter increased in the mid-teens on a percentage basis compared to last year's second quarter.  We remain confident that we can post double-digit order growth for the year."

> **"Comdata's bottom-line performance during the quarter was solid, especially given the on-going challenges in the transportation market.**  Transportation revenue during the quarter was slightly less than anticipated, primarily due to softness in the transportation industry. Transaction levels in the over-the-road trucking market slowed considerably during the first two months of the quarter before rebounding in June.  **Stored Value Systems (SVS) enjoyed strong performances in both gift card sales and transactions, and we expect SVS to continue its solid performance through the balance of the year.  Comdata's emerging businesses again gained traction during the quarter and contributed meaningfully to growth**."

168.  **False Statement – July 17, 2003 Conference Call:**  Also on July 17, 2003, Ceridian

held a conference call with analysts announcing the 2Q03 financial results:

(a)  During the call, Turner stated in part:

> *I am extremely pleased with the results of our second quarter.  Our financial performance for the quarter was solid.  Our range was on target, revenues were in line with our expectations*.

*      *      *

> *For the second quarter revenues for the HR business segment were $220 million and $456 million in the second half of 2003. In the quarter, this represents about 6% revenue growth from the prior year and this is the fourth straight quarter we have seen year over year quarterly revenue growth.*

*      *      *

*During the second quarter Comdata data generated revenues of over $77 million and revenues of 56 million for the first half. Comdata's focus on customer satisfaction, operating efficiency and productivity continued to reap results. Second quarter operating margins were above planned at almost 33%.*

*       *       *

*Comdata's stored value systems again performed well in the quarter and exceeded our expectations and plans.  Revenue growth from card processing continue to be solid in the second quarter, up more than 20% from the prior year*.

(b)       On the same July 17, 2003 conference call, defendant Eickhoff stated:

*Revenue for the quarter was $298 million, up 3.5% over last year and within the range we suggested for the quarter. . . . Earnings per share were 17 cents, which is exactly what we expected. It is 1 cent over last year's result*.

*       *       *

*Total HR revenue for the quarter was $220.4 million, up 5.8% over last year.  And within the guidance that we had provided.*

*       *       *

*Within [SVS], card revenue and transaction processing revenue were both up more than 20% in the quarters.*

169.       During the July 17, 2003 call, defendant Eickhoff also falsely explained a change in

the Company's revenue recognition policy for its SVS unit:

In the third quarter based on new accounting interpretations we will be required to make a modification in the way revenue is recognized for [SVS].  That's going to go through the details of the change being implemented, but in summary a portion of the transaction processing revenue will be deferred and spread over six months following the transaction.  On the other hand, all [SVS] card revenue will be now recognized as revenue upon delivery to customers rather than some of it being spread over time which was the case in the past. *The impact of this change is fairly insignificant in that revenue in the second half of the year will increase by about $3-4 million*. Because of the substantially different profit margins on cards versus transaction processing the profit impact of this change is expected to be slightly negative.

*This is not a significant change but one reason I'm bringing it to your attention is that card revenue will likely become somewhat more volatile and more difficult to predict than it has historically been. So in summary, for the company, revenue and profits were in line with what we expected*.

- 75 -

170.    On July 18, 2003, the day after defendants' false statements, Ceridian's stock price increased to an artificially inflated $18.28 per share, which was 35% higher than the price on the first day of the Class Period.

171.    **False Statement – August 14, 2003 Form 10-Q:**  On August 14, 2003, Ceridian issued its final 2Q03 financial results in a Form 10-Q with the SEC.  The 10-Q reported the following false revenue, expenses, net earnings and EPS for the quarter ending June 30, 2003:

|                          | **2Q03** | **First Half 2003** |
|--------------------------|----------|---------------------|
| Revenue                  | $297.8   | $612.4              |
| Total Costs and Expenses | $257.7   | $530.3              |
| Net Earnings             | $25.4    | $52.1               |
| EPS (diluted)            | $0.17    | $0.35               |

172.    The Company's Form 10-Q for 2Q03 also contained false statements concerning its "Controls and Procedures" that were substantially similar to the disclosures made in ¶158 in 1Q03.

173.    Defendant Gross signed and attested to the Company's financial statements and Form 10-Q as the "Vice President and Corporate Controller (Principal Accounting Officer)."

174.    **False Statement – August 14, 2003 Certifications:** In the August 14, 2003 Form 10-Q, both Turner and Eickhoff submitted signed certifications attesting to the truth and accuracy of the Company's reported financial statements and its system of internal controls, which were substantially identical to the certifications made in ¶¶141-142, *supra*.

175.    On August 15, 2003, Ceridian's stock increased slightly to $18.49 per share.

    **D.    Reasons Why the 2Q03 Statements Were False and Defendants Knew It**

176.    The falsity of defendants' 2Q03 statements is confirmed by the Company's five separate financial restatements, as set forth in §V.D.-I., *supra*.  In the first restatement, Ceridian admitted to understating total costs and expenses by $0.7 million.  Even that restatement was false,

however, because the subsequent restatements revealed that revenue and net income were also overstated by $6.7 million and $0.4 million, respectively.

177.    As set forth in §V.D.-I., the Company's restatements of its 2Q03 financial results are an admission that those results were materially false at the time they were issued, based on facts existing at the time.  *See* APB No. 20.  Thus, defendants' statements in press releases, SEC filings and conference calls concerning the Company's financial condition in 2Q03, and specifically revenue, expenses and earnings, including revenues from SVS, were false and misleading when issued.  Defendants' 2Q03 statements were also false because they failed to disclose the Company's rampant accounting manipulations and complete lack of internal controls. Further, as set forth in §V.B., defendants were aware in 2Q03 that their revenue recognition policy was being manipulated to overstate revenues recognized from SVS transactions before the revenue was earned.  Indeed, defendants knowingly changed their revenue recognition policy in July 2003 to a method which violated GAAP.

178.    As set forth in §§V.K. & L., defendants' insider trading scheme and 2003 compensation packages were tied directly to their revenue and EPS results in 2003, which were grossly overstated. Thus, defendants had a strong motive to inflate the Company's 2Q03 results and its stock price so that defendants could unload their Ceridian shares at higher prices before the market learned of the accounting fraud.

179.    Finally, defendants' scienter is shown by the facts alleged in connection with Whistleblower #1's lawsuit filed against Ceridian under Sarbanes-Oxley.  ¶¶23-33, *infra*. Whistleblower #1 stated that she specifically told defendant Buzz Gross about Ceridian's improper accounting and that many other executives were aware of it.  The restatements reveal that Ceridian continued to disregard Whistleblower #1's warnings and ended up reversing millions in revenues and expenses in the same areas identified by Whistleblower #1 in 2001. ¶¶34-36. Ceridian also

expressly admitted in documents filed with OSHA that at least 14 employees "knew" about improper accounting and caused Ceridian to inflate its financial results.  ¶31.  Defendants' scienter is also reinforced by the numerous CWs cited in ¶¶135-139, who confirmed defendants' involvement in all aspects of the Company's financial and accounting decisions.

### E.    False 3Q03 Statements

180.    **False Statement – October 15, 2003 Press Release:**  On October 15, 2003, Ceridian issued a press release entitled, "***Ceridian Corporation Reports Solid Third Quarter Results***."  The press release announced the Company's 3Q03 financial results and was also attached to a corresponding Form 8-K filed with the SEC on the same date.  The press release stated in part:

> ***Third quarter 2003 net earnings were $30.3 million, or $.20 per diluted share of common stock, on revenue of $309.5 million. . . .***
>
> "***I am extremely pleased with Ceridian's operating results for the third quarter of 2003,***" *said Ronald L. Turner, chairman, president and chief executive officer of Ceridian*.
>
> "***During the quarter, the Human Resource Solutions (HRS) business posted solid top-line growth despite the continuing negative economic impact from low interest rates and weak hiring trends. The U.S. human resources business met our expectations, as new business, higher float balances, and better retention more than offset the negative impact of the economy. . . .***"
>
> "***I am particularly encouraged that order levels remained strong during the quarter, increasing almost 20 percent over the third quarter of last year.  We are confident that we can post double-digit order growth for both the fourth quarter and the year***.
>
> "***Comdata posted very strong results in the quarter.  Revenue was up significantly year over year, mainly on strength in Stored Value Systems.  Gift card and transaction revenue both came in above plan, and new customers contributed meaningfully to revenue during the quarter. . . .***"
>
> "Cash flow from operations remained very strong during the quarter. We have reduced our debt balance by more than $52 million since June, and continued to opportunistically repurchase Ceridian shares."

181.    **False Statement – October 15, 2003 Conference Call:**  On October 15, 2003, defendants held a conference with analysts repeating the Company's false 3Q03 financial results.

      (a)     On the call, defendant Turner stated in part:

*For the third quarter, revenues for the HR business were $224 million and $680 million for the first nine months of 2003.  For that quarter, this represents a 5.8% revenue growth from the prior year.  This is the fifth straight quarter we have seen year-over-year quarterly revenue growth.*

\*     \*     \*

*During the quarter, [Comdata] generated revenues of $85.3 million, a 13% increase from the third quarter of 2002.  [Comdata]'s focus on customer satisfaction, operating efficiency and productivity continue to provide strong benefits.  Third quarter operating margins were above  34%.*

\*     \*     \*

*In retail services, the performance of Comdata Stored Value Systems was outstanding in the third quarter.*  The performance exceeded both our expectations and our plan.

\*     \*     \*

*Overall, it was a solid quarter, good first nine months of 2003 for both of our business segments.*

      (b)     Also during the conference call, defendant Eickhoff repeated the Company's

false 3Q03 results and stated in part:

*Revenue for the quarter was $310 million, up 7.3% over last year, and within the range that we suggested for the quarter.*

\*     \*     \*

*EPS were 20 cents, which is exactly what we expected, and is 1 cent over last year's results excluding the one-time charge that we took in the third quarter of last year.*

\*     \*     \*

*[T]he total HR revenue for this quarter was $224.2 million, up 5.2% over last year.*

\*     \*     \*

*The Human Resource operating profit margin for this quarter was 8.4%, which includes a $3 million onetime gain on the sale and investment that I talked about earlier.  Excluding this one-time gain, the margin for the quarter was 7.1%, which is just slightly below last year.*

\*     \*     \*

> *Comdata had a strong quarter, which was exaggerated by an easy [sic] compared to last year and to a lesser extent the revenue recognition change that I talked about last quarter.  Revenue for the quarter is $85.3 million, up 13% over last year, and at the top end of the range we expected.*

*       *       *

> *As a result of substantially increased SVS business and because of an easy year-over-year compare, the SVS revenue almost doubled last year's revenue.*

*       *       *

> So in summary, we are very pleased with the quarter.  *Revenue, profit, orders, operational improvements met our expectations for the quarter and the pipeline looks promising.*

182.    On October 16, 2003, Ceridian's stock was trading at an artificially inflated $20.50 per share, over 50% higher than the price on the first day of the Class Period.

183.    **False Statement – November 7, 2003 Form 10-Q:**  On November 7, 2003, Ceridian issued its 3Q03 financial results by filing its Form 10-Q with the SEC.  The 10-Q reported the following false revenue, expenses, net earnings and EPS for the quarter ending September 30, 2003:

|                          | **3Q03** | **2003 First Nine Months** |
|--------------------------|----------|----------------------------|
| Revenue                  | $309.5   | $921.9                     |
| Total Costs and Expenses | $261.7   | $791.9                     |
| Net Earnings             | $30.3    | $82.4                      |
| EPS (diluted)            | $0.20    | $0.55                      |

184.    The Company's Form 10-Q for 2Q03 also contained false statements concerning its internal "Controls and Procedures" that were substantially similar to the disclosures made in ¶158 in 1Q03.

185.    Defendant Gross signed and attested to the Company's financial statements and Form 10-Q as the "Vice President and Corporate Controller (Principal Accounting Officer)."

186.    **False Statement – November 7, 2003 Certifications:** In the November 7, 2003 Form 10-Q both Turner and Eickhoff submitted signed certifications attesting to the truth and

- 80 -

accuracy of the reported financial statements and the Company's system of internal controls, which were virtually identical to the certifications made in ¶¶141-142, *supra*.

187.    On November 10, 2003, the next trading day, Ceridian's stock price traded at an artificially inflated $21.45 per share, 4% higher than the price on the date of defendants' October 15, 2003 false statements.  From November 2003 to late January 2004, Ceridian's stock continued to be inflated by defendants' false statements hovering in the low $20 range.

F.    **Reasons Why the 3Q03 Statements Were False and Defendants Knew It**

188.    The falsity of Ceridian's 3Q03 statements is confirmed by the Company's three separate financial restatements, as described in §V.D.-I., *supra*.  In the first restatement, Ceridian admitted to overstating revenue and earnings by $5.6 million and $1.0 million, respectively.  Even those restated financials, however, were false and misleading because the company's subsequent restatements revealed that revenues and earnings were actually overstated by ***$17.9 million (5.8%)*** and ***$10.9 million (36%)***, respectively.  Importantly, the subsequent restatements also revealed that the Company's originally reported EPS of $0.20 (which was reduced to $0.19 after the first restatement) was really $0.13, a ***35%*** overstatement.

189.    As set forth in §V.A.-G., the Company's restatements of its 3Q03 financial results are an admission that those results were materially false at the time they were issued, based on facts existing at the time.  *See* APB No. 20.  Thus, defendants' statements in press releases, SEC filings and conference calls concerning the Company's overall financial condition and specifically revenue, expenses and earnings, including revenues from SVS, were false and misleading.  Defendants' 3Q03 statements were also false because they failed to disclose the Company's accounting manipulations and lack of internal controls. Further, as set forth in §V.E., defendants were aware in 3Q03 that their revenue recognition policy was being manipulated to overstate revenues recognized from SVS

transactions before the revenue was earned.  Indeed, defendants (misleadingly) changed their revenue recognition policy only a few months before the 3Q03 results were issued.

