UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

IN RE: CERIDIAN CORPORATION
SECURITIES LITIGATION

Case No. 04-CV-3704 (PJS/RLE)

MEMORANDUM OPINION AND ORDER
GRANTING MOTION TO DISMISS

---

Reed R. Kathrein, HAGENS BERMAN SOBOL & SHAPIRO LLP; Eli R.
Greenstein, LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS
LLP; Frances E. Baillon, HALUNEN & ASSOCIATES; and Garrett D.
Blanchfield, Jr., REINHARDT WENDORF & BLANCHFIELD, for lead plaintiff
Western Pennsylvania Electrical Employees Benefits Funds.

Peter W. Carter, Daniel J. Brown, and Seth J.S. Levanthal, DORSEY &
WHITNEY LLP; and Heather J. Klaas, AMERIPRISE FINANCIAL INC., for
defendants.

This is a sprawling jumble of a securities-fraud action brought against defendant Ceridian

Corporation (Ceridian) and three of its former officers: Ronald L. Turner, the former president

and CEO; John R. Eickhoff, the former CFO; and Loren Gross, the former controller and

principal accounting officer.  This action is based on dozens, if not hundreds, of accounting

errors — errors of many different types committed by many different employees over many

different years.  These errors — which, for the most part, were not related — led to either three

or five restatements of Ceridian's financial results (the parties dispute the number), and quite

possibly cost Turner, Eickhoff, and Gross their jobs.

Seeing fraud where others might see incompetence — seeing Gordon Gekko where

others might see the Keystone Cops — plaintiffs bring claims of securities fraud under Section

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and under the SEC's

implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plaintiffs also bring claims of

controlling-person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t.

Plaintiffs' original  consolidated class-action complaint was dismissed by Judge Michael

J. Davis because it failed adequately to plead scienter.  With Judge Davis's permission, plaintiffs

filed an amended complaint, seeking to correct the inadequacies that led Judge Davis to dismiss

the original complaint.  After this case was transferred to the undersigned, defendants moved to

dismiss the amended complaint for failure to state a claim.  For the reasons described below,

defendants' motion is granted, and plaintiffs' first amended complaint is dismissed with

prejudice.  Plaintiffs will not be given another opportunity to amend their complaint.

## I.  BACKGROUND

Ceridian is a multinational information-services company specializing in the human-

resource, transportation, and retail markets.  Ceridian collects, manages, and analyzes data;

processes transactions; and provides customers with related products, software, and services.

The company has two main components:  (1) HRS, which offers human resource services,

including payroll processing, tax filing, benefits administration, qualified retirement and other

plan administration, and employee-assistance programs; and (2) Comdata, which provides

transaction processing, financial services, and regulatory compliance services to the

transportation and retail industries.  In 2003 and 2004, HRS accounted for more than two-thirds

of Ceridian's total revenues.

Comdata is a major issuer of credit cards, debit cards, and stored-value cards, and a major

processor of payments related to the use of such cards.  Comdata's wholly-owned subsidiary

Stored Value Systems (SVS) offers rechargeable private-label gift and cash cards and other

transaction-processing services to retailers, grocery and restaurant chains, and entertainment companies.  In the transportation industry, Comdata provides trucking companies with a credit/debit type of card that truckers use for fuel and other expenses during trips, thereby enabling their employers to monitor and control these expenses.  Comdata also assists clients with compliance services, such as obtaining regulatory permits, reporting fuel taxes, and auditing driver logs.

Plaintiffs seek to represent a class of investors who purchased publicly-traded Ceridian securities from April 17, 2003, when Ceridian announced its 1Q03 results, to and including March 17, 2005, when Ceridian announced that its 2004 Form 10-K annual report and its 4Q04 results would be delayed and that it would be restating its financial results for the first three quarters of 2004.  First Am. Compl. ¶¶ 1, 154, 265 [Docket No. 54].

According to plaintiffs' first amended complaint, defendants fraudulently inflated the price of Ceridian's publicly-traded securities by exploiting a weak system of internal controls to manipulate the company's financial results.  This scheme involved many different areas of the company and many different violations of generally accepted accounting principles (GAAP). Plaintiffs allege that these violations included, among other things, improper revenue recognition, improper expense reporting, improper accounting for derivatives, improper reserve accounting and accrual adjustments, excessive restructuring charges, improper accounting of assets and liabilities, and improper accounting for operating leases.  In 2004 and 2005, Ceridian restated its previously issued financial statements a number of times — five times, according to

plaintiffs' count.[1]  Plaintiffs allege that, with each restatement, defendants revealed only a small part of their scheme to make lots of accounting errors and thus avoided having to reveal the full extent of their fraud all at once.

### A.   First Restatement

On February 18, 2004, Ceridian announced that it was retroactively changing the way its SVS subsidiary recognized revenue from the sale and servicing of stored-value cards.  Stored-value-card revenue derives both from the sale of the cards and from Ceridian's processing of the charges made to the cards.  Typically these processing services begin six to eight months after the cards are shipped to the purchaser.

Before July 1, 2003, Ceridian recognized all stored-value-card revenue ratably over a 12-month period, beginning when the card was shipped.  In July 2003, Ceridian announced that it would change its practice and recognize revenue from *selling* the cards immediately upon shipment and revenue from *servicing* the cards on a straight-line basis over a six-month period following activation of the card.  Ceridian announced that it was making this change at the suggestion of its outside auditors on the basis of a new rule, EITF 00-21, recently announced by the Emerging Issue Task Force (EITF) of the Financial Accounting Standards Board.  Rule EITF 00-21, entitled "Revenue Arrangements with Multiple Deliverables," addresses how and when a

---

[1]Plaintiffs allege that Ceridian restated its financial information five times.  Defendants contend that Ceridian filed three restatements, and that plaintiffs improperly characterize certain announcements relating to forthcoming restatements as separate restatements.  But the parties do not dispute the underlying relevant facts (such as the dates and contents of various press releases, conference calls, and SEC filings).  Defendants' contention seems correct, but the Court will adopt plaintiffs' five-restatement framework for discussing the facts alleged in the complaint in order to avoid resolving any potential factual disputes in defendants' favor at this stage.

revenue transaction involving "multiple deliverables" may be divided into separate revenue-generating transactions for accounting purposes.