190.    As set forth in §§V.K. & L., defendants' insider trading scheme and 2003 compensation packages were tied directly to their revenue and EPS results in 2003, giving them a strong motive to falsify the 3Q03 results.  In fact, on September 8-9, 2003, only three weeks before the close of the quarter,  Turner and Eickhoff collectively dumped over 100,000 shares of Ceridian stock for over *2.3 million* in insider trading proceeds.  Thus, defendants had a strong motive to keep Ceridian's stock inflated before revelation of the restatements and SEC investigation began to leak out a few months later.  Additionally, scienter is reinforced by the fact that Eickhoff and Gross were later replaced and their so-called "retirements" were made contingent on the issuance of accurate 2003 and 2004 results.

191.    Finally, defendants' scienter is shown by the facts alleged in connection with Whistleblower #1's lawsuit filed against Ceridian under Sarbanes-Oxley.  ¶¶23-33, *infra*. Whistleblower #1 stated that she specifically told defendant Buzz Gross about Ceridian's improper accounting and that many other executives were aware of it.  The restatements reveal that Ceridian continued to disregard Whistleblower #1's warnings and ended up reversing millions in revenues and expenses in the same areas identified by Whistleblower #1 in 2001.  ¶¶34-36.  Ceridian also expressly admitted in documents filed with OSHA that at least 14 employees "knew" about improper accounting and caused Ceridian to inflate its financial results.  ¶31.  Defendants' scienter is also reinforced by the numerous CWs cited in ¶¶135-139, who confirmed defendants' involvement in all aspects of the Company's financial and accounting decisions.

### G.    False 4Q03 and FY03 Statements

192.    **False Statement – January 22, 2004 Press Release:** On January 22, 2004, before the market opened, Ceridian issued a press release entitled, "*Ceridian Posts Strong Fourth Quarter*

*Results*" announcing its 4Q03 and FY03 financial results.  The press release was also attached to a

corresponding Form 8-K which defendants filed with the SEC on the same date.  The press release

stated in part:

> *Fourth quarter 2003 net earnings were $45.6 million, or $.30 per diluted share of common stock, on revenue of $352.2 million. For 2003, net earnings were $128.0 million, or $.85 per diluted share of common stock, on revenue of $1,274.1 million. . . .*

> \*        \*        \*

> *"The fourth quarter 2003 operating results were strong," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian. "Revenue growth in the Human Resource Solutions (HRS) business accelerated during the quarter and hit our target for the year*. . . .

> \*        \*        \*

> *"Comdata's performance during the quarter was very solid. Revenue during the quarter came in well above our expected range, mainly on strength in Stored Value Systems. Card shipments were extremely strong, and processing transactions exceeded our expectations. . . ."*

193.    In the same press release, Ceridian disclosed that the SEC had commenced a formal

investigation of the Company:

> Ceridian also announced that it is responding to a document request from the Securities and Exchange Commission (SEC), and has been advised that the SEC has issued a formal order of investigation. The SEC has informed Ceridian that this is a non-public fact finding inquiry and that the investigation and document request do not mean that the SEC has concluded that Ceridian has violated any securities laws. Ceridian is fully cooperating with the request.

194.    **False Statement – January 22, 2004 Conference Call:** On January 22, 2004, at

10:00 a.m. EST, shortly after the market opened, defendants held a conference call with analysts

announcing their 4Q03 and FY03 financial results.

> (a)       On the call, defendant Turner stated in part:

> Given the economic factors which continued to impact our business throughout 2003, we are pleased with the fourth quarter and full-year performances of both of our business segments. *In the fourth quarter, revenues for the HR services business segment were up 11 percent. This is the sixth consecutive quarter of positive growth in the HR business. Comdata's revenue grew at 15 percent in*

*the fourth quarter, significantly exceeding the range we had anticipated in October. This performance, which is outstanding, was primarily due to the higher than anticipated card sales at the SVS retail services part of the business. These fourth-quarter performances enabled us to generate earnings-per-share of 30 cents for the quarter, which was in the range we anticipated, and 85 cents for the year.*

*       *       *

*Comdata's Stored Value Systems operation, which provides specialty cards used by retailers for gift certificates, customer returns, and debit purposes, had a terrific 2003.*

(b)       In the question and answer portion of that call, defendant Eickhoff stated:

*From every perspective of the quarter we saw with revenue, profit and cash flow are all equal to or better-than-expected. The total company revenue for the quarter was $352 million, up 12 percent over the prior year and modestly above the ranges that we had suggested for the quarter. Earnings per share were 30 cents, which is 1 cent over consensus and is 4 cents over 2002 results, excluding a onetime charge in that year.*

*Earnings for the quarter were 50 percent higher than any other quarter this year.*

*       *       *

*Now for our comments on the human resource business. The total HR revenue for the quarter was $255 million, up 11 percent over last year, and for the year was $935 million, up 6.5 percent.*

*       *       *

Now for comments on Comdata. *The revenue for the quarter was quite a bit stronger than we anticipated at $97 million, up 15 percent year-over-year, and for the full year revenue was $339 million, up 7.8 percent over the prior year. The SVS card sales were very strong in the quarter, especially in the month of December, some of which we previously anticipated would have been delivered to customers in the first quarter of 2004. As a result of the change in revenue recognition rules, we modified the SVS method of recognizing revenue for cards in July of last year, and to a lesser extent also modified transaction processing revenue. For the quarter, the change positively impacted year-over-year revenue by $6 million, and for the six-month period by about $10 million.*

*       *       *

*From an operational standpoint, excluding the accounting change, SVS revenue increased by 35 percent in the quarter. Within this, card revenue grew by more than 40 percent, and processing revenue was up somewhat more than 25 percent.*

- 84 -

\*     \*     \*

***So, in summary, for last year, given the more difficult economy that we anticipated a year ago, we're pleased with the quarter and the year. For the quarter, revenue, profit, and cash flow met our expectations and the pipeline looks promising***.

195. Notably, at the January 22, 2004 conference call, defendant Eickhoff also issued financial guidance for 2Q04-4Q04 and FY04.

> Now for comments on earnings. The total year earnings are expected to be in the range of 90 to 98 cents a share. As I noted earlier, we again expect the tax rate in the range of 35 percent for the year. The first quarter's earnings should be in the range of 14 to 16 cents.

\*     \*     \*

> The second-quarter revenue should be in the range or earnings-per-share of 17 to 20 cents per share and the third-quarter in the range of 22 to 25 cents a share. The fourth quarter is between 35 and 39 cents.

> Now I will comment briefly on cash flow from operations and a few balance sheet items. ***There should not be any significant changes to our financial characteristics other than no pension plan contribution is contemplated in 2004***. Total depreciation and amortization for 2003 was $85 million and we expect to it be close to $90 million this year.

196. After defendants' January 22, 2004 partial disclosures of adverse facts concerning their accounting problems and SEC investigation, Ceridian's stock plummeted before the market opened. Ceridian's stock price opened at $17.10 and hit an intra-day low of $16.69, down over ***22%*** from the previous day's close of $21.59. Over 7.24 million shares changed hands on January 22, 2004, more than ***13 times*** the volume on the previous trading day. The Company's stock price ultimately closed down approximately 3.8%, but remained artificially inflated because defendants failed to disclose the full extent of their accounting manipulations which later resulted in numerous financial restatements and admissions about the Company's fraudulent internal controls. Indeed, as set forth below, the Company announced massive restatements of its financial results less than a month after the Company's January 22, 2004 statements.

197.   **False Statement – February 18, 2004 Press Release Announcing Restatement #1**:
On February 18, 2004, Ceridian issued a press release entitled, "Ceridian Reports Change in Revenue Recognition Policy at Stored Value Systems."   The press release was attached to a corresponding Form 8-K which defendants filed with the SEC on the following day.   The press release stated in part:

> Ceridian Corporation (NYSE: CEN) announced today that it is changing its revenue recognition policy at its Stored Value Systems ("SVS") unit, a wholly owned subsidiary of its Comdata business that provides gift card and related processing principally to the retail industry. The change will be applied retroactively, and is being made with the concurrence of the Company's outside auditors, KPMG LLP.
>
> *        *        *
>
> *For 2003, the Company's previously reported total revenue of $1,274 million will be reduced by approximately $20 million and previously reported pre-tax profit of $197 million will be reduced by approximately $5 million. Previously reported earnings per share of $.85 will be reduced by $.02.*
>
> *Revenue and earnings before taxes for 2002 will be decreased by $2 million and $2 million, respectively. Earnings per share for 2002 will be decreased by $.01.*
>
> *Revenue and earnings before taxes for 2001 will be decreased by $10 million and $4 million, respectively. Earnings per share for 2001 will be decreased by $.02.*
>
> *Revenue and earnings before taxes for 2000 will be decreased by $7 million and $5 million, respectively. Earnings per share for 2000 will be decreased by $.02*
>
> *Further information as to the impact on particular periods will be provided as the Company completes its restatement.*

198.   **False Statement – February 19, 2004 Conference Call:** On February 19, 2004, defendants held a conference call to discuss Restatement #1 and the Company's change in its revenue recognition policy.  In the call, defendants repeated the false financial results issued in the February 18, 2004 press release and made misleading statements about why the Company changed its revenue recognition policy for SVS transactions.  Those statements are set for more fully in §V.B.

199.    Following Ceridian's disclosure of adverse facts in the February 18, 2004 press release and February 19, 2004 conference call, the Company's stock price dropped approximately 2.6% on February 19, 2004, and another 3.3% on February 20, 2004, on huge volume of 916,300 and 1.4 million shares, respectively.  The stock continued to decline on February 23-24, 2004, dropping another 2% during those two trading days on heavy volume of 1.88 million and 1.2 million shares, respectively.  On March 4, 2004, defendants made a presentation at the Raymond James 25th Annual Institutional Investors Conference.  Shortly thereafter, Goldman Sachs & Co. analyst Gregory Gould upgraded its outlook on Ceridian stock to "outperform" from "in-line."  This upgrade was based in part upon Ceridian's false financial results issued prior to March 4, 2004.  On March 4, 2004, Ceridian's stock jumped over 6% to $20.63 per share, on heavy volume of two million shares.  As set forth below, however, Ceridian's stock continued to trade at artificially inflated prices due to defendants' false and misleading statements and concealment of the true extent of their numerous other accounting improprieties, which resulted in massive subsequent restatements.

200.    **False Statement – March 15, 2004 Form 10-K:**  On March 15, 2004, Ceridian issued its 4Q03 and FY03 financial results by filing its Form 10-K with the SEC.  Both Turner and Eickhoff submitted certifications and statements with the 10-K attesting to the truth and accuracy of the reported financial statements and information.  The 10-K reported the following false revenue, expenses, net earnings and EPS for the quarter and fiscal year ending December 31, 2003:

|  | **4Q03** | **FY 2003** |
|---|---|---|
| Revenue | $335.7 | $1.253 |
| Total Costs and Expenses | $272.9 | $1.061 |
| Net Earnings | $41.4 | $124.8 |
| EPS (diluted) | $0.27 | $0.83 |

The 10-K reported that Ceridian's HRS division had *$935.1 million in revenue for 2003*.  It further stated that research and development expenses for HRS were *$61.6 million in 2003*.

201.    The Company's Form 10-K for 2003 also contained false statements concerning its "Controls and Procedures" that were substantially similar to the disclosures made in ¶158 in 1Q03.

202.    The Company's Form 10-K was signed and endorsed by all three defendants, Turner, Eickhoff and Gross.

203.    **False Statement:**    Defendants Turner and Eickhoff both submitted signed certifications with the Form 10-K, as they did with the Forms 10-Q, attesting to the truth and accuracy of the reported financial statements.  The certifications were virtually identical to those in ¶¶160-162, *supra*.

H.    **Reasons Why the 4Q03 and FY03 Statements Were False and Defendants Knew It**

204.    The falsity of Ceridian's 4Q03 statements is confirmed by their financial restatements.  In the first restatement, Ceridian admitted to overstating revenue and net earnings by ***$16.5 million (4.4%) and $4.2 million (9%)***, respectively.  Even those restated financials, however, were false and misleading because the Company's subsequent restatements revealed that revenues and net earnings were actually overstated by ***$27.9 million (8%)***, and ***$19.3 million (42%)***, respectively.

205.    The impact of the five restatements on Ceridian's reported EPS for 4Q03 was even more material.  The first restatement reduced the Company's 4Q03 EPS from $0.30 to $0.27, a ***9%*** overstatement.  Even those restated EPS results, however, were false because the impact of the subsequent restatements reduced the Company's 4Q03 EPS to ***$0.17***, a change of over ***43%*** from the originally reported EPS results.

206.    As set forth in §V.A.-G., the Company's restatements of its 4Q03 and FY03 financial results are an admission that those results were materially false at the time they were issued, based on facts existing at the time.  *See* APB No. 20.  Thus, defendants' statements in press releases, SEC filings and conference calls concerning the Company's financial condition in 4Q03 and FY03, and

specifically revenue, expenses and earnings in those periods, were false and misleading when issued. Defendants' 4Q03 and FY03 statements were also false because they failed to disclose the Company's accounting manipulations and lack of internal controls. Defendant Turner's statement at the January 22, 2005 conference call that "there should not be any significant changes to our financial characteristics" was also false, as confirmed by the subsequent five restatements which changed the financial characteristics drastically.

207.    Also, as set forth in §V.E., defendants were aware that their revenue recognition policy was being manipulated to overstate revenues recognized from SVS transactions before the revenue was earned. Indeed, as set forth in §V.B., *supra*, defendants knowingly changed their revenue recognition policy in July 2003 to a method which violated GAAP and changed it ***again*** shortly after the end of the FY03. As set forth in §V.A.-E., CW1 confirmed that defendant Gross was personally involved in the decisions regarding revenue recognition rules. Also, as set forth in V.E.4., defendants' conflicting explanation of the two revenue recognition changes reinforces a strong inference of scienter.

208.    Additionally, as set forth in §§V.K. & L., defendants' insider trading scheme and 2003 compensation packages were tied directly to their revenue and EPS results in 2003, which were vastly overstated in both 4Q03 and FY03. Thus, defendants had a strong motive to inflate the Company's 4Q03 and FY03 results.