In the July 2003 announcement of the revenue-recognition change, Eickhoff explained that "a portion of the transaction processing revenue will be deferred and spread over six months following the transaction.  On the other hand, all [SVS] card revenue will now be recognized as revenue upon delivery to customers rather than some of it being spread over time which was the case in the past."  First Am. Compl. ¶ 169.  Plaintiffs allege that both the pre-July 2003 policy and the post-July 2003 policy were improper.

On February 18, 2004, Ceridian announced that, after further discussions with its outside auditors, it had determined that it needed to change its stored-value-card revenue-recognition policy yet again.  Under the new policy, no card revenue is recognized until the processing of the card begins — that is, until approximately six to eight months after shipment.  Approximately 90% of the revenue is then recognized over the next six months, with the remaining 10% recognized over the next 24 months.  This change resulted in a restatement of the company's financial statements for all fiscal periods between December 31, 1999 and December 31, 2003, and caused large drops in revenue and earnings for each restated fiscal year.[2]  First Am. Compl. ¶ 52 (alleging respective decreases in revenue and earnings of $7.1 million and $2.9 million for

---

[2]As noted above, plaintiffs' count of the number of restatements does not track the actual number of times Ceridian filed revised financial documents with the SEC, which makes what would otherwise be a fairly straightforward presentation of the financial fallout from these restatements somewhat complex.  Plaintiffs have highlighted the financial effects of some, but not all, of the various accounting practices at issue, which is why the Court's statement of facts does not specify the financial impact of every alleged impropriety.

fiscal year 2000, $10.8 million and $2.6 million for fiscal year 2001, $1.7 million and $1.6 million for fiscal year 2002, and $20.9 million and $3.2 million for fiscal year 2003).

### B.  Second Restatement

On July 19, 2004, a few months after restating its financial reports on the basis of its new stored-value-card revenue-recognition policy, Ceridian announced that it would postpone the release of its 2Q04 results so that its audit committee, with the help of an outside auditor, could review capitalization and expensing practices in its HRS division.  First Am. Compl. ¶ 224. Ceridian admitted that this review could have an impact both on its 2Q04 results and on previously reported results, and Ceridian disclosed that it had advised the SEC of its review. First Am. Compl. ¶ 224.  Later, the company announced that it would not meet the filing deadline for its 2Q04 Form 10-Q and that it expected to restate its prior financial statements. Ultimately, on October 18, 2004, Ceridian announced that, based on the audit committee's review, it would be restating its financial statements for the years 1999 through 2003 and for 1Q04.

The audit was apparently prompted by the discovery of numerous GAAP violations involving the improper capitalization of expenses for internally-developed software, but the audit ended up uncovering numerous additional problems not related to the software.  The software-related violations included improperly capitalizing the cost of post-implementation software fixes (which should have been recorded as expenses); capitalizing expenditures for some projects before obtaining the requisite internal approval for the projects; capitalizing overhead costs for internally-developed software; failing to stop capitalization when the software was substantially complete and ready for its intended use; failing to write off the value of an abandoned software

project in a timely manner; and capitalizing costs for software as if the software was solely for internal use when it was actually also sold to outside customers. According to plaintiffs, the software-expense-related aspects of defendants' accounting-fraud scheme caused Ceridian to overstate its reported net income by a total of $35.8 million from pre-1999 through fiscal year 2004. First Am. Compl. ¶ 62.

The second restatement also corrected errors in revenue recognition relating to HRS service offerings — errors that were unrelated to internally-developed software. Plaintiffs identify three ways in which Ceridian's previous HRS revenue-recognition policies violated GAAP. First, Ceridian improperly recognized revenue upon the installation and implementation of its products and services, even though processing and administrative elements of the transactions had not yet occurred. Second, Ceridian improperly recognized some revenue for up-front and contractual performance fees before the customer accepted the underlying contract. Third, Ceridian improperly recognized the full amount of contractual up-front revenue immediately upon execution of the contract, before all deliverables were rendered.

Finally, the second restatement corrected Ceridian's treatment of its reserve accounts. In the 1980s and 1990s, Ceridian over-reserved for special restructuring changes by $23.5 million, and held this excess reserve on its balance sheet throughout the class period. As part of the second restatement, Ceridian transferred the balance of its excess reserve to the beginning balance of its retained earnings for fiscal year 1999. Plaintiffs also allege that Ceridian falsely reported the amount of its accruals related to its accounts payable, employee compensation, and benefits liabilities in order to smooth its earnings. According to plaintiffs, this latter violation

increased Ceridian's expenses for most years, resulting in a net increase of $7.4 million in expenses through FY04.  First Am. Compl. ¶ 69.

*C.  Third Restatement*

On December 15, 2004 and January 31, 2005, Ceridian announced additional accounting violations involving Ceridian's derivative instruments.  Starting in 1992 and continuing throughout most of the class period, Ceridian engaged in an interest-rate hedging program related to its customer deposits.  In 2003, Ceridian implemented a fuel-price hedging strategy.  Since the beginning of these derivative activities, Ceridian has accounted for them as "cash-flow hedges" under special rules for hedge accounting.  Hedge accounting is an elective accounting treatment, and the applicable rules require substantial formal documentation.  As part of what plaintiffs characterize as the third restatement, Ceridian admitted that its hedging activities were not properly documented and did not qualify for hedge-accounting treatment.  According to plaintiffs, the correction of this accounting violation reduced Ceridian's reported revenues by a total of $75.3 million for fiscal years 2001 through 2004.  First Am. Compl. ¶ 83.