209.    As set forth §V.E.5., defendants admitted during the conference call on January 22, 2004 that they were previously aware of certain "revenue items" that were the subject of the SEC's investigation. Turner stated:

> *[M]ost of the information requested [by the SEC] focuses on revenue items that we had previously reviewed internally and with our outside auditors.*

*    *    *

*The items requested generally relate to matters we previously reviewed in depth, previously reviewed in depth with our outside auditors.*

\*  \*  \*

*[O]ur auditors know about it. We knew about it. We reviewed it quite a while ago as a matter-of-fact, whatever it is.*

210.    Thus, the Company admitted that it knew of revenue improprieties long before the issuance of the 4Q03 and FY03 results. Ultimately, the Company had to restate its revenue results in at least three of the Company's restatements.

211.    Finally, defendants' scienter is shown by the facts alleged in connection with Whistleblower #1's lawsuit filed against Ceridian under Sarbanes-Oxley.  ¶¶23-33, *infra*. Whistleblower #1 stated that she specifically told defendant Buzz Gross about Ceridian's improper accounting and that many other executives were aware of it.  The restatements reveal that Ceridian continued to disregard Whistleblower #1's warnings and ended up reversing millions in revenues and expenses in the same areas identified by Whistleblower #1 in 2001.  ¶¶34-36.  Ceridian also expressly admitted in documents filed with OSHA that at least 14 employees "knew" about improper accounting and caused Ceridian to inflate its financial results.  ¶31.  Defendants' scienter is also reinforced by the numerous CWs cited in ¶¶135-139, who confirmed defendants' involvement in all aspects of the Company's financial and accounting decisions.

## I.    False 1Q04 Statements

212.    **False Statement – April 15, 2004 Press Release:** On April 15, 2004, Ceridian issued a press release entitled, ***"Ceridian Corporation Reports Solid First Quarter Results,"*** announcing its 1Q04 financial results.  The press release was also attached to a corresponding Form 8-K which defendants filed with the SEC the same day.  The press release stated in part:

*First quarter 2004 net earnings were $24.3 million, or $.16 per diluted share of common stock, on revenue of $326.5 million. First quarter 2003 net earnings were $28.1 million, or $.19 per diluted share of common stock, on revenue of $314.1 million.*

*"The first quarter 2004 operating results were strong in almost every respect," said Ronald L. Turner, chairman, president and chief executive officer of Ceridian. "Revenue in both businesses hit our targets for the first quarter, and earnings per share were solidly on plan. The Human Resource Solutions (HRS) business posted top line growth for the seventh consecutive quarter, despite the previously announced shift of W-2 processing revenue out of the quarter and moderating weakness in customer employment levels."*

"**Operational performance in HRS continues to be encouraging**. Customer retention is on track to meet our target of over 90 percent for the year, and order growth for the quarter was solidly in double digits. Installations were also strong, meeting an aggressive plan."

213.    **False Statement – April 15, 2004 conference call:** On April 15, 2004, defendants

held a conference with analysts announcing their 1Q04 financial results.

(a)    On the call, defendant Turner stated in part:

*We are extremely pleased with the results of our first quarter.  Our financial performance in the first quarter was exactly in line with what we expected in Human Resource Solutions with revenue comfortably within our guidance and in the first quarter Comdata revenue was also well within the revenue range we anticipated.*

*Earnings for the first quarter, 16 cents per share, were in the middle of the range of our guidance. The quarter was a good start for the year. For both of our business segments I'll focus on operations, and in those areas in the first quarter we performed as expected, or better, in virtually every area.*

First, the HR business for the first quarter.  *Revenues for the HR business segment were $245 million, which was a 4% increase from the prior year. If we adjust for last year's W-2 anomaly growth was 8%. This is the seventh quarter in a row we've had revenue improvement from the prior year, and we saw revenue growth in the U.S., Canada, and the U.K.*

*Operating margins for the HR business were also on plan in the first quarter, overall, as I said, a strong first quarter performance.*

(b)    On the April 15, 2004 conference call, defendant Eickhoff stated in part:

*Revenue for the quarter was $326.5 million, up 4% over last year, and about in the middle of the range we suggested for the quarter. The economic factors affecting the quarter were slightly negative to what we expected, but not materially so. Earnings per share were up 16 cents and were on consensus and in the middle of our guidance and were 3 cents below last year.*

*             *             *

Now for comments on the Human Resource Solutions business. ***The total HR revenue for the quarter was $245 million up 4% over last year and in line with the guidance we provided.***

\*   \*   \*

***So in summary, the quarter was solid. Orders, revenue margins, earnings per share were all in the middle to upper end of what we expected and free cash flow was very strong***. Expectations for the full year remain unchanged with earnings per share in the range of 88 to 96 cents.

\*   \*   \*

We think that from an operating viewpoint, we are very encouraged by the first quarter, specifically by, as you indicated, the activity on the new business front and our ability to get that new business converted into revenue. ***This was a very, very good quarter for us. We placed emphasis on it, and we've had success in getting there.***

(c)     Also in the question and answer session of the April 15, 2004 conference call,

defendant Turner made the following false statements about the SEC investigation:

CRAIG PECKHAM, ANALYST, JEFFERIES & COMPANY: Hi, just a quick question. Regarding the SEC investigation, or inquiry, I know your hands are tied, but I just wanted to confirm, you said in the past that it's immaterial to the company's financials. Is that still the case? I'm just trying to find out and make sure this hasn't broadened.

RONALD TURNER: ***Absolutely no change. We believe in the aggregate that the items that we've submitted in response to the SEC request are not material to our consolidated financial statements.***

214.     On April 15, 2004, and April 16, 2004, Ceridian's stock price increased 2.7% and

1.7%, respectively, based on defendants' bullish April 15, 2004 statements and words of comfort

concerning the SEC investigation.  The following week, Ceridian's stock jumped another 4.8% to

close at an artificially inflated price of $22.40 on April 23, 2004, which was 65% higher than the

price on the first day of the Class Period.

215.     **False Statement – May 7, 2004 Form 10-Q:**  On May 7, 2004, Ceridian issued its

final 1Q04 financial results in its Form 10-Q with the SEC.  The 10-Q reported the following false

revenue, expenses, net earnings and EPS for the quarter ending March 30, 2004:

| Revenue | $326.5 |
|---|---|
| Total Costs and Expenses | $289.1 |
| Net Earnings | $24.3 |
| EPS (diluted) | $0.16 |

216.    The Company's Form 10-Q for 2Q03 also contained false statements concerning its "Controls and Procedures" that were substantially similar to the disclosures made in ¶158 in 1Q03.

217.    Defendant Gross signed and attested to the Company's financial statements and Form 10-Q as the "Vice President and Corporate Controller (Principal Accounting Officer)."

218.    **False Statement – May 7, 2004 Certifications**: In the Company's 10-Q filed on May 7, 2004, both Turner and Eickhoff submitted signed certifications attesting to the truth and accuracy of the reported 1Q04 financial statements, which were substantially identical to the certifications made in ¶¶160-162, *supra*.

**J.    Reasons Why the 1Q04 Statements Were False and Defendants Knew It**

219.    The falsity of Ceridian's 1Q04 statements is confirmed by their second and third financial restatements. In the second restatement, Ceridian admitted that its 1Q04 revenues and net earnings were overstated by $2 million and $4.1 million, respectively. Even those numbers were false and misleading as the fifth restatement revealed that 1Q04 revenues and net earnings were really overstated by *$12.6 million (3.8%)* and *$7.0 million (29%)*, respectively.

220.    The impact of the restatements on Ceridian's 1Q04 EPS results was even more material. The first restatement reduced the Company's EPS results from $0.16 to $0.13, a material *19%* change. Even those results were false, however, because subsequent restatements revealed that EPS was really only $0.11, or *31%* lower than the originally reported results. Accordingly, if Ceridian originally reported EPS of $0.11 to the market, it would have missed its previous public guidance significantly.

221.    As set forth in §§V.D.-I., the Company's restatements of its 1Q04 financial results are an admission that those results were materially false at the time they were issued, based on facts existing at the time. *See* APB No. 20. Thus, defendants' statements in press releases, SEC filings and conference calls concerning the Company's financial condition in 1Q04, and specifically revenue, expenses and earnings in those periods, were false and misleading when issued. Defendants' 1Q04 statements were also false because they failed to disclose the Company's additional accounting manipulations and lack of internal controls. Eickhoff's statements downplaying the materiality of the SEC investigation were also misleading because he knew that the Company was manipulating its financial results which ultimately caused the SEC to broaden the scope of its investigation.

222.    Additionally, as set forth in §§V.K. & L., defendants' insider trading scheme and 2004 compensation packages were tied directly to EPS results in 2004, which were vastly overstated in the first three quarters by *31%*. Beginning in 2004, the Company changed the Individual Defendants' bonus structure such that 40% of their bonuses were no longer tied to revenue, but to cash flow, which defendants repeatedly stated was not affected by the restatements. This change confirms that defendants purposely tinkered with their compensation structure such that it was less affected by the restatements. Despite this change, the Company later admitted that Turner and Eickhoff would not receive bonuses for 2004, because they were "not merit[ed]."

223.    Finally, defendants' scienter is shown by the facts alleged in connection with Whistleblower #1's lawsuit filed against Ceridian under Sarbanes-Oxley. ¶¶23-33, *infra*. Whistleblower #1 stated that she specifically told defendant Buzz Gross about Ceridian's improper accounting and that many other executives were aware of it. The restatements reveal that Ceridian continued to disregard Whistleblower #1's warnings and ended up reversing millions in revenues and expenses in the same areas identified by Whistleblower #1 in 2001. ¶¶34-36. Ceridian also

expressly admitted in documents filed with OSHA that at least 14 employees "knew" about improper accounting and caused Ceridian to inflate its financial results.  ¶31.  Defendants' scienter is also reinforced by the numerous CWs cited in ¶¶135-139, who confirmed defendants' involvement in all aspects of the Company's financial and accounting decisions.

224.  **Ceridian Delays 2Q04 Earnings Results**: On July 19, 2004, Ceridian announced that it was postponing the release of its second quarter earnings due to accounting problems with the HRS financial statements.  The Company issued a press release entitled, "Ceridian Postpones its Second Quarter Earnings Release and Conference Call," which was attached to a corresponding Form 8-K filed on the following day, which stated in part:

> Ceridian Corporation (NYSE:CEN) announced today that it has postponed its second quarter earnings release and related investors teleconference and Webcast, previously scheduled to take place on Tuesday, July 20, 2004. The company will announce the date of its earnings release, teleconference and Webcast at a later date. ***The delay was prompted by the company's recent initiation of a review focusing on the capitalization and expensing of certain costs in its U.S. Human Resource Solutions business***. The review, which is still in the early stages, is being conducted under the direction of the company's Audit Committee, with the assistance of Deloitte & Touche LLP. It is possible that the review may have an impact on the company's consolidated financial statements for the second quarter of 2004 and for previously reported periods, as well as guidance.
>
> Ronald L. Turner, the company's chairman, president and chief executive officer, said "***A concern was raised internally very recently regarding capitalization and expensing of certain costs in our U.S. Human Resource Solutions business. We responded immediately and aggressively to make sure the matter is reviewed appropriately and thoroughly***. We regret our decision today to delay our earnings announcement due to the timing of this review and the amount of time necessary for a complete and thorough review. We will reschedule our earnings release and teleconference as quickly as practical. We believe the business is sound. Although each of our businesses had positive developments in the quarter, we will not discuss any details until we are in a position to make complete disclosure."
>
> Ceridian has advised the U.S. Securities and Exchange Commission of the current review initiated by the company. Mr. Turner further stated, "As reported in January, Ceridian received a formal document request from the SEC. Ceridian provided documents in response to that request, and will continue to be fully cooperative with the SEC."

225.    Although the Company had not yet revealed that it would restate its financials, according to a July 21, 2004 article in the *Saint Paul Pioneer Press*, some analysts clued in that a restatement was highly probable:

> Accounting rules guide companies on when costs should be expensed and when they can be stored on the balance sheet. But "***when those rules apply are sort of malleable***," said Yoni Engelhart, an analyst with the Center for Financial Research and Analysis in Rockville, Md.
>
> "***It's easy for companies to sort of squeeze more on the balance sheet rather than the income statement***."
>
> ***If the company did inappropriately capitalize expenses, the only way to rectify that would be a restatement of their financials for prior periods***, Engelhart said. The company did not give a timeline on when the review would be complete nor did it say that a restatement was imminent.

226.    Following the Company's disclosures on July 19, 2004, Ceridian's stock price declined ***over 10%*** on July 20, 2004, from $20.34 to $18.21 on huge volume of 6.8 million shares. The Company's stock price continued to decline during the next week, dropping approximately ***2.8%*** between July 20-July 28, 2004, as more artificial inflation was removed from the stock price. Despite this slow leakage of adverse facts, however, the Company's stock price remained artificially inflated by defendants' continued misrepresentations of the Company's financial condition and concealment of numerous accounting manipulations still occurring at the Company.   In fact, defendants intentionally dulled the negative impact of the news by issuing false positive statements about the Company.

227.    For example, investment analysts mentioned defendants' positive statements that counteracted the negative news.  Credit Suisse First Boston issued a report on July 20, 2004 which stated in part:

> Management noted in the press release that business is sound and cited ***"positive developments"*** during the quarter.

> While frustrating for shareholders and not helpful to management's credibility, we do not expect this potential accounting restatement to adversely impact cash flow (or intrinsic value) . . . .

Similarly, Robert Baird & Co. issued a research report on July 20, 2004 stating:

> Q2 results postponed due to accounting review. Stock likely to open lower, but probably not a disaster, as *no cash impact and the market is growing accustom to accounting/reporting issues at CEN.*
>
> *              *              *
>
> ***Management indicated that each of the company's businesses experience positive developments during Q2*** – we believe trends are good in both major business units.
>
> The review is another in a string of accounting/reporting-related issues that have depressed the valuation.