In addition, Ceridian revised its treatment of revenue associated with third-party-vendor transactions.  Under GAAP, revenue from transactions with third-party vendors that also result in costs to the vendor must be recognized on a net basis, with the amount of the revenue reduced by the amount of associated costs.  Plaintiffs allege that Ceridian improperly recognized revenue from these transactions on a gross basis and treated the vendors' costs separately in Ceridian's cost of revenue.

Another revenue-recognition problem corrected in the third restatement was Comdata's improper recognition of equipment-sales revenue at year-end 2001 and year-end 2002 for equipment that had not yet been delivered and accepted by the customer.

Plaintiffs also allege that Ceridian misclassified certain cost-of-revenue expenses, which had the effect of inflating its overall operating margins. In its restatement, Ceridian's correction of this misclassification increased its cost-of-revenue expenses from 2001 through 1Q04 by a total of $311.4 million. First Am. Compl. ¶ 89.

Finally, plaintiffs allege that Ceridian misclassified Comdata's assets and liabilities. First, in several instances, Ceridian violated GAAP by improperly offsetting trade receivables against certain customer advances and improperly offsetting customer deposits against related liabilities. As a result, Ceridian understated its liabilities by tens of millions of dollars for three quarters (4Q02, 4Q03, and 1Q04) during the class period. First Am. Compl. ¶ 90. Second, Ceridian misclassified a vendor-payable account as a reduction in Ceridian's liabilities rather than as an asset, which resulted in an understatement of its liabilities by $2.6 million in 4Q03. First Am. Compl. ¶ 91. Third, Ceridian misclassified certain receivables as current assets when they were not, which resulted in an overstatement of its assets by $2 million and $1.7 million in 4Q03 and 1Q04, respectively. First Am. Compl. ¶ 92.

### D. Fourth Restatement

On March 17, 2005, the last day of the class period, Ceridian announced that it would be restating its 2004 quarterly financial information because it had previously failed to accelerate the amortization of a trademark that it had decided to stop using as of December 2004. This failure caused Ceridian's amortization expense for the first three quarters of 2004 to be

understated, its assets to be overstated, and its earnings for that period to be inflated by $20 million.  First Am. Compl. ¶ 101.

### E.  Fifth Restatement

Finally, in what plaintiffs characterize as the fifth restatement, Ceridian announced on April 15, 2005 that it would be restating its financial statements due to "another laundry list of improprieties occurring in different areas of the Company."  First Am. Compl. ¶ 102.  This list included failing to expense scheduled rent increases on a straight-line basis over the terms of the leases, and instead deferring the recognition of these expenses to future periods.  In addition, Ceridian improperly accounted for two acquisitions made in the United Kingdom and Canada in 1995 and 1998.  Finally, the fifth restatement revealed additional misstatements involving balance-sheet reserves.

As the foregoing makes clear, Ceridian's internal financial-reporting controls before and during the class period were inadequate, to say the least.  In its Form 10-K reports filed with the SEC on February 18 and April 21, 2005, Ceridian admitted to numerous specific "material weaknesses" and "significant deficiencies" in its internal controls, First Am. Compl. ¶ 113, and admitted that these deficiencies would result in an adverse opinion from its outside auditor, KPMG, First Am. Compl. ¶ 116.  As described above, plaintiffs highlight several aspects of Ceridian's restated financial results.  Plaintiffs argue that, all told, Ceridian's earnings per share from 3Q03 through 3Q04 were overstated by 35%, 43%, 31%, over 100%,[3] and 36%, respectively.  First Am. Compl. ¶ 3.

---

[3]According to plaintiffs, Ceridian reported earnings per share of $0.15 for 2Q04 when it should have reported a loss of $0.02 per share.)

### F.  SEC Investigation

In a January 22, 2004 press release (before any of the restatements described above), Ceridian announced that it was the subject of an SEC investigation.  A month later, at the same time that it announced the final change in its revenue-recognition policy for stored-value cards (in what plaintiffs call the first restatement), Ceridian disclosed that the SEC had asked for a fuller explanation of Ceridian's changes to that policy.  Over a year later, on April 20, 2005, Ceridian disclosed that the SEC had made a second document request the previous December that "broadened the areas of inquiry to include, among other things, Ceridian's restatement, revenue recognition, capitalization, expense recognition, how we respond to any internal ethics complaints, and Ceridian's accounting policies and procedures."  First Am. Compl. ¶ 146.  In June 2005, Ceridian received a subpoena from the SEC seeking the same types of documents.  First Am. Compl. ¶ 8.  To date, the SEC has not issued any findings or held any hearings with respect to this investigation.

### G.  Stock Prices

On the first day of the class period, Ceridian's stock traded at $13.55 per share.  First Am. Compl. ¶ 2.  At its height in mid-2004, Ceridian stock reached over $23.00 per share.  First Am. Compl. ¶ 2.  On March 29, 2005, twelve days after the end of the class period, Ceridian stock closed at $16.87.  First Am. Compl. ¶ 266.  Plaintiffs allege that the rise in Ceridian's stock during the class period was a result of defendants' fraudulent accounting improprieties.

### H.  Insider Trading and Compensation Structures

In May 2003, Eickhoff traded nearly 100,000 shares of Ceridian stock in two trades when the stock was trading at $16.62 and $16.49 per share, respectively.  First Am. Compl. ¶ 120.

Later, on September 8, 2003, when Ceridian stock was trading at $20.00 per share, Eickhoff sold 65,340 shares. A day later, Turner sold 51,000 shares of Ceridian stock for prices ranging from $19.70 to $19.99. In total, Eickhoff made $2.96 million from selling stock in May and September 2003, and Turner made $1.01 million from selling stock in September. First Am. Compl. ¶ 120. Turner had not sold any shares in the previous three years, and Eickhoff had not sold any in the previous four. First Am. Compl. ¶ 124. Plaintiffs point out that in September 2003, Ceridian's earnings per share were overstated by 35%; thus, plaintiffs contend, the September 2003 sales were perfectly timed to take advantage of the inflated stock price before later restatements revealed the extent of the fraud.