228.    On August 5, 2004, Ceridian issued a press release entitled, "Ceridian Delays SEC Filing to Complete Previously Announced Internal Review," announcing the postponement of the filing of its 2Q04 Form 10-Q.  The press release, which was also attached to a corresponding Form 8-K filed the same day, revealed that the Company was investigating additional accounting issues:

> Ronald L. Turner, the Company's chairman, president and chief executive officer, said, "Due to the timing of the review and the amount of time necessary for a complete and thorough review, the Company will not be able to complete its review and meet the filing deadline of August 9, 2004, for its second quarter Form 10-Q. The U.S. HRS business has been engaged in a number of development projects over recent years. To assure an appropriate allocation of costs, and the appropriate recording and timing of an expense, requires a detailed review of complex technology and accounting matters relating to each of these projects, including an analysis of some earlier time periods. It is important to the Company for the process to be complete and thorough. We will release our financial results as soon as practical, and then make the appropriate SEC filings, without compromising the process. The Company's business fundamentals remain sound."
>
> The Company also announced today that it has amended its $350 million domestic revolving credit facility and $150 million Comdata receivables securitization facility to allow additional time to deliver its Form 10-Q for the second quarter to its lenders through September 30, 2004, without the delayed delivery constituting a default under these agreements.

229.    On August 5, 2004, Ceridian's stock price dropped nearly 1%, and declined another 2% over the next two trading days.  The stock price remained artificially inflated, however, because

- 97 -

defendants continued to issue false statements for 2Q04 and 3Q04, and concealed the magnitude and pervasiveness of the Company's accounting manipulations. The Company also issued positive statements to counteract the negative disclosures such as the statement that "the Company's business fundamentals remain sound."

230. **Ceridian Admits Restatement Is Likely:** On September 30, 2004, Ceridian issued a press release entitled, "Ceridian Receives Extension From Lenders," which disclosed that Ceridian again was forced to negotiate an extension with its lenders so that it would not be in default of its credit and securitization facilities. The press release, which was also attached to a corresponding Form 8-K filed the same day, also announced the Company expected to restate its financial results. The press release stated in part:

> The Company also announced today that the Audit Committee of its Board of Directors is in the process of completing its internal review focusing on the capitalization and expensing of certain costs in the Company's Human Resource Solutions business. Although the Audit Committee's internal review is ongoing and no conclusions have been reached, ***the Company currently anticipates that a restatement of its prior financial statements and a revision to its current guidance will be necessary***, and that accordingly, such financial statements and guidance should no longer be relied upon. The Company will announce the results of and file its Form 10-Q for the quarterly period ended June 30, 2004, and amend the appropriate prior filings with the Securities and Exchange Commission, as soon as practicable following the Audit Committee's completion of its internal review.

231. Over the next six trading days, Ceridian's stock declined over ***5%***. Yet, the Company's stock price remained artificially because defendants continued to issue false statements in 2Q04 and 3Q04 and concealed the magnitude and pervasiveness of the Company's accounting manipulations.

### K.    False 2Q04 Statements

232. **False Statement – Announcement of Restatement #2 and 2Q04 Results:** On October 18, 2004, defendants issued a press release entitled, "Ceridian Reports Second Quarter Results and Initial Determinations from Audit Committee Investigation." The press release, which

was also attached to an SEC Form 8-K filed that same day, disclosed the details of the second

restatement (which impacted 2000-2003 and 1Q04) and announced the Company's 2Q04 financial

results as follows:

| Revenue | $327.0 |
|---|---|
| Total Costs and Expenses | $290.8 |
| Net Earnings | $23.7 |
| EPS | $0.15 |

The press release also stated in part:

> Ceridian Corporation (NYSE:CEN) today reported restated results for fiscal years 1999 through 2003 and the first quarter of 2004, and its results for the second quarter of 2004. The Company also provided revised guidance for the remainder of 2004. As a result of its previously announced Audit Committee investigation focusing on capitalization and expensing of certain costs in its Human Resource Solutions (HRS) business, the Company's historical financial results have been restated.

> **Audit Committee Investigation and Restatement**

> Based on its investigation to date, the Audit Committee has concluded that the Company needs to restate its financial statements for the years 1999 through 2003, and the first quarter of fiscal 2004, to reflect necessary accounting adjustments, and that those previously issued financial statements should not be relied upon. Review of earnings results, adjustments and investigation findings by the Company's external auditor is continuing.

> \*       \*       \*

> "The Audit Committee investigation and the resulting change in our software capitalization policy for internally developed software, along with other adjustments, resulted in a change to our reported earnings." said Ronald L. Turner, chairman, president and chief executive officer of Ceridian. "*However, it should be noted that this change did not impact the historical cash flow of the Company. The Company has taken action to correct these policies and the Audit Committee and the Board of Directors are reviewing additional comprehensive remedial actions to ensure that we do not make these kinds of mistakes in the future*."

> \*       \*       \*

> "*We were pleased with the solid operating performance in the second quarter,*" *said Mr. Turner.* "*In the HRS business, revenue was in line with our plan, and the key metrics of our business – orders, customer retention and customer employment levels - were all in line with expectations. Float balances again grew in double digits in percentage terms. Comdata performed extremely well in the quarter, on continued strength in Stored Value Systems, healthy*

*conditions in the over the road trucking market, and the successful launch of its BusinessLink product."*

233.   In addition to issuing false 2Q04 results, the October 18, 2004 press release also

provided financial guidance for 3Q04 and 4Q04 and issued positive statements about growth in

3Q04 and 4Q04:

> Guidance for Third and Fourth Quarter
>
> The Company now anticipates it will report its third quarter earnings in the next few weeks. Based on preliminary data, the Company anticipates that revenue for the third quarter in HRS and Comdata to be approximately $242 million to $243 million and about $92 million, respectively. . . .
>
> *      *      *
>
> Operational performance in Comdata in the third quarter continued to be very strong, with both revenue and profit exceeding expectations.
>
> For the fourth quarter of 2004, the Company expects revenue for HRS to be in the previously guided range of $277 million to $287 million. Revenue in Comdata is expected to be between $85 million and $88 million. Earnings per share for the fourth quarter are expected to be between $.25 and $.29.

234.   On October 18, 2004, defendants held a conference with analysts repeating its false

2Q04 financial results and guidance for 3Q04 and 4Q04.

235.   On October 18-19, 2004, Ceridian's stock price dropped over 2%, but remained

inflated by defendants' false 2Q04 results, positive guidance and concealment of additional

accounting improprieties which were disclosed months later.  Defendants intentionally counteracted

the impact of the partial disclosure of the restatement by issuing false positive statements regarding

the Company's future guidance and the purported correction of the violations that gave rise to the

restatement.

236.   Analysts latched on to the Company's positive statements in their reports.  For

example, on October 19, 2004, Craig Peckham of Jefferies & Company, Inc. issued a research report

stating:

- 100 -

New Orders Suffered, But *Company Confident In Rebound*.  The uncertainty surrounding Ceridian's 2Q04 results caused new orders to suffer in 3Q04, particularly with high-end customers that have high-margin one-time upfront requirements. . . . *Ceridian made clear that no existing customers were lost due to its delayed reporting*; the company believes that the majority of new orders were postponed rather than lost to competitors.

\*     \*     \*

As expected, the accounting issues do not have any bearing on the company's cash flow, which is expected to be in a range of $220-$230 million this year. . . .

237.    Also on October 19, 2004, Credit Suisse First Boston issued a research report focusing on defendants' positive statements:

The newly restated results show a reduction of earnings over the last several quarters . . . however, we believe it is worth highlighting that *cash flow was not impacted.*

\*     \*     \*

*Management expects new order trends to bounce back in 4Q[05]*, which appears to be a quick recovery, yet we think achievable given what we believe to be modest visibility into near-term order trends.

## L.    Reasons Why the 2Q04 Statements Were False and Defendants Knew It

238.    The falsity of Ceridian's 2Q04 financial results reported in October 2004 is confirmed by the Company's financial restatements.  In the Company's December 15, 2004 press release preliminarily announcing the restatement, the Company admitted to overstating revenue and net earnings in 2Q04 by $0.9 million and $0.7 million, respectively.  That restatement press release, however, was also false and misleading because the subsequent restatements revealed that the Company's 2Q04 revenues were actually overstated by *$10.5 million*, or 3.2% of total revenues, which was *1300%* more than the amount disclosed in the first restatement.  Even more disturbing, the subsequent restatements revealed that the Company's reported net earnings of $23.7 million in 2Q04 were actually *a net loss of $2.3 million*, a difference of *over 100%*.  Finally, the later restatements revealed that Ceridian's originally reported EPS results of $0.15 per share for 2Q04

- 101 -

were actually overstated by over 100% and should have been reported as ***negative $0.02 per share*** in the quarter. Given the Company's earlier 1Q04 EPS guidance of $0.17-$0.20 at its January 22, 2004 conference call, defendants' failure to disclose the true ***$0.02 EPS loss*** was material to investors.

239.    As set forth in §V.D.-I., the Company's restatements of its 2Q04 financial results are an admission that those results were materially false at the time they were issued, based on facts existing at the time. *See* APB No. 20. Thus, defendants' statements in press releases, SEC filings and conference calls concerning the Company's financial condition in 2Q04, and specifically revenue, expenses and earnings in those periods, were false and misleading when issued. Defendants' 2Q04 statements were also false because they failed to disclose the Company's additional accounting manipulations and lack of internal controls.

240.    Additionally, as set forth in §V.K. & L., defendants' insider trading scheme and 2004 compensation packages were tied directly to EPS results in 2004, which were overstated in 1Q04 and 2Q04 by ***31%*** and ***100%***, respectively. Beginning in 2004, the Company changed the Individual Defendants' bonus structure such that 40% of their bonuses were no longer tied to revenue, but to cash flow, which defendants repeatedly stated was not affected by the restatements. This change confirms that defendants purposely tinkered with their compensation structure such that it was less affected by the restatements. Despite this change, the Company later admitted that Turner and Eickhoff would not receive bonuses for 2004, because they were "not merit[ed]."

241.    Finally, defendants' scienter is shown by the facts alleged in connection with Whistleblower #1's lawsuit filed against Ceridian under Sarbanes-Oxley.  ¶¶23-33, *infra*. Whistleblower #1 stated that she specifically told defendant Buzz Gross about Ceridian's improper accounting and that many other executives were aware of it. The restatements reveal that Ceridian continued to disregard Whistleblower #1's warnings and ended up reversing millions in revenues and expenses in the same areas identified by Whistleblower #1 in 2001. ¶¶34-36. Ceridian also

expressly admitted in documents filed with OSHA that at least 14 employees "knew" about improper accounting and caused Ceridian to inflate its financial results.  ¶31.  Defendants' scienter is also reinforced by the numerous CWs cited in ¶¶135-139, who confirmed defendants' involvement in all aspects of the Company's financial and accounting decisions.

242.    On November 9, 2004, defendants again disclosed in a Form 8-K filed with the SEC that they were forced to negotiate with their lenders to amend credit and securitization agreements so that their SEC filing delays would not trigger default under the agreements.

**M.    3Q04 False Statements**

243.    **False Statement – December 15, 2004 Press Release:** On December 15, 2004, Ceridian issued a press release announcing its 3Q04 preliminary financial results and providing additional information about its previous restatement and resulting SEC investigation.  Notably, the press release also announced the replacement of defendant Eickhoff as Ceridian's CFO.  The press release was also attached to a Form 8-K filed with the SEC on the following day.

(a)    Regarding the 3Q04 earnings, the press release quoted Turner falsely stating:

"*Earnings per share of $.11 for the quarter came in slightly below our preliminary estimates, primarily because we underestimated the additional third quarter expense that would result from applying the revised capitalization policy to software development spending in the Human Resource Solutions (HRS) business.*"

"*During the third quarter, the HRS business posted solid top-line growth. Strong installations, higher float balances, better retention, higher interest rates, a weaker dollar, and firming customer employment levels combined to drive revenue higher. . . .  On the positive side, orders in Canada and the U.K. were very strong*."

*            *            *

"Cash flow from operations remained healthy during the third quarter, despite incremental spending of approximately $7 million on the internal investigation and Sarbanes-Oxley compliance. Debt was paid down by $36 million since the end of the June quarter, and the cash balance remained healthy at $156 million."

244.     The press release also announced additional accounting problems relating to the previously announced Restatement #2:

> Additional adjustments have been made to Ceridian's historical financial statements since our October 18, 2004 press release reporting second quarter results. The adjustments, which pertain to the results of HRS, are primarily line item expense reclassifications, and there was a minor change in revenue reporting relating to services provided to our customers by third party vendors. The adjustments reduced reported R&D expense, reduced reported selling expense, increased reported cost of revenue, and caused a minor reduction in HRS revenue. The impact on net profit from these most recent adjustments was minimal. Schedules D, E and F posted on Ceridian's web site reflect these additional adjustments and the latest restated financial results for the Company.

> The Company is reviewing one other issue related to revenue recognition in its U.K. HRS operation which may or may not result in an additional adjustment to its historical financial statements. The Company anticipates that any adjustment related to this remaining issue would not be material.

The press release also provided future guidance of the Company:

> HRS revenue and margins will be negatively impacted by continuing weakness in order levels in the U.S. The Company anticipates that orders should rebound as the uncertainty surrounding the Audit Committee investigation clears, however, we now expect HRS orders in the fourth quarter to be down modestly compared to last year. This will also have a negative impact on our performance in 2005.

> For the fourth quarter, the Company expects earnings per share to be $.24 to $.27; HRS revenue to be between $276 million and $282 million; and Comdata revenue to be between $87 million and $90 million.

> For the full year, earnings per share are expected to be between $.64 and $.67; HRS revenue to be between $996 million and $1,002 million; and Comdata revenue to be between $350 million and $353 million.

> Free cash flow (cash from operations less capital expenditures) is expected to be between $140 million and $150 million for 2004.

245.     The press release also provided additional detail regarding the departure of defendants Eickhoff and Gross.  Notably, the Company stated that both defendants' retirements would not be effective until the *later* of the end of the year, *or* Ceridian's issuance of clean amended financial statements.  In other words, the Company would not let defendants leave until the Company fixed the accounting manipulations which occurred on their watch.