Plaintiffs also allege that Turner's and Eickhoff's compensation structure was tied to meeting certain financial goals and that this fact motivated them to inflate Ceridian's financial results. Specifically, Turner's and Eickhoff's 2003 bonuses were 80% dependent on earnings per share and 20% dependent on revenue growth. First Am. Compl. ¶¶ 128, 130. In 2003, Turner was eligible to receive a bonus of up to 200% of his $650,000 base salary, and he ultimately received a bonus of $650,000 for that year. First Am. Compl. ¶ 128. Eickhoff similarly was eligible for a bonus of up to 150% of his $414,423 base salary in 2003, and ultimately received a $300,000 bonus for that year. First Am. Compl. ¶ 130. In 2004, in what plaintiffs characterize as a suspicious change, Turner's and Eickhoff's eligibility for bonuses was changed to be 60% dependent on earnings per share and 40% dependent on cash-flow targets. First Am. Compl. ¶ 127. Plaintiffs allege that, through this change, Turner and Eickhoff purposefully ensured that a substantial proportion of their 2004 bonuses would be tied to a

financial measurement that they knew would not be affected by future restatements.  Ultimately, neither Turner nor Eickhoff received a bonus in 2004.  First Am. Compl. ¶¶ 129, 131.

### I.  Departure of the Individual Defendants

In December 2004, Ceridian announced that both Eickhoff and Gross would be leaving upon the filing of amended financial statements.  Eickhoff and Gross left the company on February 18, 2005, when Ceridian filed the restated financial documents plaintiffs characterize as the second and third restatements.  First Am. Compl. ¶ 259.  At around the same time, Ceridian terminated fourteen employees for violating GAAP in relation to expense deferrals.  First Am. Compl. ¶ 32 & Ex. E.  Turner announced his retirement from Ceridian in April 2006.  Plaintiffs allege that the timing of these departures — during the SEC investigation — is suspicious.  Plaintiffs also contend that the requirement that Eickhoff and Gross stay until the revised financial statements were filed demonstrates that Eickhoff and Gross were connected to the alleged fraud.

### J.  Additional Allegations About Whistleblowers and Confidential Witnesses

#### 1.  Whistleblower #1

The first amended complaint includes new allegations primarily relating to five individuals whom plaintiffs identify as whistleblowers and confidential witnesses.  Whistleblower #1 (W1), a former director of general accounting, was one of the fourteen people fired in late 2004 for accounting improprieties.  After her termination, she filed a complaint under the whistleblower provision of the Sarbanes-Oxley Act with the Occupational Safety and Health Administration (OSHA), which has jurisdiction over such complaints under 29 C.F.R. § 1980.103(c).  First Am. Compl. Ex. B.  She alleged that in 2001 she reported certain

accounting improprieties originating with an internal group known as the "Sprint to the Finish"

team, whose purpose was to identify ways to improve Ceridian's revenue.  The improprieties

alleged by W1 in her lawsuit included billing on maintenance contracts in advance of services

rendered; recognizing revenue for installation and integration of software in excess of amounts

expected to be realized; improperly recording expense credit as revenue in connection with an

annual customer conference; recognizing revenue based on letters of intent before the receipt of

signed contracts; and delaying customer credit contrary to the usual policy of granting credit

against a customer's next invoice.  First Am. Compl. Ex. C.  According to W1, her supervisor,

Dan Dolan, told her that orders were being overstated because Ceridian executives believed that

stock analysts did not have the patience to wait two quarters for Ceridian to show a turnaround.

First Am. Compl. ¶ 25.

    In her complaint, W1 identifies Gross as an individual involved in the Sprint to the Finish

team, and she alleges that she brought "the accrual of certain items affecting income which were

not in accordance with U.S. GAAP" to Gross's attention.  First Am. Compl. Ex. B ¶ 10; *see also*

*id.* Ex. C (alleging that she met with Gross "to express her concerns with the accounting for

Sprint Teams items" on July 3, 2001, that items she questioned were delivered to and reviewed

by Gross, and that the Sprint team, including Gross, decided to "neutralize" W1 by including her

in Sprint team meetings).

    OSHA later found that there was no reasonable cause to believe that Ceridian violated the

Sarbanes-Oxley Act in terminating W1.  First Am. Compl. Ex. E.  OSHA also cited an internal

Ceridian investigation that found that fourteen employees, including W1, engaged in

inappropriate deferral of expenses that violated GAAP and inflated Ceridian's financial results.

First Am. Compl. Ex. E.  OSHA concluded that "[t]he matter was corrected, and [Ceridian]'s

financial statements [were] restated."  First Am. Compl. Ex. E.  W1 exercised her right to file

objections to these findings and requested a hearing before an Administrative Law Judge.  First

Am. Compl. Ex. F.  In her objections, W1 claimed that OSHA was wrong in concluding that the

erroneous accounting practices had been corrected.  First Am. Compl. Ex. F.  She argued that she

and the other terminated employees were forced to take the blame for the improprieties in order

to protect senior management.  First Am. Compl. Ex. F.  The parties later settled the case for an

undisclosed amount.  First Am. Compl. ¶¶ 7, 33.

### 2.  Confidential Witnesses and Whistleblower #2

Confidential witness #1 (CW1) was the vice president of finance for the HRS division

until late 2004.  CW1 alleges that Gross was responsible for accounting policies and procedures

for the entire company and reported directly to Eickhoff.  CW1 and others regularly conferred

with Gross for validation and approval of accounting decisions.  CW1 recalls that Eickhoff and

Turner attended monthly HRS meetings to discuss operations, and at one of these meetings the

SEC investigation and restatements were discussed.