246.    On December 15, 2004, Ceridian filed a Form 8-K with the SEC reaffirming that

defendants CFO Eickhoff and Controller Gross were being replaced.  The Form 8-K stated in part:

> *John R. Eickhoff will retire as the Company's Executive Vice President and*
> *Chief Financial Officer and Loren D. Gross will retire as the Company's Vice*
> *President and Corporate Controller*. The Company announced during its earnings
> teleconference on July 17, 2003 that Mr. Eickhoff had agreed to delay his retirement
> from the end of 2003 until the end of 2004. As contemplated by the Audit Committee
> following its internal review, the Company confirmed with Mr. Eickhoff that his
> retirement will be effective at the end of 2004. Also as contemplated by the Audit
> Committee following its internal review, discussions between the Company and Mr.
> Gross on Mr. Gross' retirement began on December 1, 2004. On December 9, 2004,
> Mr. Gross provided notice to the Company of his retirement at the end of 2004. On
> December 14, 2004, *Messrs Eickhoff and Gross agreed to defer their retirements*
> *until the later of December 31, 2004 or upon the Company's filings with the*
> *Securities and Exchange Commission of: (1) an amended Annual Report on Form*
> *10-K/A for the year ended December 31, 2003; (2) an amended Quarterly Report*
> *on Form 10-Q/A for the quarterly period ended March 31, 2004; and (3) the*
> *Quarterly Reports on Form 10-Q for the quarterly periods ended June 30, 2004*
> *and September 30, 2004*.

247.    **False Statement – December 16, 2004 Conference Call:**  On December 16, 2004,

Ceridian held a conference call with analysts as a follow-up to the December 15, 2004 press release

which repeated the false 3Q04 results.

(a)     During the call, defendant Turner stated:

> First, a few comments with respect to the SEC document request and
> investigation that we have previously discussed. We have been and continue to be
> fully cooperative with the SEC. Our outside SEC counsel has continued to keep the
> SEC advised on a regular basis, relative to the audit investigation and related matters.
> As we anticipated, we have received an additional request for documents, and we are
> in the process of providing those additional documents and information to the SEC.

*     *     *

> Let me make a few additional comments before we open the call. Both of our
> business segments are solid. Our operational cash flow is extremely strong. Our
> revenues continue to grow in each of our business segments and our HRS operations,
> we expect to move ahead. But obviously the business has been impacted by the
> accounting issues. Our focus as a management team is to get the HRS business back
> on track as quickly as possible. Comdata continues its outstanding performance and
> continues to generate impressive productive gains.

(b)     Also during the December 16, 2004 call, defendant Eickhoff made the following statements:

Attached to the earnings release is a historical P&L for 2002 through the second quarter of 2004, which shows the financial results as they were last reported, the effect of the restated changes and the adjusted results, including the restatements. Also attached to the release is the historical revenue and operating profit split between the human resource and Comdata. Now let me get onto the quarter.

**The total revenue was $344 million, up 10.7 percent. Earnings per share were 11 cents, which is one cent below the consensus**.

\*     \*     \*

Lastly I'll comment on the SEC filings. We are finalizing the amended 2003 10K-A, the amended First Quarter 10Q-A, and the Second Quarter 10Q. **We are in the process of researching one remaining item that may not result in any change to our financials, but if it did, we expect the impact to be very small**. When the third quarter 10Q is completed, we will file all of the SEC documents at one time. Based on this, we expect to complete the process and file as soon as practical.

(c)     During the question and answer session of the call, defendant Eickhoff misleadingly gave the impression that the Company would not delay its financial results further:

RANDY MEHL – *Robert W. Baird - Analyst*: Okay. What do you feel is the risk to the fourth quarter reporting timing, at this point? In other words, are there things that could delay that as well into March, April?

**JACK EICKHOFF . . . : We don't think so, Randy. I think we should be done. I think that we would have delayed the release had we not even had these problems because the Sarbanes-Oxley. So I fully expect we'll be out within the time frames we'd be required.**

248.    Eickhoff and Turner also misleadingly downplayed the broadening SEC investigation as insignificant:

ADAM FRISCH – *UBS Securities - Analyst*: Thanks, good morning, guys. Just a quick clarification on the new SEC document request. Was that related to the first investigation, or does it focus on a different topic or business line?

RONALD TURNER: It was a general request and -- there were some aspects that come back in a pervasive, but -- I don't think you can specify. It was just a general request that wanted to make sure that, you know, I'm sure the SEC wants to have all available information, ***including some additional issues with the SVS investigation that did occur in the first quarter***.

ADAM FRISCH . . . : So it seems to be broadening a little bit?

***RONALD TURNER . . . : Yeah, you can say that it's -- you could say it's broadened a bit, but it's related basically to the audit investigation, for the investigation that went on and the issues that we put on the table.***

\*       \*       \*

MARK MARCON – *Wachovia Securities - Analyst*: Can you address what could -- sounds like there may not be any further reclassification, but if there is an additional reclassification, what sort of area would that be in?

JACK EICKHOFF . . . : ***It's relatively small, Mark, and I'd rather not get into that right now. We expect it will be nothing. I brought it up as something we're still looking at. But if it is something, it will be very insignificant. In fact, it could be a slight plus. But we're hoping it will prove out to be a non-issue.***

249.    After defendants' partial misleading disclosures of adverse information on December 15-16, 2004, Ceridian's stock price declined approximately ***4.8%*** from $18.75 to $17.85 during the four subsequent trading days.  However, Ceridian's stock price remained artificially inflated due to defendants' positive false statements and concealment of the true financial picture of the Company. Defendants intentionally counteracted the negative news and corresponding impact on the Company's stock price by representing that the additional accounting issues "will be nothing," and could even be a "slight plus" for the Company.  Turner also misleadingly represented that the Company's accounting improprieties were coming to a close.

250.    Analysts latched on to defendants' false positive statements and issued reports which maintained the Company's stock price.  On December 16, 2004, William Blair & Company issued a research report stating:

> Management has spent a lot of time during the last several months looking under every stone to make sure it gets all the accounting issues behind it.  This quarter the company once again restated financials, as the Audit Committee continues to look at the books.  Although the investigation is ongoing, ***we are hopeful that we are nearing the end of this chapter***.

\*       \*       \*

- 107 -

Ceridian provided restated financials again this quarter, having found the need to reclassify some expenses within the HRS business. The reclassifications modestly affect revenues but there is *no impact on earnings*.

251.    Also on December 16, 2004, Smith Barney Citigroup published a research report reflecting defendants' the positive spin and attempts to soften the blow of another restatement. The report parroted defendants' false impressions that the restatements were finally over:

> Accounting issues appear to be cleaned up, and valuation looks fair . . . . In addition, since the accounting changes are non-cash in nature, cash flow fundamentals still appear to be solid.

*     *     *

> Despite the potential for growth and margins to accelerate upon a cyclical recovery, we are not awarding a multiple significantly higher than historical levels, due to the risk of increased stock price volatility resulting form potential lingering investor caution following the downward guidance revisions and restatements surrounding accounting issues in 2004, the consequent continued concern about execution and financial controls, and lower-than-expected HRS new order growth in 3Q04 and 4Q04. We expect that the company has taken corrective steps to improve the chances that these problems do not recur . . . .

**N.     Reasons Why the 3Q04 Statements Were False and Defendants Knew It**

252.    The falsity of Ceridian's 3Q04 financial results is confirmed by the Company's financial restatements. Those restatements revealed that the Company overstated its reported revenue and net income in 3Q04 by *$5.6 million (1.7%)* and *$5.5 million (34%)*, respectively. Most materially, the restatements revealed that Ceridian's reported EPS results of $0.11 in 3Q04 were really only $0.07, an *overstatement of 36%*. Given the Company's earlier EPS guidance of $0.35-$0.39 during its January 22, 2004 conference call, defendants' failure to disclose the truth about its $0.07 EPS number was material to investors.

253.    As set forth in §V.D.-I., the Company's restatements of its 3Q04 financial results are an admission that those results were materially false at the time they were issued, based on facts existing at the time. *See* APB No. 20. Thus, defendants' statements in press releases, SEC filings

and conference calls concerning the Company's financial condition in 3Q04, the purported end to the restatements, and the delay in the Company's SEC filings, were false and misleading when issued. Defendants' 3Q04 statements were also false because they failed to disclose the Company's additional accounting manipulations and lack of internal controls which resulted in additional restatements.

254.     Additionally, as set forth in §V.K. & L., defendants' insider trading scheme and 2004 compensation packages were tied directly to EPS results in 2004, which were overstated by *31%, 100%* and *36%* in the first three quarters of 2004.  Beginning in 2004, the Company changed the Individual Defendants' bonus structure such that 40% of their bonuses were no longer tied to revenue, but to cash flow, which defendants repeatedly stated was not affected by the restatements. This change confirms that defendants purposely tinkered with their compensation structure such that it was less affected by the restatements.  Despite this change, the Company later admitted that Turner and Eickhoff would not receive bonuses for 2004, because they were "not merit[ed]."

255.     Finally, defendants' scienter is shown by the facts alleged in connection with Whistleblower #1's lawsuit filed against Ceridian under Sarbanes-Oxley.   ¶¶23-33, *infra*. Whistleblower #1 stated that she specifically told defendant Buzz Gross about Ceridian's improper accounting and that many other executives were aware of it.  The restatements reveal that Ceridian continued to disregard Whistleblower #1's warnings and ended up reversing millions in revenues and expenses in the same areas identified by Whistleblower #1 in 2001. ¶¶34-36.  Ceridian also expressly admitted in documents filed with OSHA that at least 14 employees "knew" about improper accounting and caused Ceridian to inflate its financial results.  ¶31.  Defendants' scienter is also reinforced by the numerous CWs cited in ¶¶135-139, who confirmed defendants' involvement in all aspects of the Company's financial and accounting decisions.

O.      **Additional Adverse Facts Leak Out**

256.    **Additional Disclosures:** On January 10, 2005, defendants issued a press release and filed a Form 8-K with the SEC announcing the resignation of Ewald, Ceridian's Executive Vice President, Director, and President of HRS.  During the next three trading days, Ceridian's stock price declined 1.6%.

257.    On January 21, 2005, Ceridian filed a Form 8-K with the SEC announcing the departure of one of its directors, William J. Cadogan.

258.    On February 1, 2005, defendants filed a Form 8-K with the SEC reaffirming the replacements of defendant Eickhoff and HRS President Ewald.  The Form 8-K stated in part:

> (1) As previously disclosed in a Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on December 15, 2004, Mr. Eickhoff will retire upon the filing of Amendment No. 1 on Form 10-K/A to the Annual Report on Form 10-K for the year ended December 31, 2003, Amendment No. 1 on Form 10-Q/A to the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2004, and Quarterly Reports on Form 10-Q for the quarterly periods ended June 30, 2004 and September 30, 2004.

> (2) As previously disclosed in a Current Report on Form 8-K filed with the SEC on January 10, 2005, Mr. Ewald resigned as Executive Vice President of the Company, President, Ceridian Human Resource Solutions and from the Company's Board of Directors on January 10, 2005.

259.    On February 18, 2005, Ceridian announced more details of executives leaving the Company.  Ceridian filed a Form 8-K with the SEC which stated in part:

> As previously announced in a press release dated December 15, 2004 and as reported in Item 5.02(b) of a Current Report on Form 8-K dated December 15, 2004, John R. Eickhoff, Executive Vice President and Chief Financial Officer, and Loren D. Gross, Vice President and Controller, retired from Ceridian Corporation (the "Company") on February 18, 2005 following the filing with the Securities and Exchange Commission of Amendment No. 1 on Form 10-K/A to the Company's Annual Report on Form 10-K for the year ended December 31, 2003, Amendment No. 1 on Form 10-Q/A to its Quarterly Report on Form 10-Q for the first quarter of 2004, and its Quarterly Reports on Form 10-Q for the second and third quarters of 2004.

260.    On March 3, 2005, the media reported that Moody's credit rating agency downgraded Ceridian's debt rating to the lowest investment grade rating, "Baa3," and lowered its outlook to "negative" because of the mounting restatement issues.  Tomi Kilgore, "Moody's Cuts Ceridian Debt Outlook to 'Negative,'" CBS MarketWatch, March 3, 2005.

261.    **Ceridian Announces Additions to Restatement #3**: On January 31, 2005, Ceridian issued a press release entitled "Ceridian Retroactively Changes Accounting Treatment for Interest Rate and Fuel Price Hedging Programs[;] Accounting Change Impacts Previously Announced Restatement."  The press release was attached to a corresponding Form 8-K filed with the SEC on the same day.  The press release stated:

> Ceridian Corporation (NYSE: CEN) today announced a change in accounting treatment for its interest rate and fuel price derivative securities. Interest rate hedges have been highly successful components of Ceridian's risk management strategy since 1992, and have generated cash payments to the Company of $97.7 million since the beginning of 2001. Similarly, a fuel price hedging strategy was introduced in 2003 to mitigate the Company's exposure to fuel price variability in its Comdata operation. Based on the current yield curve and fuel prices, the Company expects to receive an additional $16.1 million in cash payments from its hedging programs in 2005.

**P.    False 2005 Statements**

262.    **False Statement – Amended and Delayed SEC Filings for Restatement #3:** On February 18, 2005, Ceridian filed with the SEC its Reports on Form 10-Q for the second and third quarters of 2004.  Ceridian also filed an amended Form 10-Q for the 1Q04 and amended Form 10-K for 2003 reflecting the restated results.

(a)     In the 2Q04 Form 10-Q, Ceridian provided the following financial results:

| | |
|---|---|
| Revenue | $316.5 |
| Total Costs and Expenses | $309.0 |
| Net Earnings | $4.9 |
| EPS (diluted) | $0.03 |

(b)     In the 3Q04 Form 10-Q, Ceridian provided the following financial results:

| Revenue | $328.7 |
| Total Costs and Expenses | $301.7 |
| Net Earnings | $17.9 |
| EPS (diluted) | $0.12 |

(c)     In the amended Form 10-Q for 1Q04, Ceridian provided the following restated

financial results:

| Revenue | $313.9 |
| Total Costs and Expenses | $277.6 |
| Net Earnings | $23.5 |
| EPS (diluted) | $0.16 |

(d)     In the amended Form 10-K for 2003, Ceridian provided the following restated

financial results:

| Revenue | $1,213.9 |
| Total Costs and Expenses | $1,062.4 |
| Net Earnings | $98.7 |
| EPS (diluted) | $0.66 |

263.    The Company's Form 10-Qs and Form 10-Ks cited above were signed by the three

defendants.  Defendants Turner and Gross also filed sworn certifications pursuant to the Sarbanes-

Oxley Act, which were substantially identical to the certifications cited in ¶158.