Confidential witness #2 (CW2) was the senior vice president of marketing at Ceridian

until February 2005.  CW2 states that Turner and Eickhoff were responsible for signing off on

"schedule of authority" forms for all capital expenditures or expense approvals over a certain

dollar amount, and also states that Eickhoff and Turner attended monthly HRS meetings.

Confidential witness #3 (CW3) was a senior financial analyst at Ceridian from March

1999 until September 2001.  CW3 states that Gross and Eickhoff decided to capitalize expenses

concerning Ceridian's software projects, and that she became aware that Ceridian was

recognizing revenue on contracts in the absence of a signed contract, although she does not state the source of this knowledge.

Finally, plaintiffs identify an individual whom they refer to as Whistleblower #2 (W2), who raised accounting concerns that ultimately led to the expanded SEC investigation. Plaintiffs do not know W2's identity and have no further information about him or her.

### K.  False Statements

Plaintiffs allege that defendants' statements in press releases, conference calls, and SEC filings throughout the class period, concerning both Ceridian's financial performance and the adequacy of its internal controls, were false, as demonstrated by Ceridian's five restatements and Ceridian's later admission of material weaknesses and significant deficiencies in its internal controls. *See* First Am. Compl. ¶¶ 154-255. Plaintiffs identify a very large number of allegedly false statements, but in general they all fit within five broad categories:

(1) statements of Ceridian's financial performance for the relevant quarter or fiscal year, whether in a press release, conference call, or SEC filing;

(2) statements in Ceridian's SEC filings certifying that defendants (a) designed and evaluated Ceridian's internal controls to ensure their effectiveness, (b) identified and disclosed to its auditors any "material weaknesses" and "significant deficiencies" in the internal controls as well as any fraud, and (c) reviewed Ceridian's quarterly reports and found them to be accurate, First Am. Compl. Ex. G;

(3) statements about the impact of the restatements and of various accounting changes (such as the revenue-recognition policy for stored-value cards);

(4) statements downplaying the importance of the SEC investigation; and

(5) statements about the possible need for future restatements or about the need for delays in reporting results.

Plaintiffs allege that Ceridian's restatements, defendants' insider trading and compensation packages, and the facts alleged in W1's lawsuit all support an inference of

scienter.  Plaintiffs also point to a number of other circumstances supporting an inference of

scienter, including the SEC investigation, the statements of confidential witnesses, the timing of

Eickhoff's and Gross's departures from the company, the company's later admissions that its

internal controls were inadequate, and the sheer number of times Ceridian restated its financials

and changed its accounting practices in a short period of time.

## II.  ANALYSIS

Plaintiffs bring claims of securities fraud under Section 10(b) of the Securities Exchange

Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as claims of

controlling-person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t.

Section 78j states, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means
or instrumentality of interstate commerce or of the mails, or of any facility of any
national securities exchange . . .

(b)     To use or employ, in connection with the purchase or sale of any security
        registered on a national securities exchange or any security not so
        registered . . . any manipulative or deceptive device or contrivance in
        contravention of such rules and regulations as the Commission may prescribe as
        necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78(j).  Rule 10b-5 states, in turn:

It shall be unlawful for any person, directly or indirectly, by the use of any means
or instrumentality of interstate commerce, or of the mails or of any facility of any
national securities exchange,

(a)     To employ any device, scheme, or artifice to defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact
        necessary in order to make the statements made, in the light of the circumstances
        under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would
        operate as a fraud or deceit upon any person, in connection with the purchase or

sale of any security.

17 C.F.R. § 240.10b-5.

To establish their securities-fraud claims under § 78j(b) and Rule 10b-5, plaintiffs must prove (1) misrepresentations or omissions of material fact, or acts that operated as a fraud or deceit; (2) causation; (3) scienter; and (4) economic harm.  *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002).  To prevail on their 15 U.S.C. § 78t controlling-person-liability claims, plaintiffs must first establish a separate underlying violation of the 1934 Act.  *See Deviries v. Prudential-Bache Secs., Inc.*, 805 F.2d 326, 329 (8th Cir. 1986).  If plaintiffs cannot maintain their § 78j(b) and Rule 10b-5 securities-fraud claim, then they also cannot maintain their § 78t claim.

*A.  Standard of Review*

Ordinarily, in reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the claimant's favor.  *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 (8th Cir. 2003).  But because this is a private securities-fraud action, the Private Securities Litigation Reform Act ("Reform Act"), 15 U.S.C. § 78u-4(b), modifies the Rule 12(b)(6) standard in two important ways.

First, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  This means that plaintiffs must specifically allege such matters as the time, place, and contents of false representations, as well

as who made each misrepresentation.  *K-Tel*, 300 F.3d at 890.

Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "Strong" means "strong."  Under the Reform Act, it is not sufficient for the facts alleged to give rise to a weak or plausible or even reasonable inference of scienter; instead, the facts alleged must give rise to a strong inference that the defendants acted with the required state of mind.  *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001).

Under these provisions of the Reform Act, the court disregards "catch-all" or "blanket" assertions that do not satisfy the particularity requirements of the Reform Act.  *Green Tree*, 270 F.3d at 660.  If the complaint fails to satisfy these requirements, it must be dismissed.  15 U.S.C. § 78u-4(b)(3).

## B.  Procedural History

This action was originally filed on August 6, 2004.  On June 27, 2005, plaintiffs filed a consolidated class-action complaint [Docket No. 26], and defendants moved to dismiss.  On May 25, 2006, Judge Davis granted defendants' motion and gave plaintiffs leave to amend the complaint.  [Docket No. 50].  A few days later, this action was transferred to the undersigned. Plaintiffs filed the first amended class-action complaint on July 14, 2006.  [Docket No. 54].  That July 14 pleading is the subject of defendants' current motion to dismiss.