### Q.    Reasons Why the 2005 Statements Were False and Defendants Knew It

264.    The financial results issued on February 18, 2005 in connection with Restatement #3

were still false and misleading because defendants failed to disclose additional accounting violations

which would later reduce those numbers further as part of Restatement #4 and Restatement #5.  As

set forth in §V.H. & I., defendants were aware of those additional accounting violations but had

powerful motivation to conceal the true state of Ceridian's financial condition to receive millions of

dollars in bonuses and to cover up their insider trading scheme.

265.    **Ceridian Announces Restatement #4 and Delays Filing of 2004 10-K:** On March

17, 2005, the last day of the Class Period after three previous restatements, Ceridian issued a press

release stating that it would restate its financials yet again. The press release was also attached to a corresponding Form 8-K which defendants filed with the SEC on the same day. The press release entitled, "Company Expects to Release 2004 Earnings in a Few Weeks[;] Company to Restate Quarterly Results for 2004," stated:

> Ceridian Corporation (NYSE:CEN) announced today that it will not meet the filing deadline of March 16, 2005 for the filing of its Annual Report on Form 10-K for the year ended December 31, 2004. The Company is working diligently on completing its consolidated financial statements for the fourth quarter and 2004 year, including its annual assessment of intangible assets and goodwill and its evaluation of internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act of 2004. The Company expects to report its fourth quarter and 2004 earnings and to provide guidance for 2005 within the next few weeks, and then to file its Annual Report on Form 10-K with the SEC.

> The Company further announced today that, as a result of reviewing its long-lived assets, it must accelerate the amortization of a trademark asset in 2004. This will increase 2004 amortization expense by approximately $41 million. Previously issued financial statements for the first three quarters in 2004 will require restatement and should no longer be relied upon.

> The fourth quarter 2004 results will also reflect the previously announced charges of $7.4 million relating to a change in accounting for derivative instruments and **$28.5 million for sale of certain customer relationships and other assets associated with its SourceWeb payroll platform**. Furthermore, such results are expected to reflect a decrease in the Company's effective income tax rate resulting principally from the effects of the previously mentioned items.

266.    During the next seven trading days following the March 17, 2005 disclosures, Ceridian's stock declined approximately 4.6% and closed at $16.87 on March 29, 2005, only a few points higher than the price on the first day of the Class Period, and more than 28% lower than the Class Period high.

267.    After the fifth restatement, analysts were less forgiving on hearing the bad news. On March 17, 2005, Bear Sterns issued a research report stating:

> Ceridian delayed the filing of its 2004 10K and the release of its 4Q04 results. The 10K delay is not a big surprise but the delay in filing 4Q results **is a disappointment and disconcerting. . . . [T]he delays highlight the weak financial controls and oversight at Ceridian. . . . We think that this latest episode adds to serious concerns investors have regarding senior management**. We upgraded the stock last week,

sensing that the news flow would likely get better and if not, it would be hard to imagine the Board not taking action.

*        *        *

***Given the chronic execution issues, significant restatements and internal controls, we believe Ceridian senior management has only a limited amount of time to demonstrate meaningful progress on the company's turnaround***.

268.    Also on March 17, 2005 Robert W. Baird & Co. issued a research report stating:

Ceridian did not meet the filing deadline for its 2004 10-K, and announced new restatements related to amortization.  We believe the stock can outperform the market, but only if significant actions are taken to unlock value and ***improve management accountability***.

*        *        *

***The delayed filing and additional restatement add additional items to what has been a long list of accounting and internal control issues***.

## VII.    POST-CLASS PERIOD ADMISSIONS

269.    **Ceridian Announces Restatement #5:**  On April 12, 2005, defendants filed a Form 8-K which stated in part:

On April 12, 2005, the Company issued a press release announcing among other things that the Company has concluded that it must restate its financial statements for fiscal years 2000 through 2003 and for the first, second and third quarters of 2004 to reflect necessary accounting adjustments relating to the ***correction of errors related to the accounting for free rent, concessions and escalation clauses in leases and smaller corrections primarily related to accounting for international acquisitions, and that such previously issued financial statements should not be relied upon.***

270.    On April 21, 2005, Ceridian filed its 2004 Form 10-K with the SEC.  The Form 10-K admitted to many of the improprieties occurring during the Class Period:

We have restated our consolidated financial statements for the years 2000 through 2003 and for the first nine months of 2004 (the "Restatement"). The determination to restate these financial statements was made after errors were discovered in March and April 2005. In addition, certain disclosures in the notes to our consolidated financial statements have been restated to reflect the Restatement adjustments. In the Restatement, we have:

•        recorded accelerated amortization of the CobraServ trademark

- 114 -

- corrected the accounting for certain leases

- corrected errors in the accounting for international acquisitions

- corrected other accounting errors related to the accrual of costs and expenses

- reduced income tax reserves

- corrected balance sheet amounts for customer funds and employee benefits.

*       *       *

The following is a more detailed description of the six classes of restatement adjustments:

### CobraServ trademark amortization

In March 2005, we discovered that as a result of the determination to rename the CobraServ product offering, the CobraServ trademark capitalized as part of a 1999 acquisition of our benefits services division was no longer being used. It was determined that the decision to abandon the trademark was made in January 2004 and to stop use of the CobraServ trademark in December 2004. As part of this abandonment, we began phasing out use of this trademark over the course of 2004, and the scheduled amortization expense for 2005 and future years of $40.9 was accelerated and amortized to selling, general and administrative expense in equal amounts of $10.2 over the four quarters of 2004. This treatment was applied as a change in accounting estimate under Accounting Principles Board Opinion No. 20, "Accounting Changes." The impact on our consolidated balance sheets was a $10.2 reduction of other intangible assets in each of the four quarters in 2004.

### Lease accounting

In April 2005, we discovered errors in our accounting for certain operating leases. Rent obligations were not being expensed on a straight-line basis in accordance with the Financial Accounting Standard's Board Technical Bulletin 85-3, "Accounting for Operating Leases with Scheduled Rent Increases." The correction to a straight-line basis increased costs and expenses by $3.2 during 2002 and 2003. This $3.2 was charged to selling, general and administrative expense, except for $0.3 in 2003 that was charged to cost of revenue. The pretax impact for periods prior to 2002 was an expense of $2.8, which was recorded as a reduction of retained earnings at January 1, 2002 of $2.0, net of tax.

### International acquisition accounting

As part of a March 2005 review of international purchase accounting entries for acquisitions in the United Kingdom and Canada in 1995 and 1998, errors were discovered in the initial entries as well as the ongoing accounting treatment. The net impact of these adjustments was an increase in selling, general and administrative expense of $0.5 during 2002 and 2003. The pretax impact for periods prior to 2002 was an expense of $2.4, which was recorded as a reduction of retained earnings at

January 1, 2002 of $1.7, net of tax. The company also made errors in the application of certain foreign currency translation impacts for the international operations which impacted the balance sheet accounts for goodwill, other intangible assets, capitalized software and accumulated other comprehensive income—foreign currency translation.

### Accrual of costs and expenses

As part of the ongoing review of our financial statements, we discovered certain other errors related to the accuracy and timeliness of the accrual of costs and expenses. These errors generally related to the timing of expense recognition and offset each other within annual reporting periods; however, the expense recognition timing between quarters had a larger impact as disclosed in Note O, "Supplementary Quarterly Data." These adjustments increased selling, general and administrative expense for 2002 and 2003 by $0.3. The pretax impact for periods prior to 2002 was a reduction of expenses of $0.4, which was recorded as an increase in retained earnings at January 1, 2002 of $0.3, net of tax.

The adjustments consisted of:

- Casualty loss reserves

- Accrual of commissions and incentives

- Prepayment of expenses originally recorded as an investment

- Payroll taxes on third party contractors in the United Kingdom.

### Income tax reserves

It was determined that as a result of an error in the recording of a reduction in our income tax reserves, our liability was overstated by $0.9 as of December 31, 2003. Accordingly, a tax benefit was recorded in the fourth quarter of 2003 as part of the Restatement. This adjustment is in addition to the tax impact of the corrections to pretax earnings listed above.

### Balance sheet corrections for customer funds and employee benefits

In reviewing our customer funds assets and liabilities we discovered that an $11.4 correction needed to be made at December 31, 2003 related to amounts due from customers and taxing authorities. We also determined that a $2.0 employee benefits accrual should have been recorded as a current liability rather than long-term and reclassified it at December 31, 2003.

*       *       *

### Disclosure Controls and Procedures

We carried out an evaluation, under the supervision and with the participation of our management, including our President and Chief Executive Officer and our

- 116 -

Executive Vice President and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act")), as of December 31, 2004. *As a result of the material weaknesses identified in our Management's Report on Internal Control over Financial Reporting located in Part II, Item 8 of this report, we have concluded that as of December 31, 2004, our disclosure controls and procedures were ineffective to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act are recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission. . . .*

271.    Ceridian's auditor KPMG also issued the following letter in the 2004 10-K which expressed an "*adverse opinion*" on Ceridian's internal controls.  The opinion stated in pertinent part:

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Ceridian Corporation's internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated April 20, 2005 expressed an unqualified opinion on management's assessment of, *and an adverse opinion on the effective operation of, internal control over financial reporting*.

In our opinion, management's assessment that Ceridian Corporation and subsidiaries *did not maintain effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects*, based on the COSO criteria. Also, in our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, *Ceridian Corporation and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2004, based on the COSO criteria*.

272.    **Troubles Still Not Over:** On May 11, 2005, Ceridian issued a press release entitled, "Ceridian Posts Strong First Quarter 2005 Results."  In the same press release, however, Ceridian disclosed the Company could not complete and timely file their 1Q05 Form 10-Q with the SEC because correcting the prior financial statements purportedly took more time than anticipated.

### VIII.   CERIDIAN'S FALSE FINANCIAL REPORTING AND GAAP VIOLATIONS

#### A.    Ceridian's Five Restatements

273.    As set forth in §V.D.-I., *supra*, Ceridian's five restatements resulted in countless violations of GAAP and SEC rules.  GAAP requires a restatement to occur when the originally

issued financial statements were based on fraudulent accounting practices.[7]  As set forth in APB No. 20, the type of restatement announced by Ceridian was for "a correction of an error in previously issued financial statements."  *See* APB No. 20, ¶¶7-13.  APB No. 20 defines errors as "mathematical mistakes, ***mistakes in the application of accounting principles***, or oversight or ***misuse of facts that existed at the time the financial statements were prepared***."  *See* APB No. 20, ¶13.

The SEC has reiterated its position regarding restatements:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia*, ***to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter*** . . . .

*See In re Sunbeam Sec. Litig*., 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report (S.D. Fla. Jan. 31, 2002) (emphasis added).

274.    In addition, the SEC noted:

> [R]estatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared. ***That is, GAAP does not allow a change in an accounting estimate resulting from new information or subsequent developments to be accounted for as a restatement of previous financial statements. See APB Opinion 20, ¶31.***  The APB has defined the kind of "errors" that may be corrected through a restatement: "Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time that the financial statements were prepared."  *See id*. at ¶¶13, 36-37.  In accordance with APB Opinion 20, the Commission does not condone the use of restatements by public companies or auditors to make any adjustments (particularly to judgmental reserves) to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared.

---

[7]    In general, restatements of past financial statements are disfavored because they dilute investors' confidence in the financial statements, and make it difficult to compare financial statements; therefore, GAAP provides that financial statements should only be restated in limited circumstances.  *See* APB No. 20, ¶14.

275.    Ceridian's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by Ceridian that its previously issued financial results and its public statements regarding those results were false and misleading.  Furthermore, given that GAAP permits restatements only based on facts known at the time the financial statements were prepared, it is highly revealing that Ceridian has restated its financial statements for FY00-FY03 on three separate occasions and its quarterly results for 1Q04 on two separate occasions, all within just 15 months.

**B.      Ceridian's Financial Statements Violated Fundamental Concepts of GAAP**

276.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP.  These violations included breaches of the following fundamental accounting principles:

(a)      the principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)      the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON No. 1, ¶34);

(c)      the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASCON No. 1, ¶40);

(d)      the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of

- 119 -

the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASCON No. 1, ¶50);

   (e) the principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASCON No. 1, ¶42);

   (f) the principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant, is a notion that is central to accounting (FASCON No. 2, ¶¶58-59);

   (g) the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASCON No. 2, ¶79); and

   (h) the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASCON No. 2, ¶¶95, 97).

   277. Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, investors and securities analysts expect to be disclosed and corporate officials and their legal and financial advisors know to be the type of information which is expected to be and must be disclosed.

C.      **Improper Revenue Recognition**

278.    As set forth in §V.D.-I., *supra*, Ceridian admitted to revenue recognition violations in a majority of the five restatements.  GAAP sets forth specific rules governing revenue recognition. As described by FASCON No. 5, ¶¶83-84, GAAP requires that revenue be both earned and realizable (collectible) before it can be recognized.  Per SAB No. 101, *Revenue Recognition in Financial Statements*, revenue is generally realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists;

- Delivery has occurred or services have been rendered;

- The seller's price to the buyer is fixed or determinable; and

- Collectibility is reasonably assured.

279.    Most of Ceridian's revenue recognition violations involved transactions with multiple deliverables.  There are specific rules that apply for multiple deliverable transactions.

280.    Furthermore, SAB No. 101 provides that:

> If an arrangement (*i.e.*, outside the scope of SOP 81-1) requires the delivery or performance of multiple deliverables, or "elements," the delivery of an individual element is considered not to have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element.

> In licensing and similar arrangements (*e.g.*, licenses of motion pictures, software, technology, and other intangibles), the staff believes that delivery does not occur for revenue recognition purposes until the license term begins. Accordingly, if a licensed product or technology is physically delivered to the customer, but the license term has not yet begun, revenue should not be recognized prior to inception of the license term. Upon inception of the license term, revenue should be recognized in a manner consistent with the nature of the transaction and the earnings process.

281.    Furthermore, EITF 00-21, *Revenue Arrangements with Multiple Deliverables*, issued in December of 2002 with an effective date of June 15, 2003, addresses when and how a revenue arrangement with multiple deliverables should be divided into separate units of accounting.  Per

EITF 00-21, ¶9, revenue arrangements with multiple deliverables should be divided into separate units of accounting if the deliverables in the arrangement meet the following criteria:

- The delivered item(s) has value to the customer on a standalone basis (*i.e.*, it is sold separately by any vendor or the customer could resell the deliverable on a standalone basis);

- There is objective and reliable evidence of the fair value of the undelivered item(s);

- If the arrangement includes a general right of return, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.