Judge Davis did not explain why he dismissed the original consolidated class-action complaint, but, as the parties agree, there is little doubt that he concluded that the allegations in

-19-

the complaint failed to give rise to a strong inference of scienter.  Scienter was the focus of the

defendants' motion to dismiss the original complaint, and it was the focus of oral argument

before Judge Davis.  The undersigned will therefore continue to focus on the issue of scienter —

and, in particular, on whether the new allegations in the first amended complaint are sufficient to

cure the deficiencies that caused Judge Davis to dismiss the original consolidated complaint.  To

aid the Court's analysis, plaintiffs have provided a "red-lined" copy of the complaint that

highlights the new material.  [Docket No. 76].  As the parties agreed at oral argument, the main

additions to the latest complaint are the statements of the whistleblowers and confidential

witnesses.

## C. Scienter

Scienter means the intent to deceive, manipulate, or defraud.  *Ferris, Baker Watts, Inc. v.*

*Ernst & Young, LLP*, 395 F.3d 851, 854 (8th Cir. 2005).  Negligence — even gross or

inexcusable negligence — is not sufficient to meet this standard.  *Id.*  Severe recklessness is

sufficient, but it can be found only in connection with

> "highly unreasonable omissions or misrepresentations that involve not merely
> simple or even inexcusable negligence, but an extreme departure from the
> standards of ordinary care, and that present a danger of misleading buyers or
> sellers which is either known to the defendant or is so obvious that the defendant
> must have been aware of it."

*Id.* (quoting *Green Tree*, 270 F.3d at 654).  As noted above, the Reform Act requires that

plaintiffs must allege "with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

Also as noted above, Judge Davis concluded that plaintiffs' original consolidated

complaint did not adequately allege scienter.  His conclusion is hardly surprising:  Given the

course of conduct described in the original consolidated complaint and the first amended

complaint — a course of conduct involving dozens of employees committing hundreds of

unrelated accounting errors of many different types over many different years — it seems almost

inconceivable that there could have been *any* unifying intent behind the errors, much less an

intent to defraud.  The allegations in the complaint reek of incompetence, not fraud.  At bottom,

plaintiffs' allegations amount to little more than allegations that lots of accountants committed

lots of GAAP violations.  It is well established that, in the absence of evidence of fraudulent

intent, GAAP violations are insufficient as a matter of law to establish scienter.  *In re Navarre*

*Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir. 2002).

From the beginning, plaintiffs have argued that the sheer number of violations, and the

magnitude of the restatements, give rise to an inference that defendants were at least severely

reckless. When the allegations of insider trading and the individual defendants' bonus packages

are added to the mix, plaintiffs have argued, the inescapable conclusion is that defendants

intentionally inflated Ceridian's financials for their personal economic benefit.[4]  These

arguments failed to persuade Judge Davis — and they fail to persuade the undersigned — for

several reasons.

First, regarding the plaintiffs' contention that defendants must have been aware of the

accounting violations because there were so many of them and they had such a substantial effect

on the company's bottom line:  As the Court's factual summary demonstrates, the accounting

---

[4]Because Judge Davis already found plaintiffs' original consolidated complaint
inadequate, the Court's discussion of the allegations contained in it is not meant to be
exhaustive.  Rather, the Court is simply summarizing the strongest of plaintiffs' arguments, and
the problems that undoubtedly caused Judge Davis to disagree with them, in order to provide a
context for the Court's later discussion of the new allegations.

violations were committed by many different employees, involved many different areas of the company, occurred at many different times, and involved many different accounting procedures. For example, according to plaintiffs, Ceridian announced that it made the July 2003 change to its stored-value-card revenue-recognition policy on the advice of its outside auditors, and later changed this policy again based on its auditors' advice. Plaintiffs claim that these multiple rapid changes in policy are suspicious, but they offer no facts to show that Ceridian was *not* being truthful when it claimed to be relying on outside advice. Several months later, a whole series of accounting problems came to light, but, as recounted in the first amended complaint, the discovery of those problems was the result of an audit review that was prompted by internal concerns over capitalization of software expenses — concerns that were completely unrelated to the stored-value-card revenue-recognition issue.

Plaintiffs have alleged little reason to believe that the many violations they cite were connected — that the violations were in any way orchestrated, much less orchestrated by the individual defendants. Indeed, plaintiffs have not even alleged specific facts *connecting* the individual defendants to most of the accounting violations. If one makes a list of the numerous alleged GAAP violations — and then, with respect to each violation on the list, looks for *specific* allegations in the complaint linking one of the individual defendants to the violation — one will almost invariably come up empty handed.

The 1934 Act does not prohibit accounting malpractice; it prohibits fraud. Although plaintiffs allege that "[t]he entire accounting system was intentionally structured to allow defendants to manipulate virtually every accounting function of the Company at will," First Am. Compl. ¶ 36, plaintiffs offer no facts in support of this allegation other than the utterly

commonplace fact that, like the senior financial managers of *every* company, the individual defendants had control over Ceridian's accounting policies and procedures.  In short, far from painting a picture of a masterful high-level plot to overstate the company's performance, plaintiffs' allegations instead portray a company that was riddled with incompetence among its financial managers and accountants.  Barely supported conspiracy theories may make for interesting magazine articles or blog entries, but, under the Reform Act, they are not sufficient to "giv[e] rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

Plaintiffs argue that, even if the allegations regarding the number and magnitude of the accounting errors are not by themselves sufficient to give rise to a strong inference of scienter, those allegations are sufficient when considered together with the individual defendants' financial motive to overstate the company's performance.  Allegations of insider trading, if unusual in timing or amount, can surely be sufficient to raise a strong inference of scienter.  *See K-Tel*, 300 F.3d at 895-96.  Here, however, plaintiffs' allegations fall short for several reasons.

First, there is nothing particularly suspicious about the timing of the insider trades cited by plaintiffs.  Plaintiffs allege an ongoing scheme that lasted for years — indeed, the complaint contains allegations of accounting manipulations stretching back into the 1990s.  Thus, under plaintiffs' theory, *any* sale of stock by an individual defendant during a period of roughly ten years would have been suspicious, because there were *always* ongoing GAAP violations at Ceridian that had not yet been disclosed.