282.    In revenue arrangements where some or all of the deliverables are not independently functional, or there is not sufficient evidence of their fair values to account for them separately, then a company should not consider the deliverable items to be a separate unit of accounting but rather it should account for the arrangement as a single unit of accounting.  EITF 00-21, ¶10.  As set forth in §V.A.-G., Ceridian admitted to violating these revenue recognition accounting rules.

### D.    Improper Expense Reporting

283.    As set forth in §V.D.-I., Ceridian admitted to various violations involving expense reporting.  Under GAAP, as set forth in SOP 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use*, in certain circumstances a company may capitalize many of the costs associated with developing or obtaining software for internal use as opposed to expensing the costs immediately.

284.    Capitalization of costs involves classifying certain costs as a long-term investment – similar to property, plant and equipment – rather than expensing them immediately.  The costs do not immediately affect the income statement – and thus do not immediately reduce earnings – as do other types of expenditures but rather they are first classified as an asset and held on the balance sheet.  Thereafter, the capitalized costs are amortized over the period of time of the expected benefits.  Amortization is similar to depreciation as it reduces the value of an asset over time.  The

reduction consists of a non-cash charge to income, thus reducing earnings. In effect, capitalization changes the timing of expense recognition by spreading out the recognition of the costs of certain expenditures over several periods rather than immediately recognizing the entire amount in the period the expenditure is incurred.

285.    As set forth in SOP 98-1, ¶12, internal-use software has the following characteristics:

a.    The software is acquired, internally developed, or modified solely to meet the entity's internal needs.

b.    During the software's development or modification, no substantive plan exists or is being developed to market the software externally.

286.    If both conditions are met, SOP 98-1 applies and costs may be capitalized if certain other requirements are met. If a company does plan on selling, leasing or otherwise marketing software externally, then the company must account for the software costs in accordance with SFAS No. 86, *Accounting for the Costs of Computer Software to Be Sold, Leased, or Otherwise Marketed*, even if the company also plans on using the software internally. SOP 98-1, ¶¶1, 7, 12-16. FASB 86 provides for the capitalizing of fewer costs than under SOP 98-1, hence more costs would be immediately expensed under FASB 86.

287.    SOP 98-1 identifies three stages in the development of internal-use software: (1) the preliminary project stage; (2) the application development stage; and (3) the post implementation/operation stage. The treatment of the costs incurred in the development of the software depends upon which phase of development the project is in. SOP 98-1, ¶¶17-32.

288.    *Preliminary Project Stage* – The preliminary project stage is the research and development stage in the development of software. In this stage once a need for internal-use software is recognized, the company engages in the conceptual formulation, design and testing of possible software project alternatives, including determining if the technology exists to develop the software. All costs incurred in the preliminary project stage should be expensed as incurred and

should be included in the total R&D expense for the period. SOP 98-1, ¶¶18-20; SFAS No. 2, ¶12, *Accounting for Research and Development Costs*.

289.    *Application Development Stage* – Once a project has passed the research and development stage, it passes into the application development stage. During this phase, certain costs may be capitalized. Costs incurred that are associated with developing or obtaining the software should be capitalized, while costs associated with preparing data for use within the new system should typically be expensed. SOP 98-1, ¶¶ 21-22.

(a)    Capitalized costs include the following:

- external direct costs of materials and services consumed in developing or obtaining internal-use software;

- internal direct costs of payroll and payroll-related costs for employees who are directly associated with developing the software; and

- interest costs.

(b)    General and administrative costs, as well as overhead costs, are not capitalized but rather are expensed as incurred. SOP 98-1, ¶31. The capitalization of costs begins when the following two conditions are met: (1) the preliminary project stage is complete and (2) management authorizes and commits to funding a software project and management believes that it is probable the project will be completed and used to perform the intended function. Capitalization of costs ends when software is substantially complete, including all necessary testing, and ready for use. Once costs are capitalized, they are then amortized on a straight line basis over the estimated useful life of the software. SOP 98-1, ¶¶27, 29, 36-38.

290.    *Post Implementation/Operation Stage* – Once a project has been completed, it enters into the post implementation/operation stage. In this stage, the costs that a company incurs that are associated with training and application maintenance should be expensed. SOP 98-1, ¶23. Additionally, in this stage, companies should distinguish costs paid for upgrades and enhancements

from costs for maintenance.  Maintenance costs – or costs to fix problems associated with the software – are to be expensed while upgrade and enhancement costs may be capitalized *if* they can be separated from regular maintenance costs and *if* it is probable that these expenditures will result in additional functionality (*i.e.* extensions of the life of the software or increases in its utility or functionality).  If costs associated with upgrades cannot be separated from maintenance costs, then all the costs should be expensed as incurred.  SOP 98-1, ¶¶24-26.

291.    Moreover, as with other long-lived assets, capitalized costs for internal-use software being developed or currently in use must be tested for impairment and written-down if impaired.  Under SOP 98-1, internal-use software assets are subject to the provisions of SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*.[8]  GAAP requires that companies review long-lived assets, including internal-use software, to determine if the assets are impaired and to take an impairment charge if the company determines that the carrying amount of the long-lived asset is not recoverable and exceeds its fair value.  Internal-use software, as other assets, should be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable.  The following are examples of such events or changes in circumstances as they applies to internal-use software being developed or currently in use:

a.    Internal-use computer software is not expected to provide substantive service potential;

---

[8]    Initially, SOP 98-1 provided that internal use software was subject to the provisions of SFAS No. 121.  SFAS No. 121 was later superceded by SFAS No. 144.  Nonetheless, SFAS No. 121 was substantially similar to SFAS No. 144 in its provisions mandating that companies periodically review long-lived assets to determine if the assets are impaired and to take an impairment charge if the company determines that the carrying amount of the long-lived asset is not recoverable and exceeds its fair value.  SFAS No. 144 became effective for financial statements issued after December 31, 2001.  SOP 98-1 was amended in October of 2002 to reflect the issuance of SFAS No. 144.

      b.      A significant change occurs in the extent or manner in which the software is used or is expected to be used;

      c.      A significant change is made or will be made to the software program; and

      d.      Costs of developing or modifying internal-use computer software significantly exceed the amount originally expected to develop or modify the software.

In particular, if the project is no longer expected to be completed or placed into service (*i.e.* the project is abandoned), then a write-off is required.  SOP 98-1 ¶¶34-35; SFAS No. 144, ¶¶7-9.

      292.      Ceridian's stated accounting policy corresponds to this accounting standard.  For example, in its 2003 Form 10-K filed on March 15, 2004, Ceridian represented its accounting for its software and development costs as follows:

      We capitalize purchased software that is ready for service and development costs for marketable software incurred from the time of technological feasibility until the software is ready for use. Under the provisions of current accounting rules AICPA Statement of Position ("SOP") 98-1, "Accounting for Costs of Computer Software Developed or Obtained for Internal Use," we capitalize costs associated with software developed or obtained for internal use when both the preliminary project stage is completed and our management has authorized further funding for the project which it deems probable of completion and use for the function intended. Capitalized internal-use software costs include only (1) external direct costs of materials and services consumed in developing or obtaining the software; (2) payroll and payroll-related costs for employees who are directly associated with and who devote time to the project; and (3) interest costs incurred, when material, while developing the software. Capitalization of these costs ceases no later than the point at which the project is substantially complete and ready for its intended purpose.

      We charge research and development costs and other computer software maintenance costs related to software development to operations as incurred. We amortize software development costs using the straight-line method over a range of three to seven years, but not exceeding the expected life of the product.

      We regularly review the carrying value of software and development costs and recognize a loss when the value of estimated undiscounted cash flow benefit related to the asset falls below the unamortized cost.

      293.      The Company has now admitted that its accounting practices did not comply with its own standard.

### E.     Improper Accounting for Derivatives

294.    As set forth in §V.H., the Company was forced to restate due to improper accounting related to derivative activities.  The accounting rules for derivatives are set forth in SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*.  A company recognizes its derivative instruments as either assets or liabilities on its balance sheet and measures those instruments at fair value.  SFAS No. 133, ¶17.  However, the impact of such activities on a company's earnings depends on the intended use of the derivative and the resulting designation, *i.e.,* whether or not it can be classified as one of the following types of hedging activities:

- Fair Value Hedge – A hedge of the exposure to changes in the fair value of a recognized asset or liability or an unrecognized firm commitment;

- Cash Flow Hedge – A hedge of the exposure to variable cash flows of a forecasted transaction; or

- Foreign Currency Hedge – A hedge of the foreign currency exposure of a net investment in a foreign operation, an unrecognized firm commitment, an available-for-sale security, or a foreign-currency-denominated forecasted transaction.

SFAS No. 133, ¶¶4, 18.

295.    Ceridian improperly classified its derivative instruments, thus violating the accounting rules.

### F.     Improper Accounting for Operating Leases

296.    As set forth in §V.F., Ceridian admitted to violating GAAP rules in its accounting for operating leases.  GAAP provides rules for accounting for operating leases with scheduled rent increases due to terms in the lease agreements for free rent, concessions and escalation clauses.  Under GAAP, the rent increases "should be recognized by [ ] lessees on a straight-line basis over the lease term unless another systematic and rational allocation basis is more representative of the time pattern in which the leased property in physically employed."  FASB Technical Bulletin ("FTB")

No. 85-3, *Accounting for Operating Leases with Scheduled Rent Increases*, ¶¶1-2 and SFAS No. 13, *Accounting for Leases*, ¶¶15 and 19(b).

297.    In a letter dated February 7, 2005 sent to Robert J. Kueppers, the American Institute of Certified Public Accountants' Chairman for its Public Company Audit Firms, Donald T. Nicolaisen, the Chief Accountant for the SEC, reaffirmed this accounting guidance, stating that:

> The staff believes that pursuant to the response in paragraph 2 of FASB Technical Bulletin 85-3 ("FTB 85-3"), Accounting for Operating Leases with Scheduled Rent Increases, rent holidays in an operating lease should be recognized by the lessee on a straight-line basis over the lease term (including any rent holiday period) unless another systematic and rational allocation is more representative of the time pattern in which leased property is physically employed.
>
> *        *        *
>
> To the extent that SEC registrants have deviated from the lease accounting standards and related interpretations set forth by the FASB, those registrants, in consultation with their independent auditors, should assess the impact of the resulting errors on their financial statements to determine whether restatement is required. ***The SEC staff believes that the positions noted above are based upon existing accounting literature*** and registrants who determine their prior accounting to be in error should state that the restatement results from the correction of errors or, if restatement was determined by management to be unnecessary, state that the errors were immaterial to prior periods.

298.    Ceridian admitted that it violated and did not adhere to these rules in its accounting for its operating leases.

### G.    Ceridian Lacked Adequate Internal Controls

299.    As set forth in §V.J., Ceridian admitted to egregious problems in its internal controls and financial reporting.  As a result, the Company was forced to implement strict remedial measures to prevent the violations from happening again.  The Company explained these remedial measure in it Form 10-K for 2004:

> . . . . [I]n order to remediate the material weaknesses in internal control over financial reporting and ensure the integrity of our financial reporting processes stated above, we have implemented in the third and fourth quarters of 2004 or are in the process of implementing the following actions:

- a comprehensive review of internal control over financial reporting through our ongoing review being carried out in connection with our efforts to comply with the Section 404 Requirements, including additional remediation as necessary;

- additional training for finance, accounting and certain other personnel at HRS in (i) appropriate accounting for the capitalization and amortization of internally developed software, (ii) month-end expense cut-off and cost and expense accrual processes, (iii) revenue recognition, (iv) procedures for identifying unusual events or transactions and obtaining appropriate accounting guidance prior to recording such transactions, (v) the importance of a robust internal control environment and (vi) the application of technical accounting pronouncements;

- implementation of detailed, new internally developed software capitalization and amortization policy and formal procedures that are consistent with U.S. GAAP;

- implementation of detailed, new revenue recognition policies at HRS that are consistent with U.S. GAAP;

- establishment of new documentation requirements and monitoring procedures for HRS finance and accounting employees to ensure, among other things, that (i) accounting conclusions involving the interpretation of complex accounting standards are thoroughly documented and identify the critical factors that support the basis for such conclusions, and (ii) the factors upon which such employees rely are validated and adequately evidenced;

- implementation of detective controls in the form of (i) random internal audits by our Internal Audit Department of selected HRS software development projects for compliance with our new capitalization policy, (ii) monthly testing processes at HRS to analyze whether costs and expenses have been accrued properly, and (iii) quarterly monitoring procedures at HRS to analyze costs and expenses incurred during such period and determine whether such costs and expenses were classified correctly on our Statement of Operations;

- modification of systems and procedures to (i) ensure that appropriate cut-off dates for the monthly accounts payable cycle are strictly observed, thereby preventing improper deferral of costs and expenses, (ii) ensure that purchases in an amount of over $1,000 be evidenced by a written purchase order form and that appropriate purchase order reports are generated and analyzed monthly and (iii) establish appropriate deterrent controls, including clear and regular communication of operating policies and procedures by management to HRS employees emphasizing that noncompliance with such policies and procedures may result in corrective action, including termination;

- creation of a new position, Director of Financial Accounting and Compliance, and retention of such person to review and coordinate the

implementation of new revenue-related pronouncements and regulations under U.S. GAAP at Ceridian;

- review of all new HRS contracts containing certain quantitative and qualitative characteristics in order to determine appropriate accounting treatment under U.S. GAAP;

- creation of a revenue recognition steering committee comprised of financial and accounting personnel to discuss and review revenue recognition issues at HRS for policy amendments and interpretations;

- periodic review of details supporting the Statement of Operations to determine whether significant costs and expenses are being classified appropriately on a historical and recurring basis and to reclassify where appropriate; and

- reconciled balance sheet accounts for HRS that were unreconciled for the third quarter of 2004. We have reviewed our account reconciliation process at HRS to ensure that, among other things, such accounts are being reconciled on a timely basis, the reconciliation is being independently reviewed, any reconciling items are cleared on a timely basis, and the accuracy of the underlying supporting detail, or subledger, has been substantiated and independently reviewed.