Plaintiffs allege, though, that the insider trades were perfectly timed to take maximum advantage of the alleged fraud.  That simply cannot be true.  GAAP violations continued to occur

for months after Turner's and Eickhoff's stock sales.  Despite the fact that, during those months, the stock price stayed well above the price that Turner and Eickhoff received for their stock, neither of them sold any more stock.  Against this backdrop, there would appear to be no particular reason why 2003 would have been the perfect time for the individual defendants to cash in, unless they were somehow aware that their fraud was about to be revealed and were rushing to sell before the inevitable crash.  But there is nothing in the complaint to suggest that defendants had such knowledge.

Moreover, of the 165,298 shares Eickhoff sold in 2003, more than half were sold in May, well before the stock rose to its class-period high, and at a price slightly *lower* than the post-class-period price of $16.87.  Not only were these sales far from perfectly timed to take advantage of the alleged fraud, they are also too remote from any of the later disclosures to give rise to an inference that Eickhoff was unloading his stock to avoid the effect of imminent revelations of accounting violations.

The September sales were slightly closer in time to the February 18, 2004 announcement of the first restatement.  But the allegedly fraudulent accounting that necessitated that restatement — the July 2003 change in the recognition of revenue for stored-value cards — was not exactly a revelation to the market:  In July 2003, Ceridian had explained how it planned to recognize stored-value-card revenue based on the newly-issued rule EITF 00-21.  Plaintiffs' scenario, in which Turner and Eickhoff, after years of cooking the books, suddenly decide to sell off stock in order to avoid the fallout from a fraudulent revenue-recognition policy — the details of which had already been disclosed months earlier — simply does not make sense, much less give rise to a strong inference of scienter.  True, Turner and Eickhoff had not sold stock for a

number of years previously.  But, given the lack of a logical or temporal connection between the stock sales and the disclosures of the alleged fraud, and given the lack of any specific allegations suggesting that Turner or Eickhoff knew anything about the various accounting problems at Ceridian, plaintiffs' allegations do not rise to the requisite level.  Moreover, the fact that Gross did not sell *any* stock during the class period substantially undermines any inference of scienter. The few details contained in the complaint regarding the individual defendants' knowledge of accounting improprieties mostly pertain to Gross, making his lack of sales almost inexplicable under plaintiffs' theory.  *See In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005) (fact that none of the other defendants traded stock during the class period decreased any inference of scienter).

Finally, the mere fact that an individual defendant's compensation depends in part on the company's financial performance is insufficient to give rise to a strong inference of scienter. Rather, the plaintiff must plead that "an individual defendant will benefit to an unusual degree, based upon the magnitude of a compensation package tied to earnings and the timing of an overstatement of earnings."  *K-Tel*, 300 F.3d at 894.  No such facts are plead in this case.  Here, Eickhoff and Turner received respective bonuses of $300,000 and $650,000 for 2003.  Courts have held that bonuses in similar amounts were insufficient to give rise to strong inference of scienter.  *Compare Cerner*, 425 F.3d at 1085 ($355,000 bonus not sufficient to raise an inference of scienter) *and Kushner*, 317 F.3d at 830 ($630,000 bonus not sufficient to raise an inference of scienter) *with Green Tree*, 270 F.3d at 661 ($102 million bonus, combined with other suspicious circumstances, sufficient to raise an inference of scienter).  Plaintiffs argue that the 2004 change in Turner's and Eickhoff's bonus eligibility, which made their bonuses more dependent on cash

flow and less dependent on earnings per share, shows that they knew that the company's previous earnings per share were false.  But putting aside that the fact that the complaint does not allege facts to support the inference that Turner and Eickhoff were behind this change, even after the change Turner's and Eickhoff's bonuses remained 60% dependent on earnings per share. This fact undercuts any inference that Turner and Eickhoff were aware of undisclosed accounting problems.

In sum, as Judge Davis found, the facts alleged in the original consolidated complaint fell far short of giving rise to a strong inference of scienter.  The Court is therefore left to consider whether the allegations added to the first amended complaint cure this deficiency.

It is clear that the allegations relating to the three confidential witnesses lack the detail necessary to give weight to any inference of scienter.  These allegations merely inform the Court that Turner and Eickhoff attended meetings at which accounting issues were sometimes discussed and that the individual defendants participated generally in accounting decisions, were responsible for accounting policies and procedures, and answered employees' questions concerning accounting issues.  The Court could have surmised as much from the individual defendants' job titles.  CW3, who alleges that Gross and Eickhoff "made the strategic decisions related to the capitalization of expenses concerning Ceridian's software projects" (without stating what these decisions were or when they were made) has not worked for Ceridian since September 2001.  First Am. Compl. ¶ 139.  Given the amount of time between the end of CW3's employment with Ceridian and the beginning of the class period, there is no way to connect that allegation to the later problems with software accounting without more detail about the specific software projects or the actual decisions.  These allegations do not help plaintiffs.

-26-

The amended complaint contains even less detail about W2, who is merely alleged to have raised certain issues about capitalization and expensing that ultimately led the SEC to expand its investigation.  Plaintiffs provide no specifics about these allegations, and, as nothing has yet come of the SEC's investigation, the mere fact of the investigation does not appreciably add to the evidence supporting an inference of scienter.

That leaves W1's allegations, which are detailed in exhibits attached to the first amended complaint.  While W1 alleges that she spoke directly with Gross about her concerns regarding accounting improprieties, these allegations all relate to *2001*, long before the class period began.  Plaintiffs argue that W1's allegations concerned the "same areas" as the later accounting improprieties (revenue recognition and improper expense reporting), and that Ceridian had identified these policies as the "most critical" of its accounting policies.  First Am. Compl. ¶ 34.  But these categories are so broad as to render plaintiffs' assertion almost meaningless, and the fact that Ceridian considered them "critical" does not help link the 2001 accounting problems to the later problems.  Simply put, nothing in the first amended complaint ties the problems W1 saw in 2001 to the issues that arose in 2004 with the level of specificity required by the Reform Act.