## IX.  LOSS CAUSATION

300.  As detailed in §V., *supra*, defendants engaged in a fraudulent scheme and course of conduct which inflated the Company's financial results and its stock price.  Defendants' scheme consisted of, *inter alia*, false and misleading statements and omissions concerning Ceridian's financial results, the strength of its businesses and the overall financial condition of the Company.  Defendants also concealed a corrupt and fraudulent system of internal controls over accounting and financial reporting.  Defendants' schemes and misrepresentations caused the artificial inflation of Ceridian's stock price from $13.55 on the first day of the Class Period, to as high as $23.41 per share.

301.  Lead Plaintiff and other Ceridian investors purchased shares at inflated prices during the Class Period and suffered economic loss when that inflation was later removed from the stock price upon the disclosure of the true financial condition of the Company.

302.    As set forth in §V.I., *supra*, defendants' false statements caused the artificial inflation of Ceridian's stock price beginning on April 17, 2003 when Ceridian announced inflated 1Q03 financial results.   Plaintiffs plead the specific stock price increases due to defendants' false statements and that defendants failure to reveal the fraud kept the stock inflated to upwards of $21 per share during the Class Period.  *See, e.g.*, ¶¶156, 170, 200.  Plaintiffs also allege that the artificial inflation was removed from the stock price upon the disclosure of adverse facts related to defendants' fraud.  *See, e.g.*, ¶¶197, 200.  The artificial inflation was not removed upon one or two disclosures of bad news or a massive restatement which caused a huge stock price decline on one day.  Defendants here were careful to slowly leak certain bits and pieces of adverse information throughout the Class Period causing a slow decline in Ceridian's stock price.  Indeed, the Company slowly leaked its accounting violations and true financial condition of the Company through many partial disclosures, including five separate restatements, disclosure of SEC investigations, and the replacement of top executives.  Defendants made sure that Ceridian's massive accounting scandal did not all reach the market at once in order to avoid a dramatic stock price decline that would follow.

303.    Some of defendants' partial disclosures of adverse facts caused sharp declines in Ceridian's stock price.  Other disclosures of adverse facts did not because they were issued along side positive false statements and omissions which counteracted the negative revelations about defendants' misconduct and the true financial condition of the company.  Nevertheless, Ceridian's stock remained artificially inflated throughout the Class Period and investors were damaged when that inflation was removed from the stock price.

304.    For example, one of defendants' first partial disclosures of adverse facts about defendants' accounting violations and the true financial condition of the Company occurred before the market opened on January 22, 2004.  On that day, defendants announced an SEC investigation

into its accounting practices and revealed bits of information concerning improper revenue recognition at the Company's SVS unit. On this news, Ceridian's stock dropped over 22% from the previous day's closing price of $21.59, to a intra-day low of $16.69 on January 22, 2004, before closing at $20.75, a decline of over 3.8%. Thus, some of the inflation of Ceridian's stock price was removed upon the negative disclosures, causing economic loss (damages) to investors. However, the Company's stock price remained artificially inflated because defendants did not reveal the full extent of their accounting manipulations which resulted in five restatements beginning only a month later.

305. Just weeks later on February 18-19, 2004, Ceridian leaked more partial disclosures of bad news. The Company announced that it would have to restate its financial results (Restatement #1) due to improper revenue recognition at Ceridian's SVS unit. Upon this news, the stock price declined 2.6% on February 19, 2004 and 3.3% on February 20, 2004, and continued to slip another 2% the following days causing damages to investors. Despite this removal of a small bit of the inflation built into the stock price, it remained significantly inflated because defendants had not yet revealed the full extent of the accounting manipulations and the true financial condition of the Company. Additionally, defendants minimized the impact of the adverse disclosures by releasing them at the same time as positive disclosures which counteracted the decline in stock price. Defendants downplayed the SEC investigation and continued to tout the financial condition of the company. Further, the financial results released in connection with Restatement #1 were still false and misleading and had to be restated again several times in the following months. Thus, despite defendants' partial disclosures on February 18-19, 2004, Ceridian's stock remained inflated.

306. Defendants continued to inflate Ceridian's stock price on March 4, 2004, during a presentation at the Raymond James 25th Annual Institutional Investors Conference. On the news, Goldman Sachs & Co. upgraded its recommendation of Ceridian, and the Company's stock price jumped over 6%.

307.     After another month of false statements, on July 19, 2004, defendants leaked more of their accounting improprieties.  On that day, Ceridian announced that it was delaying its 2Q04 financial results because it was reviewing its mishandling of certain capitalization and expensing costs relating to internal software development.   The media and analysts interpreted this announcement as an indication that Ceridian would most likely restate its financials.[9]  On this partial disclosure of bad news, Ceridian's stock price dropped from a closing price of $20.34 on July 19, 2004, to $18.21 on July 20, 2004, a **10.5%** drop, on huge trading volume of 6.9 million shares which was nearly seven times more than the previous day.  The stock price continued to slip, dropping to $17.69, or 13%, by July 28, 2004, causing additional damage to investors.  Still, Ceridian's stock price remained artificially inflated because defendants had not disclosed Ceridian's true financial results or the extent of the Company's accounting improprieties.

308.     On October 18, 2004, defendants again selectively leaked adverse facts concerning Restatement #2.  Defendants disclosed that the restatement, which affected over four years of financial statements, was a result of accounting violations in connection with software development expense reporting.  When this news broke, Ceridian's stock price dropped 1.4% removing additional inflation and causing damage to investors.

309.     Despite this partial disclosure, Ceridian's stock price remained artificially inflated because defendants continued to conceal much of their accounting manipulations and corrupt internal controls.  Further, even as defendants made partial disclosures, they simultaneously pumped positive statements back into the market to keep the stock price inflated.  For example, while making

---

[9]     As expected, on September 30, 2004, Ceridian disclosed that it planned to restate its financials.

the adverse disclosure of the restatement in the October 18, 2004 press release, Ceridian also stated in part:

> "We were pleased with the solid operating performance in the second quarter," said Mr. Turner. "In the HRS business, revenue was in line with our plan, and the key metrics of our business – orders, customer retention and customer employment levels – were all in line with expectations. Float balances again grew in double digits in percentage terms. Comdata performed extremely well in the quarter, on continued strength in Stored Value Systems, healthy conditions in the over the road tricking market, and the successful launch of its BusinessLink product."

310.    After another two months of false statements propping up the price of Ceridian's stock, the Company was forced to issue additional partial disclosures of bad news on December 15-16, 2004. On those days, defendants announced additional accounting violations and the departure of key accounting executives, including defendants Eickhoff and Gross. Defendants also announced that the SEC was intensifying its investigation of the Company.

311.    On this news, the Company's stock price dropped 4.8% on the four trading days following the disclosures, partially removing some of the inflation that had built up due to defendants' positive statements and causing damage to investors. The stock price, however, was still artificially inflated because defendants did not disclose accurate financial results, the full extent of their accounting manipulations, or their corrupt system of internal accounting controls. Defendants continued their pattern of releasing only partial information about their misconduct to prevent a huge drop in the Company's stock price. In addition, defendants made false and misleading statements about Ceridian's financial results and downplayed their expectations of any additional restatements.

312.    On January 31, 2005, defendants revealed additional bad news – Restatement #3 – relating to their improper accounting treatment of Ceridian's derivative instruments, which enabled defendants to overstate Ceridian's revenues. On February 18, 2005, Ceridian issued its restated financials and revealed additional fraudulent accounting practices and failure to implement internal controls. Even though Ceridian's stock price declined over 2% on January 31, 2005, and about 1%

following the February 18, 2005 partial disclosures causing damages to investors, the Company's stock remained relatively flat and artificially inflated.  That was because investors had already become accustomed to defendants' disclosure of accounting violations and defendants continued to give the impression that the restatements were finished.  Yet the Company was forced to restate again in the following months, confirming that defendants' disclosures in January and February 2005 still did not reveal the full extent of defendants' misconduct and the true financial condition of the Company.

313.    On March 17, 2005, Ceridian announced it would restate it financials for the first three quarters of 2004 (Restatement #4) and delay the filing of its Form 10-K for 2004.  On this news, Ceridian's stock price declined 4.7% over the next seven trading days, closing at $16.87 on March 29, 2005 - 28% lower than the Class Period high – and removing some of the additional inflation in Ceridian's stock price causing damage to investors.

314.    The declines in Ceridian's stock price as the bad news was incrementally disclosed, revealing the true state of defendants' financial condition and accounting controls, were directly related to defendants' prior misrepresentations and fraudulent conduct.  Indeed, each partial disclosure of adverse facts which removed inflation from Ceridian's stock price (thereby causing damages), was causally connected to defendants' accounting manipulations and the resulting false financial statements.  Defendants decided to leak this information in bits and pieces to walk the stock price down, thereby avoiding the catastrophic impact of a single cumulative disclosure of the massive accounting violations and five restatements.  If the Company revealed all at once that its quarterly EPS results were overstated by as much as 100% during the Class Period, Ceridian's stock price would have plummeted.  Instead, the inflation was removed from the Company's stock price

little by little causing damage to investors, until substantially all the restatements and negative news were fully disclosed.[10]

315.    The timing and magnitude of Ceridian's stock price declines negate any inference that the loss suffered by Lead Plaintiff and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.* damages, suffered by Lead Plaintiff and other members of the class, was a direct result of defendants' fraudulent accounting scheme to artificially inflate Ceridian's stock price and the subsequent significant decline in the value of Ceridian's financial results and stock when the true state of the Company's operations was revealed to the market.

## X.  FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### (Against All Defendants)

316.    Plaintiff incorporates ¶¶1-278 by reference.

317.    During the Class Period, defendants engaged in a scheme to inflate Ceridian's financial results and disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

318.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)    employed devices, schemes and artifices to defraud;

---

[10]    Plaintiffs believe the artificial inflation caused by defendants' fraud was also removed from the stock price at other times during the Class Period.  These additional leakages of inflation will become known after plaintiffs have an opportunity for discovery and expert testimony.

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Ceridian's publicly traded securities during the Class Period.

319.    Plaintiffs and the class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ceridian's publicly traded securities and suffered economic loss when the inflation was removed through partial disclosures of adverse facts. Plaintiffs and the class would not have purchased Ceridian's publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

320.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their purchases of Ceridian's publicly traded securities during the Class Period.

## XI. SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the 1934 Act
### (Against All Defendants)

321.    Plaintiffs incorporate ¶¶1-283 by reference.

322.    By reason of both their senior executive positions at Ceridian, and their responsibility for the Company's financial statements, the Individual Defendants had the power and authority to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the Ceridian's false financial statements. The Company had the power to control and influence, and did control and influence, the Individual Defendants.

323. In particular, each of the defendants had direct and supervisory responsibility for the financial statements, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Defendant Eickhoff, as CFO, and defendant Gross, as Controller and principal accounting officer, were directly responsible for Ceridian's financial reporting. Defendant Eickhoff was responsible for Gross, who reported directly to him. CEO Turner is liable both for his control over defendants Eickhoff and Gross, as well as his control of the Company. By reason of such control, defendants are liable pursuant to §20(a) of the 1934 Act.

## XII. CLASS ACTION ALLEGATIONS

324. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all persons who purchased Ceridian publicly traded securities on the open market during the Class Period. Excluded from the class are defendants and Ceridian's officers and employees.

325. The members of the class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Ceridian had millions of shares of stock outstanding, owned by hundreds, if not thousands, of persons.

326. There is a well defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the class that predominate over questions that may affect individual class members include:

(a) whether the 1934 Act was violated by defendants;

(b) whether defendants misrepresented material facts or substantially participated in a fraudulent scheme;

(c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- 138 -

(d)      whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)      whether the prices of Ceridian's publicly traded securities were artificially inflated; and

(f)      the extent of damage sustained by class members and the appropriate measure of damages.

327.    Plaintiffs' claims are typical of those of the class because plaintiffs and the class sustained damages from defendants' wrongful conduct.

328.    Plaintiffs will adequately protect the interests of the class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the class.

329.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23;

B.      Awarding plaintiffs and the members of the class damages, interest and costs;

C.      Ordering defendants Turner and Eickhoff to forfeit and reimburse Ceridian for any bonus or other incentive-based or equity-based compensation received by them, and any profits realized from the sale of securities during the time periods set forth in §304 of Sarbanes-Oxley.

D.      Awarding such other relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  July 14, 2006

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
REED R. KATHREIN
ELI R. GREENSTEIN
ELIZABETH A. ACEVEDO


                    s/ Eli R. Greenstein
_____
             ELI R. GREENSTEIN

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

REINHARDT WENDORF & BLANCHFIELD
GARRETT D. BLANCHFIELD, JR. (#209855)
FRANCES E. BAILLON (#284358)
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN  55101
Telephone:  651/287-2100
651/287-2103 (fax)

Liaison Counsel

T:\CasesSF\Ceridian\CPT00032801.doc

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Eli R. Greenstein
ELI R. GREENSTEIN

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:EliG@lerachlaw.com

# Mailing Information for a Case 0:04-cv-03704-PJS-RLE

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Elizabeth A Acevedo**
  eacevedo@lerachlaw.com

- **Frances E Baillon**
  baillon@halunenlaw.com vocke@halunenlaw.com

- **Garrett D Blanchfield, Jr**
  g.blanchfield@rwblawfirm.com k.schulte@rwblawfirm.com

- **Daniel J Brown**
  brown.daniel@dorsey.com derijk.dawn@dorsey.com

- **Peter W Carter**
  carter.peter@dorsey.com stalock.cynthia@dorsey.com

- **Eli R Greenstein**
  elig@lerachlaw.com

- **Reed R Kathrein**
  reedk@lerachlaw.com E_File_SD@lerachlaw.com;E_File_SF@lerachlaw.com

- **Heather J Klaas**
  heather.j.klaas@ampf.com

- **William S Lerach**
  denisey@lcsr.com

- **Seth J S Leventhal**
  leventhal.seth@dorsey.com ware.jean@dorsey.com

- **Randall H Steinmeyer**
  randalls@lcsr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Darren-NA J Robbins
Not Admitted

Jonathan M Stein
Not Admitted
```