To be clear:  Plaintiffs' inference that these issues are related is not unreasonable, but, again, under the Reform Act, a reasonable inference is not enough.  A strong inference is required.  W1's allegations do not give rise to a strong inference that Gross had the requisite state of mind even with respect to the 2001 accounting errors, much less with respect to the errors that occurred years later.  At most, W1's allegations show that Gross disagreed with her interpretation of GAAP.  *See*, *e.g.*, First Am. Compl. Ex. D at 9 (noting that Gross told her that

revenue recognition could be "'aggressive' but not wrong").  As the Eighth Circuit has observed, "GAAP 'are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions.  [GAAP], rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.'"  *K-Tel*, 300 F.3d at 890 (quoting *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979)).

Plaintiffs also contend that the OSHA findings confirm that Ceridian knew about accounting misconduct.  First Am. Compl. ¶ 31.  This argument rests on OSHA's finding that an internal Ceridian investigation discovered intentional accounting misconduct by fourteen employees, including W1.  In making this argument, plaintiffs ignore that Ceridian subsequently terminated those employees, First Am. Compl. ¶ 6, which detracts from any inference of scienter.  Moreover, plaintiffs allege no specifics about those employees — not even their job titles.  These vague allegations do not add anything to plaintiffs' complaint.

For these reasons, the Court concludes that the new allegations in plaintiffs' first amended complaint are not sufficient to cure the deficiencies that led Judge Davis to dismiss the original consolidated complaint.  For that reason, defendants' motion to dismiss plaintiffs' § 78j(b) and Rule 10b-5 claim is granted.[5]

One additional matter requires comment.  Defendants argue that any inference of scienter in the first amended complaint is substantially undercut by the fact that the accounting violations did not all result in overstatements of Ceridian's financials.  Instead, according to defendants, and as illustrated in their Exhibit 43, some of these errors caused Ceridian to understate its

---

[5]Because the Court grants defendants' motion on the basis that the first amended complaint fails to allege facts giving rise to a strong inference of scienter, it is unnecessary to address defendants' argument concerning the allegations of loss causation.

performance, while others caused Ceridian to overstate its performance.  See Brown Decl. Ex.

43, Aug. 26, 2005 [Docket No. 34] (chart summarizing Ceridian's financial performance as

reflected in its original SEC filings and its restated filings).  Plaintiffs do not dispute that the

Court can rely on publicly filed financial statements embraced by the pleadings, but plaintiffs

argue that the Court cannot consider Exhibit 43 because it is neither publicly filed nor embraced

by the pleadings.  Defendants respond that Exhibit 43 is simply a convenient summary of its

public SEC filings.

The Court appreciates defendants' attempt to simplify its task, but the Court is

unfortunately not able to rely on Exhibit 43.  Under Federal Rule of Evidence 1006, parties may

submit a summary of the contents of voluminous documents, but such a summary is admissible

only if its proponent lays an adequate foundation and only if the person who prepared the

summary is available for cross-examination.  *See United States v. Grajales-Montoya*, 117 F.3d

356, 361 (8th Cir. 1997) (Rule 1006 requires that the summary be prepared by a witness

available for cross-examination, not by an attorney trying the case); *United States v. Robinson*,

774 F.2d 261, 276 (8th Cir. 1985) (upholding Rule 1006 summary where proponent laid

sufficient foundation).  Thus, despite the fact that defendants have submitted the underlying

documents whose contents Exhibit 43 purports to summarize, the Court will not be able to

consider Exhibit 43 itself.

As defendants note, the alternative to Exhibit 43 is to present the Court with "a lengthy

string cite of publicly filed 10Q's and 10K's to present the same information and support the

same argument."  Defs.' Reply 7 n.2 [Docket No. 69].  Indeed, the defendants could have done

just that — and submitted Exhibit 43 (or something like it) as an index to those documents.  But

defendants did not do so.  As these documents comprise hundreds of pages, the Court declines to undertake the task of sifting through them for information supporting defendants' argument.  *Cf. Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").

The Court does not doubt — and the plaintiffs do not seriously contest — that at least some of the accounting errors resulted in Ceridian *understating* its financial performance in certain quarters.  But the Court cannot assess the degree to which this undercuts any inference of scienter without calculating, on an error-by-error basis, the extent to which the error actually resulted in an understatement.  Given that this evidence could only bolster a conclusion that the Court has already reached without it, the Court will not undertake that rather daunting task.

### D.  Section 20 Claim

Plaintiffs also allege that all of the defendants are liable as controlling persons under § 20 of the 1934 Act, 15 U.S.C. § 78t.  As noted above, a § 78t claim is derivative of other claims under the 1934 Act, and, without a separate underlying violation of the Act, a § 78t claim necessarily fails.  *Deviries*, 805 F.2d at 329.  As plaintiffs have failed to state a claim under § 78j(b), their § 78t claim must be dismissed.

### E.  Leave to Amend

Plaintiffs ask the Court to grant them leave to amend their complaint a second time in the event that the Court grants defendants' motion to dismiss.  In general, leave to amend a complaint is freely given.  Fed. R. Civ. P. 15(a).  But plaintiffs have already had the opportunity to amend their complaint once, and plaintiffs do not indicate what, if any, amendments they

could make that would cure the deficiencies that have now caused two judges of this Court to

dismiss their complaints.  Leave to amend is therefore denied.  *Cerner*, 425 F.3d at 1086

(affirming denial of leave to amend where plaintiff failed to detail any potential amendment).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.    Defendants' motion to dismiss [Docket No. 55] is GRANTED.

2.    Plaintiffs' first amended complaint [Docket No. 54] is DISMISSED WITH

       PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  June  5 , 2007                                       s/Patrick J. Schiltz
                                                            Patrick J. Schiltz
                                                            United States District Judge